Daniel M. Hutchinson (SBN 239458)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008
dhutchinson@lchb.com

Rachel Geman (*pro hac vice*)
Jessica Moldovan (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  212.355.9500
Facsimile:  212.355.9592
rgeman@lchb.com
jmoldovan@lchb.com

Charles J. Stiegler, (SBN 245973)
STIEGLER LAW FIRM LLC
318 Harrison Ave., Suite 104
New Orleans, LA 70124
Telephone:  504.267.0777
Facsimile:  504.513.3084
Charles@StieglerLawFirm.com

Robert B. Landry III (*pro hac vice*)
ROBERT B. LANDRY III, PLC
5420 Corporate Boulevard, Suite 303
Baton Rouge, LA 70808
Telephone:  225.349.7460
Facsimile:  225.349.7466
rlandry@landryfirm.com

*Attorneys for Plaintiffs and the Proposed FLSA Collective*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY P. FOREMAN, et al., individually, and on behalf of persons similarly situated.<br><br>             Plaintiffs,<br>    vs.<br><br>APPLE, INC.<br><br>             Defendant. | **Case No.  3:22-cv-03902**<br><br>**DECLARATION OF DANIEL M. HUTCHINSON IN SUPPORT OF PLAINTIFF'S MOTION FOR APPROVAL OF FLSA COLLECTIVE ACTION SETTLEMENT** |

1.   I am a partner in of the law firm of Lieff, Cabraser, Heimann & Bernstein, LLP ("LCHB"), counsel of record for Plaintiffs in this matter.

2.   I have been one of the lawyers primarily responsible for the prosecution of Plaintiffs' claims on behalf of the proposed FLSA Collective.

3.   I am admitted to practice before this Court and am a member in good standing of the bar of the State of California; the United States District Court for the Central, Northern, and Southern Districts of California; the United States District Court for the Eastern District of Wisconsin; and the U.S. Courts of Appeals for the First, Second, Fourth, Seventh, Ninth, and Eleventh Circuits.

4.   I respectfully submit this declaration in support of Plaintiffs' Motion for FLSA Collective Action Settlement.

5.   I make these statements based on personal knowledge and would so testify if called as a witness at trial.

**Background and Experience**

6.   LCHB is a national law firm with offices in San Francisco, New York, Nashville, and Munich, Germany.  LCHB's practice focuses on complex and class action litigation involving employment, consumer, financial fraud, securities, product liability, environmental, and personal injury matters.  Attached hereto as **Exhibit 2** is a true and correct copy of LCHB's current firm resume, showing some of the firm's experience in complex and class action litigation.  This resume is not a complete listing of all cases in which LCHB has been class counsel or otherwise counsel of record.

7.   I graduated from Brown University in 1999.  I served as a judicial extern to the Honorable Martin J. Jenkins, U.S. District Court, Northern District of California, in 2004.  I graduated from the University of California, Berkeley, School of Law (Berkeley Law) in 2005.

8.   Since 2005, I have practiced with LCHB, where I became a partner in January 2011.  At LCHB, I have focused on representing plaintiffs in employment litigation (including discrimination and ERISA disputes), and financial and consumer fraud cases.

9.   In January 2021, I became the Chair of LCHB's Employment Practice Group.

**Employment Class and Collective Actions**

10.     As an LCHB partner, I have gained extensive experience in the litigation, trial, and settlement of complex employment class actions as Class Counsel in several cases.

a.     I served as co-lead counsel in *Vedachalam v. Tata Am. Int'l Corp.*, Case No. 3:06-cv-00963-CW (N.D. Cal.), a case on behalf of a certified class of over 13,000 foreign nationals working in the United States who were denied promised wages and benefits.  In July 2013, the court approved a $29.75 million nationwide class settlement.

b.     I served as co-lead counsel in *Strauch v. Computer Sciences Corporation*, Case No. 2:14-cv-00956 (D. Conn.), a collective and class action lawsuit alleging that CSC misclassified information technology support workers as exempt from overtime pay in violation of the federal Fair Labor Standards Act ("FLSA"), and California and Connecticut law.  On December 20, 2017 following a three-week trial, a jury found that CSC wrongly and willfully denied overtime pay.  On August 12, 2019, the court entered judgment in favor of the plaintiffs in the amount of $18,755,016.46.  Following appeals to the Second Circuit, the parties reached a settlement for a total payment of $17,600,000.

c.     I served as co-lead counsel in *Martin v. Bohemian Club*, Case No.  SCV-258731 (Sonoma Super. Ct.) and *Ulucan v. Bohemian Club*, Case No.  SCV-268056 (Sonoma Super. Ct.), wage-and-hour cases on behalf of seasonal workers.  On September 28, 2016 and October 20, 2021, the Court approved two class settlements totaling $10,535,000.

d.     I served as co-lead counsel in *Ellis v. Costco Wholesale Corp.*, No. 04-03341-EMC (N.D. Cal.), a case on behalf of two certified classes of female employees charging that Costco discriminates against women in promotions to management positions.  In May 2014, the Court approved a class settlement requiring changes to Costco's promotion process and establishing an $8 million settlement fund.

e.     I, along with other attorneys from my firm and co-counsel, represented plaintiffs who contracted with MHN Government Services, Inc., to provide counseling services through the Department of Defense to military members and their families. The case was venued in the United States District Court for the Northern District of California.  In April 2016, an

arbitrator approved a class settlement in the matter, which resulted in payment of $7,433,109.19 to class members.

f.      I served as co-lead counsel in *Le v. Walgreen Co.*, Case No. 8:18-cv-01548 DOC (ADSx) (C.D. Cal.), a wage-and-hour case alleging that Walgreens failed to provide off-duty rest breaks.  On July 21, 2021, the Court approved a class settlement totaling $6,800,000.

g.      I, along with other attorneys from my firm and co-counsel, served as co-lead counsel in *Holloway v. Best Buy*, No. C05-5056-PJH (N.D. Cal.), representing a class of current employees of Best Buy that alleged Best Buy stores nationwide discriminated against women, African Americans, and Latinos.  In November 2011, the Court approved a settlement of the class action in which Best Buy agreed to changes to its personnel policies and procedures that have enhanced the equal employment opportunities of the tens of thousands of women, African Americans, and Latinos employed by Best Buy nationwide.

11.     In addition to the foregoing, prior to my elevation to partner I participated in successful litigation of a wide variety of other complex federal and state employment class actions during my professional career.

a.      I, along with other attorneys from my firm and co-counsel, served as co-lead counsel in *Cruz v. U.S., Estados Unidos Mexicanos, Wells Fargo Bank, et al.*, No. 01-0892-CRB (N.D. Cal.), representing Mexican workers and laborers, known as Braceros ("strong arms"), who came from Mexico to the United States pursuant to bilateral agreements from 1942 through 1946 to aid American farms and industries hurt by employee shortages during World War II in the agricultural, railroad, and other industries.  A settlement required the Mexican government to provide a payment of approximately $3,500 to Braceros, or their surviving spouses or children.  In approving the settlement in February 2009, U.S. District Court Judge Charles Breyer stated:

> I've never seen such litigation in eleven years on the bench that was
> more difficult than this one… Notwithstanding all of these issues
> that kept surfacing ... over the years, the plaintiffs persisted…And,
> in fact, they achieved a settlement of the case, which I find
> remarkable under all of these circumstances.

- 4 -

b. I, along with other attorneys from my firm and co-counsel, served as co-lead counsel in *Barnett v. Wal-mart Stores, Inc.*, Case No. 01-2-24553-8 SEA (Sup. Ct. Wash.), a certified statewide wage and hour class action filed on behalf of hourly employees challenging the company's failure to compensate its hourly employees for missed rest and meal breaks and off-the-clock work in stores throughout Washington state. This case settled for $35 million, as well as injunctive relief governing company policies.

c. I, along with other attorneys from my firm and co-counsel, served as one of plaintiffs' lead counsel in *Amochaev v. Citigroup d/b/a Smith Barney*, Civ. No. 05-1298-PJH (N.D. Cal.), a gender discrimination class action on behalf of female Financial Advisors employed by Smith Barney that resulted in a settlement involving comprehensive injunctive relief and over $33 million in monetary relief.

**Consumer Protection Class Actions**

12. As an LCHB partner, my practice has focused on a number of nationwide consumer protection class actions.

a. I, along with other attorneys from my firm, served as chair of the Plaintiffs Executive Committee in, *In re: Bank of Am. Credit Protection Mktg. & Sales Practices Litig.*, 3:11-md-02269-TEH (N.D. Cal.), multi-district litigation ("MDL") against Bank of America and FIA Card Services, challenging the imposition of charges for so-called "payment protection" or "credit protection" programs. In January 2013, the Court approved a $20 million settlement including required practice changes.

b. In September 2012, the court approved a $24.15 million class settlement against Sallie Mae, the then-largest monetary settlement in the history of the TCPA. *See Arthur v. Sallie Mae, Inc.*, No. C10-0198 JLR, 2012 U.S. Dist. LEXIS 132413 (W.D. Wash. Sept. 17, 2012).

c. I, along with other attorneys from my firm and co-counsel, served as counsel in *Rose v. Bank of Am. Corp.*, 5:11-cv-02390-EJD (N.D. Cal.), and *Duke v. Bank of Am., N.A.*, 5:12-cv-04009-EJD (N.D. Cal.). On August 29, 2014, the Court approved a $32,083,905

class settlement, which surpassed the *Sallie Mae* settlement as the largest monetary settlement in the history of the TCPA.

           d.      I, along with other attorneys from my firm and co-counsel, served as counsel in *In re Capital One Telephone Consumer Protection Act Litigation*, Master Docket No. 1:12-cv-10064 (N.D. Ill.).  On February 12, 2015, the court approved a $75,455,098.74 class settlement.

           e.      I, along with other attorneys from my firm and co-counsel, served as counsel in a series of TCPA class action lawsuits against Wells Fargo.  Court-approved nationwide class settlements in six actions total over $95 million.  *Cross v. Wells Fargo Bank N.A.*, Case No.: 1:15-cv-01270-RWS (N.D. Ga. Feb. 13, 2017) ($30,446,022.75); *Markos v. Wells Fargo Bank, N.A.,* Case No. 1:15-cv-01156 (N.D. Ga. Jan. 30, 2017) ($16,417,496.70); *Luster v. Wells Fargo Bank, N.A.,* Case No. 1:15-cv-01058 (N.D. Ga. Nov. 8, 2017) ($14,834,058); *Franklin v. Wells Fargo Bank N.A.*, Case No.: 14-cv-2349 (S.D. Cal. Jan. 29, 2016) ($13,859,103.80); *Prather v. Wells Fargo Bank, N.A.,* Case No. 1:15-cv-04231 (N.D. Ga. Aug. 31, 2017) ($2,075,071.80); *Dunn v. Wells Fargo Bank, N.A.*, Case: 1:17-cv-00481 (N.D. Ill. Dec. 10, 2019) ($17,850,000).

           f.      I, along with other attorneys from my firm and co-counsel, served as counsel in *Wilkins v. HSBC Bank Nev., N.A.*, Case No. 14-cv-190 (N.D. Ill.).  On February 27, 2015, the court approved a $39,975,000 class settlement.  In approving the settlement Judge James F. Holderman commented on "the excellent work" and "professionalism" of LCHB and its co-counsel in securing a $39.975 million non-reversionary cash settlement in that TCPA class action.

           g.      I, along with other attorneys from my firm and co-counsel, served as counsel in *Jenkins v. National Grid USA, et al.*, Case No. 2:15-cv-01219-JS-GRB (E.D.N.Y.).  On June 24, 2022, the court approved a $38.5 million cash settlement with significant and extensive policies and procedures designed to make it easier for National Grid's new, current, and former customers to prevent National Grid from robo-calling them.

h.      I, along with other attorneys from my firm and co-counsel, served as counsel in *Buchanan v. Sirius XM Radio, Inc.*, Case 3:17-cv-00728-D (N.D. Tex.).  On January 28, 2020, the court approved class settlement comprising of a $25 million common fund and non-monetary relief worth approximately $6.5 million.

i.      I, along with other attorneys from my firm and co-counsel, served as counsel in *Brown v. DirecTV, LLC*, No. 13-cv-1170-DMG (C.D. Cal.).  In that case, the plaintiffs obtained class certification, *see Brown v. DirecTV, LLC*, No. CV 13-1170 DMG (EX), 2019 WL 1434669 (C.D. Cal. Mar. 29, 2019) (certifying two nationwide classes), and partial summary judgment.  *See Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590 (C.D. Cal. 2021); *Brown v. DirecTV*, 2022 WL 1591325 (C.D. Cal. Mar. 31, 2022).  On March 3, 2023, the court approved a $17 million cash settlement.

j.      I, along with other attorneys from my firm and co-counsel, served as counsel in *Connor v. JPMorgan Chase Bank*, Case No. 10 CV 1284 DMS BGS (S.D. Cal. Mar. 12, 2012), a nationwide TCPA class action.  On February 5, 2015, the court approved a $11,665,592.09 cash settlement.

k.      I, along with other attorneys from my firm and co-counsel, served as counsel in *Thomas v. Dun & Bradstreet Credibility Corp.*, Case No. 2:15-cv-03194-BRO-GJS (C.D. Cal.).  On March 22, 2017, the court approved a $10.5 million cash settlement for a class of small business owners who received telemarketing calls.

l.      I, along with other attorneys from my firm and co-counsel, served as counsel in the nationwide TCPA class actions *Bradley v. Discover Financial Services,* Case No. 4:11-cv-5746-YGR (N.D. Cal.), and *Steinfeld  v. Discover Financial Services*, Case No. 3:12-cv-01118-JSW (N.D. Cal.).  In March 2014, the court approved an $8.7 million class settlement.

m.      I, along with other attorneys from my firm and co-counsel, serve as counsel in *Ossola v. American Express Co., et al.*, Case No. 1:13-CV-4836 (N.D. Ill.).  On December 2, 2016, the court approved two separate class settlements of $8.25 million and $1 million each.

n.     I, along with other attorneys from my firm and co-counsel, serve as counsel in *Smith v. State Farm Mutual Auto. Ins. Co., et al.*, Case No. 1:13-cv-02018 (N.D. Ill.).  On December 8, 2016, the court approved a $7 million settlement.

o.     I, along with other attorneys from my firm and co-counsel, serve as counsel in *Karpilovsky v. All Web Leads, Inc.*, No. 17 C 1307, 2018 WL 3108884 (N.D. Ill. June 25, 2018) (certifying nationwide class).  On August 8, 2019, the court approved a $6.5 million settlement.

p.     I, along with other attorneys from my firm and co-counsel, serve as counsel in *Pine v. A Place For Mom, Inc.*, Case No. Case 2:17-cv-01826-TSZ (W.D. Wash.). On January 11, 2021, the court approved a $6 million settlement.

q.     I, along with other attorneys from my firm and co-counsel, served as counsel in *Rice-Redding v. Nationwide Mutual Automobile Ins. Co.*, Case No. 1:16-cv-03634 (N.D. Ga.).  On August 1, 2019, the court approved a $5 million settlement.

r.     I, along with other attorneys from my firm and co-counsel, served as counsel in *Bayat v. Bank of the West*, Case 3:13-cv-02376-EMC (N.D. Cal.).  On April 15, 2015, the court approved a $3,354,745.98 settlement.

s.     I, along with other attorneys from my firm and co-counsel, served as counsel in *Grogan v. Aaron's Inc.*, Case No. 1:18-cv-02821-AT (N.D. Ga.).  On October 8, 2020, the court approved a $2.175 million settlement.

t.     I, along with other attorneys from my firm and co-counsel, served as counsel in *Woodrow v. Sagent Auto LLC*, Case No. 2:18-cv-01054-JPS (E.D. Wis.).  On Nov. 19, 2019, the court approved a $1.75 million settlement.

u.     I, along with other attorneys from my firm and co-counsel, served as counsel in *Wannemacher v. Carrington Mortgage Services LLC*, Case No. 8:12-cv-02016-FMO-AN (C.D. Cal.).  On December 22, 2014, the court approved a $1.035 million settlement.

v.     I was co-lead counsel in *Yarger v. ING Bank, fsb*, Civil Action No. 1:11-cv-00154-LPS (D. Del.), representing consumers who charge that ING Direct breached its promise to allow them to refinance their home mortgages for a fixed flat fee of $500 or $750, and

instead charged a higher fee of one-monthly mortgage payment for refinancing.  In 2012, the court certified a class of consumers in ten states who purchased or retained an ING mortgage during the class period.  On October 7, 2014, the court approved a $20,350,000 class settlement.

13.     Prior to my elevation to partner, I participated in successful litigation of a wide variety of other complex federal and state consumer class actions during my professional career.  Class action cases I have successfully prosecuted to judgment or settlement, in addition to the foregoing, include: *Sutter Health Uninsured Pricing Cases*, Case No. J.C.C.P. 4388 (Sacramento Super. Ct.) (lead class counsel in consumer class action that resulted in over $275 million settlement and comprehensive pricing and collections policy changes for uninsured patients across all Sutter hospitals); *Catholic Healthcare West Cases*, Case No. J.C.C.P. 4453 (San Francisco County Super. Ct.) (lead class counsel in consumer class action that resulted in over $423 million settlement and pricing and collections policy changes for uninsured patients across all CHW hospitals); *Scripps Health Cases*, Case No. IC859468 (S.D. Super. Ct.) (lead class counsel in consumer class action that resulted in over $73 million settlement and pricing and collections policy changes for uninsured patients at Scripps hospitals); *John Muir Uninsured Healthcare Cases*, Case No. J.C.C.P. 4494) (Contra Costa County Super. Ct.) (lead class counsel in consumer class action that resulted in over $113 million settlement and pricing and collections policy changes for uninsured patients at John Muir hospitals); *Cincotta v. California Emergency Physicians Medical Group*, No. 07359096 (Cal. Supr. Ct.) (lead class counsel in consumer class action that resulted in over $27 million settlement and pricing and collections policy changes, including complete debt elimination—100% cancellation of the bill, for nearly 100,000 uninsured patients who alleged they were charged excessive and unfair rates for emergency room service across 55 hospitals throughout California).

**Antitrust and Securities Actions**

14.     I have also served as Class Counsel in several antitrust and other financial fraud actions.

a.     I served, with my co-counsel, as Lead Counsel in *Haley Paint Co. v. E.I. Dupont De Nemours and Co. et al.*, No. 10-cv-00318-RDB (D. Md.),  a certified nationwide class

action lawsuit on behalf of direct purchasers of titanium dioxide charging that defendants conspired to fix, raise, and maintain the price of titanium dioxide in the United States.  In November 2013, the court approved class settlements with four defendants totaling $163.5 million.

15.    As an LCHB associate, I played a significant role in several antitrust and securities actions, including:

a.    I , along with other attorneys from my firm and co-counsel, served as Plaintiffs' counsel in *Quantegy Recording Solutions, LLC, et al. v. Toda Kogyo Corp., et al.*, No. C-02-1611 (PJH), antitrust litigation against manufacturers, producers, and distributors of magnetic iron oxide ("MIO").   In August 2006 and January 2009, the Court approved settlements totaling $6.35 million.

b.    I have also successfully litigated complex individual actions, including *Alaska State Department of Revenue v. America Online*, No. 1JU-04-503 (Alaska Supr. Ct.) (co-counsel in securities fraud action brought by the Alaska State Department of Revenue, Alaska State Pension Investment Board and Alaska Permanent Fund Corporation that settled for $50 million in December 2006).

16.    Together, the cases described above have resulted in court-approved class and collective action settlements, with a combined total recovery for class members exceeding well over $850 million in cash, plus other relief.  LCHB's experience in these cases, and my experience in particular, has provided LCHB and me with expertise in the legal, factual, management, notice, and administration issues that characterize these types of class actions.

**Other Experience and Awards**

17.    I have received several awards and honors for my litigation efforts.

18.    In 2016, I was named as one of the Daily Journal's Top 40 Under 40 leading lawyers in California.

19.    In 2014, Law360 recognized me as one of six of the nation's top employment lawyers under 40.  *See* Daniel Siegal, *Rising Star: Lieff Cabraser's Daniel Hutchinson* (Apr. 22, 2014), *available at* http://www.law360.com/employment/articles/530612; *Law360 Names Top*

*Attorneys Under 40* (Apr. 11, 2014), *available at* http://www.law360.com/employment/articles/ 525943.

20.     In 2012, The Recorder named me as one of "50 Lawyers on the Fast Track."

21.     In 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, and 2023, I was recognized as a Northern California Super Lawyer and, from 2009 to 2012, was named as a Northern California Super Lawyer Rising Star.

22.     In addition to being an active litigator, I have long been involved in many educational and legal groups, including the Lawyers' Committee for Civil Rights of the San Francisco Bay Area (Board Chair, 2015; Board Chair-elect, 2014; Board Secretary, 2011-2013; Member of the Board of Directors, 2009-2018); Bar Association of San Francisco Cybersecurity and Privacy Law Section (vice chair, 2015-2018); American Bar Association (Section of Labor & Employment Law Leadership Development Program); Association of Business Trial Lawyers (Leadership Development Committee, 2008-2010); National Employment Lawyers Association; California Employment Lawyers Association; Bar Association of San Francisco; Consumer Attorneys of California; and National Bar Association.

23.     I am a frequent speaker on class action and employment law topics, including at events sponsored by the American Bar Association's Section of Labor and Employment Law, the Consumer Attorneys of California, the Mason Judicial Education Program, the Impact Fund, the National Employment Lawyers Association, the Practising Law Institute, and the UCLA School of Law.  In March 2014, I provided a CLE presentation on arbitration and class actions to approximately 75 California state and federal court judges through the Judicial Education Program provided by the Law & Economics Center at George Mason University School of Law.

24.     I have published and presented papers on race and gender class actions under Title VII, including "Ten Points from Dukes v. Wal-Mart Stores, Inc.," 20(3) CADS Report 1 (Spring 2010); "Pleading an Employment Discrimination Class Action" and "EEO Litigation: From Complaint to the Courthouse Steps," ABA Section of Labor and Employment Law Second Annual CLE Conference (2008); and "Rule 23 Basics in Employment Cases," Strategic Conference on Employment Discrimination Class Actions (2008).

## I.      Overview of LCHB's Efforts in this Action

**Pre-Filing Investigation and Informal Discovery**

25.     Beginning in early 2022, Plaintiffs' Counsel thoroughly researched Apple's practices and Plaintiffs' legal claims prior to filing suit by, among other things, interviewing several Collective members, reviewing Collective members' pertinent document and information, including their payroll records, and researching relevant FLSA case law and regulations.  This information was critical to Plaintiffs' Counsel's understanding of the nature of the problem, the scope of potential damages and remedies, and the potential risks and benefits of continued litigation.

26.     Through these efforts, Plaintiffs' Counsel identified two core issues:  (1) Apple's overtime pay rate each month did not include the commissions that Apple Solutions Consultants earned that month and (2) Apple did not pay all Apple Solutions Consultants for travel time between required meetings and their worksites.

**Pre-Filing Negotiation**

27.     May 3, 2022, Plaintiffs' Counsel informed Apple of Plaintiff Foreman's intention to file a collective action lawsuit on behalf of himself and all other similarly situated Apple Solutions Consultants for legal and equitable relief.  Plaintiffs' Counsel proposed discussing an early resolution before a great deal of time and expense was incurred by any party in litigating this matter.  Plaintiff's counsel communicated that if "Apple has any interest in discussing the possibility of a resolution at this point and/or reaching a tolling agreement to discuss this matter further, please contact [Plaintiff's counsel] by no later than May 17, 2022."

28.     Over the course of the next several weeks, the parties participated in telephonic and written exchanges.  During these sessions, the parties discussed their relative views of the law and the facts.

29.     Plaintiffs' Counsel shared significant informal discovery, including Plaintiff Foreman's wage statements confirming that Apple failed to pay the required regular rate of pay.

30.     For its part, Apple declined to provide any evidence to rebut Plaintiff's factual contentions.

31.     The parties discussed the possibility of entering into a litigation standstill agreement and/or a tolling agreement providing to discuss an early resolution of the claims of Plaintiff Foreman and all other similarly-situated Apple Solutions Consultants.  Ultimate, Apple declined to enter into any such agreement and declined to engage with Plaintiff in any settlement discussions.

**The Litigation**

32.     On July 1, 2022, Plaintiff Foreman therefore filed his Collective Action Complaint.  Dkt. No. 1.  Plaintiff Foreman alleged that Apple (1) improperly calculated the regular rate of pay for overtime wages and (2) failed to include mandatory travel time.  *Id.* at ¶¶ 2-3.  Plaintiff further alleged that Apple's conduct violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*  *Id.* at ¶ 4.

33.     On August 3, 2022, Apple answered the Collective Action Complaint and set forth eleven affirmative defenses.  Dkt. No. 15.

34.     As to Plaintiff Foreman's core allegation that Apple "did not incorporate commission payments" when "calculating Foreman's and Plaintiffs' regular rate for purposes of determining overtime pay," Dkt. No. 1 at ¶ 21, Apple answered that "Apple is without sufficient knowledge or information sufficient to form a belief about the truth of the remaining allegations." Dkt. No. 15 at ¶ 21.

35.     Apple admitted instructing Plaintiff to "to clock in for work meetings," but denied failing to pay for mandatory travel when Plaintiff commuted from the location he attended the meetings (i.e., his home) to his work site.  *See* Dkt. No. 15 at ¶¶ 24-29.

36.     Apple, however, was still unwilling or unable to provide any evidentiary support for its factual contentions.  *See also* Joint Case Management Statement, Dkt. No. 34 ("Apple has never attempted to rebut the basic facts supporting Plaintiffs' claims.").

37.     The parties therefore remained sharply divided on the merits of this action.

38.     On August 31, 2022, Plaintiff Foreman filed his First Amended Complaint adding California Plaintiff Connor Sleighter and six causes of action under California law for failure to pay overtime wages (Cal. Labor Code §§ 510, 1194); failure to furnish accurate wage statements

1  (*id.* §§ 226, 226.3); failure to timely pay all wages earned (*id.* §§ 204, 210); violating California's

2  Unfair Competition Law (California Business & Professions Code §§ 17200, *et seq.*); and

3  violating California's Private Attorneys General Act ("PAGA").  *See* First Am. Compl. ("FAC"),

4  Dkt. No. 26, ¶¶ 7-10, 44-45, 80-104.

5       39.    On September 2, 2022, Plaintiff Amy Pflughaupt filed her Consent to Join

6  Collective Action.  Dkt. No. 28 & 28-1.

7       40.    On September 16, 2022, Apple filed a motion to compel arbitration for Plaintiff

8  Sleighter, claiming that Plaintiff Sleighter and Apple executed an arbitration agreement that

9  required arbitration of his claims. *See* Mot. To Compel Arbitration p. 1, Dkt. No. 32.  Apple

10  asked the Court to order Plaintiff Sleighter to submit his claims to individual arbitration and to

11  dismiss all California claims.  *Id.* at 9.

12       41.    On November 22, 2019, the Court compelled Plaintiff Sleighter's claims to

13  arbitration.  *See* Order Granting Mot. To Compel Arbitration p. 1-2, Dkt. No. 44.  The Court held

14  that since "there is no other named plaintiff for the [California] class action claims, those claims

15  are dismissed . . . [and the] FLSA collective action will go forward."  *Id.*

16       42.    This action—and the parties' Settlement—therefore only addressed FLSA claims,

17  not any claims under California law.

18  **The Discovery**

19       43.    The parties engaged in extensive discovery regarding the FLSA claims.

20       44.    On September 7, 2022, Plaintiff sent Apple counsel a set of twenty-six Requests

21  For Production ("RFPs").  Plaintiffs sought, among other things, "COMPUTER-READABLE

22  FORMAT spreadsheets, databases, AND/OR documentation reflecting [identifying and

23  compensation] information for ALL COLLECTIVE MEMBERS," "ALL DOCUMENTS

24  RELATING TO statements by DEFENDANT payment to CLASS MEMBERS AND

25  COLLECTIVE MEMBERS RELATING TO" travel time and regular rate of pay and

26  timekeeping, meeting and compensation policies.

27       45.    Apple ultimately responded with approximately 17,856 of pages of documents.

28       46.    On September 23, 2022, Apple sent Plaintiff a set of twenty RFPs.

47.     In response, Plaintiff and Opt-Ins provided hundreds of pages of relevant pay statements, time cards and communications.

48.     Both parties also sent and responded to interrogatories.

49.     Apple deposed Plaintiff Foreman and Opt-Ins Pflughaupt and Morgan.

50.     Throughout this time, the parties' telephonic and written meet and confers regarding discovery issues were protracted and contentious.  Apple took extreme positions that would not be appropriate for any litigant, but particularly a sophisticated one such as Apple.  For example, Apple produced documents without any metadata and spreadsheets and multipage PDF documents.  Addressing such unnecessary discovery issues required an inordinate amount of my time and my co-counsel's time.

**The First Mediation**

51.     On or around November 9 2022, the parties agreed to participate in a mediation session before experience FLSA mediator David Rotman on January 30, 2023.

52.     Plaintiffs insisted that Apple provide data sufficient to calculate potential damages for the FLSA Collective.

53.     On December 27, 2022, Apple produced a representative sample of ASCs' pay data production, including over 15,000 pages of earnings statements and records of ASCs' home addresses and store locations.

54.     On January 12, 2022, Apple made a supplemental production regarding ASC's pay and travel distances to their jobsites.

55.     Plaintiff's FLSA wage and hour expert analyzed the data to assess Apple's potential liability and Plaintiff's and Opt Ins' potential damages.

56.     This analysis greatly clarified—and narrowed—the parties' factual disputes.  In particular, Apple's production of comprehensive earning statements on the eve of mediation confirmed that it *retroactively* paid a regular rate to Solutions Consultants that included earned commissions between one to two pay periods *after* the Solutions Consultants performed that work.  This shifted the question from whether Solutions Consultants were still owed unpaid overtime wages including earned commissions, to whether Solutions Consultants are owed

liquidated damages because Apple allegedly did not make these retroactive overtime payments in the same pay period that Solutions Consultants earned these commissions.

57.    This analysis also subsequently confirmed that Apple paid travel time for certain Solutions Consultants, including all persons who held the title of Lead Solutions Consultant.  This also narrowed the scope of Plaintiff's proposed FLSA collective action claims.

58.    On January 30, 2023, the parties participated in a full-day mediation session before Mr. Rotman.

59.    The parties submitted detailed mediation briefs to Mr. Rotman, setting forth their respective views on the strengths of their cases.  However, the parties did not exchange mediation briefs, as Apple was unwilling to do so.

60.    During the day-long session, the parties discussed their relative views of the law and the facts with Mr. Rotman.  Counsel exchanged a series of counterproposals.

61.    At all times, the parties' settlement negotiations were highly adversarial, non-collusive, and at arm's length.

62.    The mediation resulted in an impasse.

63.    The parties returned to litigation in preparation for their respective motions for summary judgment.

**The Second Mediation**

64.    Although the first session did not result in a settlement, the parties continued to negotiate and share analyses and arguments regarding the merits of their respective positions with Mr. Rotman.

65.    In late March 2022, the parties agreed to participate in a second mediation session with Mr. Rotman on April 17, 2023.

66.    As with the prior mediation, the parties prepared and submitted detailed mediation briefs setting forth their respective views on the strengths of their cases.

67.    However, this time, the parties exchange their mediation briefs with each other.

68.    Through this process, Plaintiffs' Counsel learned for the first time the specific factual contentions that Apple believed supported its defenses.

69.     The mediation resulted in an impasse.  However, Mr. Rotman remained engaged with the parties and presented a mediator's proposal.

70.     Both parties ultimately accepted the mediator's proposal on April 21, 2023—the same day that Plaintiffs' motion for summary judgment was due.

71.     The parties jointly requested a stay of all Court deadlines to provide them with time to draft and finalize settlement documentation.  *See* Joint Notice of Settlement, Dkt. No. 53.

72.     Through hard-fought, highly adversarial, non-collusive, and at arm's length negotiations lasting over three months, the parties ultimately agreed to the Settlement no presented for Court approval.

**The Settlement Agreement**

73.     The Settlement recognizes the risks and significant expense of continued litigation for all parties.

74.     A copy of the parties' Stipulation of Collective Action Settlement and Release is attached hereto as **Exhibit 1**.  This $500,000 settlement will cover approximately 230 Opt-In claims within the relevant period (July 1, 2019 through April 17, 2023) relating to calculation of the regular rate and off-the-clock travel time.  Plaintiff's expert calculated potential liquidated damages for late overtime payments at approximately $216,513.30.  Plaintiff's expert calculated damages for unpaid travel time at approximately $2,906.20 per collective member, or $668,426.87 in total.  If awarded, liquidated damages would add another $668,426.87 to that amount.  Thus, the $500,000 settlement amount is approximately 73% of the best possible recovery of actual damages or 37% of the best possible recovery if liquidated damages are included.  This settlement amount is therefore reasonably related to the "true settlement value" considering the risk that both parties would have faced moving forward with litigation and the tenuous nature of the regular rate claim.

75.     The parties agreed to Simpluris as the settlement administrator.  The parties selected Simpluris after a competitive bidding process.  I have had positive experiences working with Simpluris on the *Bohemian Club* and *MHN* settlements mentioned above in Paragraphs 10.c. and 10.e.

**The Parties' Settlement Resolves a Series of Disputed Factual and Legal Issues**

76.     The Parties' Settlement resolves a series of disputed factual and legal issues. Apple strenuously maintained that Plaintiff and the Opt-Ins were correctly paid overtime and that overtime true-up payments were paid in a reasonable amount of time.  Apple maintained that it complied with Plaintiff's authorities by paying ASCs' overtime wages on time and adjusting those payments to account for commissions payments as soon as practicable.  Apple maintained that its retroactive overtime payments including commissions were not "late" because Apple could not calculate the ASCs' commissions until it received data from store sales and online sales, noting that Plaintiff's position was "defied by the practical reality that it takes time to calculate, validate, and process commission payments for hundreds of Lead ASCs and ASCs in a multinational corporation."  Apple claimed that adjustments must be made for, among other things, returns.  To support its positions, Apple produced over 15,000 pages of wage statements from members purporting to show that it timely paid all overtime payments, and deposed Plaintiff and two Opt-Ins (focusing on their duties, wage statements, knowledge of policies and work behaviors).

77.     The travel time issue contained many factual disputes as well.  Apple created a model to approximate the "frequency, compensability, and value of the travel time claim."  Based on this model, Apple maintained that only a small fraction of the time entries could be consistent with Plaintiff's allegations.  Even for those time entries, Apple argued that there are reasons why the time might not be compensable, for example, because ASC's had the option of taking the meeting from any private space, including his assigned store.  Notably, Apple argued that ASCs' time records contradicted Plaintiff's testimony.

78.     Apple also maintained that the facts relevant to Plaintiff's commissions calculations and travel time for Plaintiff and Opt Ins were highly individualized in nature and not suitable for collective action treatment.   For example, Apple argued that Opt-In Pflughaupt's deposition testimony suggested that each region operated under different practices, including with respect to the scheduling of ASC meetings/calls."

79.     In addition to disputing liability and collective treatment, the parties contested the measure of damages, both in terms of the hours worked by Opt-Ins, distance travelled by the Opt-Ins and the appropriate method for calculating unpaid overtime.  Apple argued that, even if Plaintiff prevailed on all his claims, any damages based on its time records would be *de minimis*.

**Contingent Nature of Action**

80.     This matter has required LCHB to spend time on this litigation that could have been spent on other matters.  At various times during the litigation of this class action, this lawsuit has consumed my time, along with the time of partner Rachel Geman; associates Jahi Liburd and Jessica Moldovan; and paralegal Elizabeth (Betsy) Keenley.

81.     Such time could otherwise have been spent on other fee-generating work.  Because LCHB undertook representation of this matter on a contingency-fee basis, LCHB shouldered the risk of expending substantial costs and time in litigating the action without any monetary gain in the event of an adverse judgment.

82.     This action was especially risky, given Apple's potential factual and legal defenses described in the prior section.  Had the Court ruled in Apple's favor, judgment may have been entered in favor of Apple, a collective may never have been certified, and Collective Members would not have recovered the monetary relief that this Settlement provides.

83.     If not devoted to litigating this action, from which any remuneration to LCHB is wholly contingent on a successful outcome, the time that LCHB's attorneys and staff spent working on this case could and would have been spent pursuing other potentially fee generating matters.

     **A.**     **LCHB's Lodestar**

84.     LCHB has maintained contemporaneous time records since the commencement of this action.  Through the date of Settlement on April 21, 2023, LCHB has worked a total of **478.80** hours in this action on matters that directly contributed to the Settlement.  This time results in a total lodestar of **$358,073.50**.

85.     This reported lodestar **excludes** all time spent on matters that did not directly contribute to the settlement.  The excluded time includes:  (1) all time spent investigating,

researching, and litigating non-FLSA, state-law claims; (2) all time spent investigating, researching, and litigating Apple's motion to compel arbitration; and (3) all time spent negotiating and briefing the Settlement after April 21, 2023. This also excludes all time expended by timekeepers who billed less than ten hours on this matter. The excluded time totals of **122.80** hours, which results in an additional lodestar of **$162,514.50.**

86.    All attorneys and staff at LCHB are instructed to maintain contemporaneous time records reflecting the time spent on this and other matters. The regular practice at LCHB is for all attorneys and staff to keep contemporaneous time records, maintained on a daily basis, and describing tasks performed in 0.1 hour increments. Firm policy requires all staff to enter their time into an electronic timekeeping system on a daily basis. I review and audit the time on a regular basis.

87.    LCHB's lodestar will grow slightly as we continue to finalize the settlement process and close the litigation. The claims period will last for several months, and LCHB's commitment of time and labor to this case will continue until (and likely beyond) that date. LCHB will continue to assist Collective members with individual inquiries, will oversee the claims resolution process. Judging by previous experiences, these responsibilities will require many hours of work by Plaintiffs' Counsel over the coming months.

### B.    LCHB's Costs

88.    LCHB maintains all books and records regarding costs expended on each case in the ordinary course of business, which books and records are prepared from expense vouchers and check records. I have reviewed the records of costs expended in this matter.

89.    LCHB has incurred **$30,597.82** in expenses, which includes LCHB's proportional contributions to the fees associated with the two full-day mediation sessions ($19,875.00); expert data analysis fees ($4,325.00); travel costs ($1,769.56) associated with, among other things, the Plaintiffs' depositions; other hard costs such as research on Westlaw; filing fees; process service; Federal Express or messenger charges; and internal costs such as printing, copying, and telephone charges.

## C.      LCHB Billing Rates

90.      The following table lists the LCHB attorneys and professional personnel and their current hourly rates.

| Name and Position | Rate |
|---|---|
| Rachel Geman<br>Partner at LCHB<br>Columbia Law School, 1997 | $1,080.00 |
| Daniel M. Hutchinson<br>Partner at LCHB<br>University of California, Berkeley School of Law (Berkeley Law), 2005 | $950.00 |
| Jessica A. Moldovan<br>Associate at LCHB<br>New York University School of Law, 2017 | $615.00 |
| Jahi Liburd<br>Associate at LCHB<br>Brooklyn Law School, 2022 | $470.00 |
| Elizabeth (Betsy) Keenley<br>Senior Paralegal at LCHB<br>B.A., University of California, Santa Barbara, 2009 | $510.00 |

91.      LCHB sets its rates for attorneys and staff members based on a variety of factors, including, among others: the experience, skill and sophistication required for the types of legal services typically performed; the rates customarily charged in similar matters; and the experience, reputation and ability of the attorneys and staff members.

92.      Below are brief backgrounds and accolades of current attorneys from my firm who spent more than ten hours on this case.

        a.      Rachel J. Geman

                i.      Rachel Geman is a partner in LCHB's Employment Practice Group and the head of LCHB's Whistleblower/False Claims Act Practice Group. She has 20 years of experience representing employees and other plaintiffs in complex plaintiff-side litigation. Rachel is an AV-Preeminent rated attorney. She is the Co-Chair of the Workplace and Occupational Health & Safety Committee of the ABA's Labor and Employment Section and a past Co-Chair of the Equal Employment Opportunity Committee. She is a former Board Member of the New York Chapter of the National Employment Lawyers' Association, and chaired its Amicus Committee

from approximately 2019 to 2022. Rachel was selected for inclusion by peers in The Best Lawyers in America in field of "Employment Law – Individuals" for 2012-2023. She has been one of the Lawdragon's Leading 500 Plaintiffs' lawyers since 2018, in the categories of consumer (2022-2023), financial (2021-2023), and employment/civil rights (2018-2022). In addition, Rachel was awarded the Distinguished Honor Award by the United States Department of State in 2001.

b.  Jessica A. Moldovan

i.  Jessica A. Moldovan is an associate at LCHB, where she focuses on employment, antitrust, and sexual abuse cases. She is also an adjunct professor of law at New York University (NYU) School of Law, from which she graduated cum laude in 2017. Prior to her work at LCHB, she was a Research Fellow at the Meltzer Center for Diversity, Inclusion, and Belonging at NYU Law and served as a law clerk to the Honorable Cheryl Ann Krause of the United States Court of Appeals for the Third Circuit and the Honorable Allyne R. Ross of the United States District Court for the Eastern District of New York. In 2023, she was recognized as a Rising Star for New York (Super Lawyers).

c.  Jahi Liburd

i.  Jahi Liburd is an associate at LCHB, where he focuses on securities fraud cases. He recently graduated from Brooklyn Law School. During his time at law school, he interned for the Honorable Donald L. Graham of the United States District Court for the Southern District of Florida and interned at the Enforcement Division of the United States Securities & Exchange Commission New York Regional Office.

93.  These rates are my firm's current commercial billing rates and are supported by our extensive and specialized experience in these types of cases and recognized expertise. LCHB's rates reflect the market rates in the markets within which LCHB's primary offices are located and from which this matter has been handled: San Francisco and New York.  LCHB's hourly rates were negotiated with and are paid on an hourly basis by sophisticated commercial entities.  LCHB does not bill at different rates for different clients or different types of cases.

94.     My firm's current rates, including my rates, or comparable firm rates from prior years, have been approved in class cases subject to Court approval, and are the rates I charge paying clients. The rates set above are supported by extensive and specialized experience in cases of this complexity. Our rate structure has been approved recently by numerous courts. *See, e.g., Cottle v. Plaid Inc.*, No. 4:20-cv-03056-DMR, ECF No. 184 at *18-19 (N.D. Cal., July 20, 2022) (specifically approving LCHB's 2022 billing rates, including for Rachel Geman); *In re Intuit Data Litig.*, No. 15-CV-1778-EJD-SVK, 2019 WL 2166236, at *1 (N.D. Cal. May 15, 2019) (granting fees supported by LCHB's 2019 billing rates); *Ellis v. Google, LLC,* No. CGC-17-561299 (San Francisco Super. Ct. Oct. 25, 2022) (granting fees supported by LCHB's 2022 billing rates); *Cuenca v. Kaiser Foundation Health Plan, Inc*., No. RG20065123 (Alameda County Super. Ct. Oct. 28, 2021) (approving 2021 billing rates).

## D.     Careful Assignment of Work

95.     Tasks were delegated appropriately among partners, associate attorneys, paralegals, and other staff according to their complexity.  The work performed by associate attorneys and paralegals was work that required sufficient knowledge of legal concepts and that I or another partner would have had to perform absent such assistance.  The paralegals identified were all qualified to perform substantive legal work based on their training and past experience working for attorneys, including attorneys outside of LCHB's offices.  I and other Plaintiffs' Counsel therefore made every effort to litigate this efficiently by reducing duplication of effort and assigning work to the lowest billing timekeepers where feasible.

96.     The following chart details the time each of these attorneys and the litigation assistants worked on this case and their contribution to LCHB's total lodestar:

| Attorney/Staff | Total Hours | % of Total Hours | Billing Rate | Lodestar |
|---|---|---|---|---|
| Rachel Geman | 53.6 | 11.19% | $1,080.00 | $57,888.00 |
| Daniel M. Hutchinson | 190.0 | 39.68% | $950.00 | $180,500.00 |
| Jessica A. Moldovan | 55.1 | 11.51% | $615.00 | $33,886.50 |
| Jahi Liburd | 151.3 | 31.60% | $470.00 | $71,111.00 |

| Elizabeth Keenley | 28.8 | 6.02% | $510.00 | $14,688.00 |

### E.        Careful Review of LCHB's Lodestar and Deletion of Duplicative Work

97.     I personally reviewed the time reported for all attorneys and paralegals listed in the schedules set forth above.  We reduced or eliminated time reported where necessary to ensure that LCHB is not seeking reimbursement for unnecessary duplication of efforts.  For example, we deleted time spent simply reviewing work done by other attorneys and billable time spent on routine, housekeeping matters.  As reported above, we deleted all time that did not directly contribute to the Settlement in this matter.  In addition, we deleted all time billed by timekeepers who billed less than 10 hours.  The total amount of time we deleted is **122.8** hours.  I can therefore confidently assert that the lodestar and hours reported in this declaration are reasonable, particularly in light of our efforts and accomplishments in this litigation.

### F.        Summary of Plaintiffs' Counsel's Time and Efforts to Avoid Duplication Among Co-Counsel

98.     I have worked closely with co-counsel to divide tasks, ensure efficient case management, and prevent duplication of efforts.  By assigning specific tasks among firms, we were able to avoid replicating work.  Only where it was necessary to have involvement from all of the firms, such as during the mediations, did such involvement occur.

99.     The tables below reflect the lodestar and costs that have been expended by all Plaintiffs' counsel.  Other than the time submitted on behalf of LCHB, I have not personally reviewed the lodestar and expenses of the other firms.

100.     All of Plaintiffs' Counsel's significant time and resources spent on this matter, including LCHB's time, were performed on a contingent basis, without any guarantee of payment.

101.     As confirmed in their individual firm declarations and above, Plaintiff's Counsel and Additional Counsel expended a total of **627.70** hours in this litigation (which does not include approximately **147.0** hours in time excluded as a result of billing discretion), with a total lodestar of **$425,796.00** as follows:

| Firm: | Lodestar: | Hours Expended: |
|---|---|---|
| **Lieff Cabraser** | $ 358,073.50 | 478.80 |
| **Stiegler Law Firm LLC** | $38,122.50 | 89.70 |
| **Robert B. Landry III, PLLC** | $29,600.00 | 59.20 |
| **Totals:** | $425,796.00 | 627.70 |

102.    As confirmed in their individual firm declarations and above, Plaintiff's Counsel expended a total of $33,942.30 in out-of-pocket costs as follows:

| Firm: | Costs: |
|---|---|
| **Lieff Cabraser** | $30,597.82 |
| **Stiegler Law Firm LLC** | $1,242.38 |
| **Robert B. Landry III, PLLC** | $2,102.10 |
| **Totals:** | $33,942.30 |

### G.    Compliance With Local Rules

103.    To the extent that Local Rule 54.5(b) applies, Plaintiffs' Counsel maintain that this Declaration is compliant because it contains a "statement of the services rendered by each person for whose services fees are claimed, together with a summary of the time spent by each person, and a statement describing the manner in which time records were maintained" and "brief description of relevant qualifications and experience and a statement of the customary hourly charges of each such person or of comparable prevailing hourly rates or other indication of value of the services." *See* N.D. Cal. Local Rule 54-5(b)(2)-(3).  Because their time records describe and reflect Plaintiffs' Counsel's litigation strategy, attorney work product, and attorney-client communications, Plaintiffs' Counsel will not file those records publicly, or share them with Apple, as doing so could harm Plaintiffs and/or Plaintiffs' Counsel.  However, Plaintiffs' Counsel are willing to provide their time records for in camera review, if the Court so requires.  *See* N.D. Cal. Local Rule 54-5(b)(2) ("Depending on the circumstances, the Court may require production

of an abstract of or the contemporary time records for inspection, including in camera inspection, as the Judge deems appropriate.").

104.     I declare under penalty of perjury of the laws of California and the United States that the foregoing is true and correct, and that this declaration was executed in San Francisco, California on August 16, 2023.

Daniel Hutch.

# EXHIBIT 1

Mia Farber (State Bar No. 131467)
Buck N. Haddix (State Bar No. 295334)
JACKSON LEWIS P.C.
725 South Figueroa Street, Suite 2500
Los Angeles, CA 90017
Telephone: (213) 689-0404
Facsimile: (213) 689-0430
Email: mia.farber@jacksonlewis.com
        buck.haddix@jacksonlewis.com

Scott P. Jang (State Bar No. 260191)
JACKSON LEWIS P.C.
50 California Street, 9th Floor
San Francisco, CA  94111
Telephone: (415) 394-9400
Facsimile: (415) 394-9401
E-mail:  scott.jang@jacksonlewis.com

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY P. FOREMAN, individually, and on behalf of all persons similarly situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>APPLE, INC.,<br><br>        Defendant. | Case No. 22-cv-03902 VC<br><br>**STIPULATION OF COLLECTIVE ACTION SETTLEMENT AND RELEASE**<br><br>Complaint Filed:   July 1, 2022<br>Trial Date:       None set |

1

1

**SETTLEMENT AGREEMENT AND RELEASE**

2

**RECITALS**

3   This Settlement Agreement and Release (the "**Settlement Agreement**") is entered into by

4 and between Plaintiff Anthony P. Foreman ("Plaintiff Foreman") and Plaintiff Amy Pflughaupt

5 ("Plaintiff Pflughaupt") (collectively, "**Plaintiffs**"), on behalf of themselves and on behalf of all

6 Putative FLSA Collective Members (as that term is defined herein), and Defendant Apple Inc.

7 ("**Apple**") (Apple and Plaintiffs are together referred to in this Settlement Agreement as the

8 "**Parties**"). This Settlement Agreement pertains to the alleged failure of Apple to (1) properly

9 include commissions when calculating the regular rate of pay for overtime for hourly paid

10 employees in the position of Apple Solutions Consultant ("ASC"); and (2) compensate ASCs for

11 travel time, including travel spent in transit between mandatory work activities.

12   WHEREAS, on July 1, 2022, Plaintiff Foreman commenced litigation under the Fair

13 Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq*., in the U.S. District Court for the Northern

14 District of California in the above-captioned matter (the "**Lawsuit**") on behalf of himself and

15 hourly paid employees of Apple who held the job title of Solutions Consultant within the three

16 years prior to July 1, 2022 through the present;

17   WHEREAS, on August 31, 2022, Plaintiff Foreman filed the operative First Amended

18 Complaint asserting causes of action for: (1) the alleged failure to properly calculate the regular

19 rate of pay for overtime wages; and (2) the alleged failure to pay wages for travel time;

20   WHEREAS, on September, 2, 2022, Plaintiff Pflughaupt filed an opt-in notice in the

21 Lawsuit;

22   WHEREAS, as of November 5, 2022, Apple agreed to toll the statute of limitations for

23 FLSA claims asserted by the Putative FLSA Collective Members in the Lawsuit so that the

24 Lawsuit could proceed to summary judgment on an individual basis prior to the court deciding the

25 issue of collective certification;

26   WHEREAS, the Parties determined to attempt to resolve the claims asserted in the

27 Lawsuit and retained mediator David A. Rotman, Esq. to assist in that effort. After Apple

28

2

responded to written discovery and provided data and other information to Plaintiff's counsel; after Plaintiffs and their counsel investigated the claims asserted in the Lawsuit; and after Plaintiff Foreman and Plaintiff Pflughaupt each responded to Apple's written discovery requests, produced documents to Apple, and submitted to all-day depositions; the Parties participated in two full-day mediation sessions facilitated by Mr. Rotman (one session on January 30, 2023, and a second session on April 17, 2023), during which the Parties discussed the claims and defenses relating to the Lawsuit with Mr. Rotman;

WHEREAS, the Parties have made a thorough and independent investigation of the facts and law relating to the allegations in the Lawsuit. In entering into this Settlement Agreement, the Parties have considered: (a) the facts developed during their investigations and the law applicable thereto; (b) the attendant risks of continued litigation and the uncertainty of the outcome of the claims alleged; and (c) the desirability of consummating this settlement according to the terms of this Settlement Agreement. The Parties have each concluded that it is in their best interests to settle the Lawsuit pursuant to the terms set forth herein; and

WHEREAS, in order to avoid the expense and burden of further litigation, the Parties desire to resolve any and all suits, actions, causes of action, claims, or demands based on Apple's alleged violations of the FLSA related or pertaining to Apple's alleged failure to pay Putative FLSA Collective Members overtime wages at the regular rate of pay and compensable travel time. The Parties further desire to resolve all claims against Apple and Releasees (as the term is defined herein) for damages or penalties, interest, liquidated damages, attorneys' fees, costs, expenses, and all other such amounts or any other forms of relief asserted in the Lawsuit or that could have been asserted based on the facts alleged in the Lawsuit.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises hereinafter set forth, the Parties agree as follows:

## DEFINITIONS

1. **Definitions**. The following terms used in this Settlement Agreement shall have the meanings ascribed to them below:

3

a. "ASC" means Apple Solutions Consultant.  The terms ASC does not include persons who held the position of Lead Apple Solutions Consultant.

b. "Court" means the U.S. District Court for the Northern District of California.

c. "Putative FLSA Collective" means the individuals employed by Apple who (a) at any time from July 1, 2019 through April 17, 2023 held the position of ASC; and (b) did not enter into an arbitration agreement with Apple in connection with their employment with Apple. Each such individual shall be a "Putative FLSA Collective Member."  The Parties estimate that the Putative FLSA Collective includes approximately 243 Putative FLSA Collective Members.

d. "FLSA Collective" means those Putative FLSA Collective Members who consent to join this settlement by completing and returning a valid and timely claim form. Each such individual shall be an "FLSA Collective Member."

e. "Releasees" means Apple and/or each of Apple's past and present parent companies, subsidiaries, predecessors, affiliates, divisions, supervisory employees, agents, managers, owners, members, shareholders, officers, directors, partners, investors, legal representatives, accountants, trustees, executors, administrators, real or alleged alter egos, predecessors, successors, transferees, assigns, attorneys, and insurers.

f. "Plaintiffs' Counsel" or "Collective Counsel" means LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, STIEGLER LAW FIRM LLC, and ROBERT B. LANDRY III, PLC.

g. "Releasees' Counsel" means JACKSON LEWIS P.C.

h. "Settlement Administrator" refers to Simpluris, the third-party settlement administrator, mutually agreed upon by the Parties, which will be retained to perform at least the following duties: (i) mailing notice and claim forms to Putative FLSA Collective Members; (ii) mailing settlement payments to FLSA Collective Members; (iii) notifying the Parties of Putative FLSA Collective Members who join this settlement; (iv) mailing appropriate tax forms to FLSA Collective Members; and (v) calculating individual settlement awards.

**NON-ADMISSION OF LIABILITY**

**2.    No Admission of Liability or Concession as to the Merits**. Releasees deny the allegations made in the Lawsuit and deny that they engaged in any wrongdoing or violation of law. Releasees are entering into this Settlement Agreement because it will eliminate the burden, risk, and expense of further litigation. Except for purposes of this settlement, neither this Settlement Agreement, nor any document referred to herein, nor any action taken to carry out this Settlement Agreement, may be construed in any way as an admission, concession, or indication by or against Releasees of any fault, wrongdoing, or liability whatsoever.

**RELEASE**

**3.    Release**. In consideration of the benefits to be received by Plaintiffs and the FLSA Collective Members under this settlement, Plaintiffs and the FLSA Collective Members shall be deemed to have released and forever discharged Releasees from all FLSA claims asserted in the Lawsuit, as well as all FLSA claims that could have been asserted based on the facts alleged in the Lawsuit, for the period of July 1, 2019 through the date the Court enters an order approving the Settlement, including without limitation (a) all claims under the FLSA for statutory damages, liquidated damages, penalties, interest, costs and attorneys' fees, and any other relief relating to properly including commissions in the calculation of the regular rate for payment of overtime; and (b) all claims under the FLSA for statutory damages, liquidated damages, penalties, interest, costs and attorneys' fees, and any other relief relating to compensation for time in transit, including any time in transit between mandatory work activities.

**SETTLEMENT IMPLEMENTATION**

**4.    Approval of Settlement.**

a.    All terms of this Settlement Agreement are contingent upon the approval of the settlement and certification by a court of the FLSA Collective for settlement purposes only.

b.   Plaintiffs shall file a motion for approval of this settlement with the Court and for dismissal of the Lawsuit with prejudice.

c.   Releasees may join in the motion and shall not oppose a motion made under this section unless any provision is inconsistent with this Settlement Agreement.

d.   Provided the Court approves this settlement, Collective Counsel and Releasees' Counsel shall cooperate to secure the approval and dismissal with prejudice of the Lawsuit.

e.   The Parties agree that if the Court requires any changes to this Settlement Agreement before it will grant approval of the settlement, the Parties agree to meet and confer in good faith and, if necessary, re-engage Mr. Rotman to resolve any issues identified in the Court's Order to resubmit an agreement to the Court for approval.

f.   Upon the Court approving the settlement and the expiration of the claims period prescribed in Paragraph 8(d) below, the stipulation entered in the Lawsuit regarding the tolling of the statute of limitations (as referenced in the recitals above) shall terminate.

**5.   Stipulation for Certification**.

a.   The Parties hereby stipulate, for settlement purposes only, to the following:

   i.   Certification of the Putative FLSA Collective, as defined herein, pursuant to 29 U.S.C. § 216(b);

   ii.   Notification of the settlement to the Putative FLSA Collective, as defined herein, pursuant to 29 U.S.C. § 216(b), in the form of the notice and claim form attached hereto as **Exhibit A** (the "**Notice of Settlement**" and "**Claim Form**," respectively);

   iii.   The appointment of Plaintiff Foreman and Plaintiff Pflughaupt as Claims Representatives on behalf of the FLSA Collective; and

   iv.   The appointment of Plaintiffs' Counsel as Collective Counsel.

b.   If the settlement is not approved by the Court, Releasees' stipulations pursuant to Section 5 shall be null and void and may not be used or relied upon by anyone for any purpose whatsoever in any lawsuit or any other judicial, administrative, or arbitral

STIPULATION OF COLLECTIVE ACTION
SETTLEMENT AND RELEASE                                    Case No. 22-cv-03902-VC

proceeding. For the avoidance of doubt, in the event the settlement described in this Settlement Agreement is not approved by the Court or the Effective Date described in Section 6 does not occur, Releasees do not waive—and expressly reserve—their right to challenge the propriety of certification of any FLSA collective. The Parties further agree that, other than to effectuate the settlement of the Lawsuit, the certification of the FLSA Collective for settlement purposes and all documents related thereto, including this Settlement Agreement and its accompanying exhibits and all orders entered by the Court in connection with this Settlement Agreement, shall not be admissible in any judicial, arbitral, administrative, investigative, or other court, tribunal, forum, or other proceeding, including without limitation any wage and hour litigation against Releasees.

c. The settlement is contingent upon Court certification of the FLSA Collective and Court approval of the notification to the Putative FLSA Collective Members, as defined in this Settlement Agreement, in the form of the Notice of Settlement. If the FLSA Collective is not certified by the Court or if notification of the settlement to the FLSA Collective or the Putative FLSA Collective in the form of the Notice of Settlement is not approved by the Court and/or is materially modified in any way, the Settlement Agreement may be voided at either Party's option.

**6.** **Effective Date**. The settlement shall become effective when all the following events have occurred:

a. This Agreement has been executed by Plaintiffs and Releasees; and

b. The Court in the Lawsuit has approved the settlement, including by certifying the FLSA Collective and approving the notification to the Putative FLSA Collective, as defined in this Settlement Agreement, in the form of the Notice of Settlement.

<strong>SETTLEMENT FUNDS AND AWARD CALCULATION</strong>

**7.** **Settlement Amount**.

7

a.   **Gross Settlement Amount**. The total settlement amount is $500,000.00 to settle the Lawsuit (the "**Gross Settlement Amount**"). The Gross Settlement Amount shall cover the entirety of the amount to settle the Lawsuit, including the amounts claimed by the FLSA Collective Members, the attorneys' fees and costs approved by the Court, the Service Awards approved by the Court, and the Administrative Costs (as the term is defined herein) approved by the Court. Under no circumstances will Releasees be required to pay more than $500,000.00 as settlement of the Lawsuit.

b.   **Funding of Settlement**. Within 45 calendar days of the Settlement Administrator notifying the Parties of the amounts claimed pursuant to Paragraph 8(e) below, Releasees shall cause to be deposited into an interest-bearing escrow account designated as a Qualified Settlement Fund pursuant to the Internal Revenue Code (the "**QSF**") designated by Plaintiffs and under the control of the Settlement Administrator (1) the amount claimed by FLSA Collective Members; (2) the attorneys' fees and costs approved by the Court; (3) the Service Awards approved by the Court; and (4) the costs of administration (collectively, the "**Collective Settlement Amount**").

c.   **Settlement Awards**. Each of the FLSA Collective Members shall be paid a settlement award from the Collective Settlement Amount (each a "**Settlement Award**"). The formula for distribution of the Collective Settlement Amount is set forth in **Exhibit B**.

d.   **No Additional Benefits**. All Settlement Awards to FLSA Collective Members shall be deemed to be paid to such individual solely in the year in which such payments actually are received by the individual. It is expressly understood and agreed that the receipt of such individual settlement awards will not entitle any FLSA Collective Members to additional compensation or benefits under any company bonus, contest or other compensation or benefit plan or agreement in place during the period covered by the Settlement, nor will it entitle any FLSA Collective Members to any increased retirement, 401K benefits or matching benefits, or deferred compensation benefits. It is the intent of this Settlement Agreement that the individual settlement awards provided

8

for in this Settlement Agreement are the sole payments to be made by Apple or Releasees to the FLSA Collective Members, and that the FLSA Collective Members are not entitled to any new or additional compensation or benefits as a result of having received the individual settlement awards (notwithstanding any contrary language or agreement in any benefit or compensation plan document that might have been in effect during the period covered by this Settlement Agreement).

**8. Process for Mailing the Notice of Settlement and Claim Form and Settlement Checks to Putative FLSA Collective Members.**

a. Within 15 calendar days after the Court's order approving the settlement, Releasees shall provide the Settlement Administrator with a list, in Microsoft Excel or Comma Separated Value format, of the full names, most recent email, mailing addresses, telephone numbers, and Social Security numbers of all Putative FLSA Collective Members ("**Collective List**"), the respective number of workweeks each Putative FLSA Collective Member worked during the period of July 1, 2019 through the date the Court enters an order approving the Settlement, and any other relevant information needed so that the Settlement Administrator can process and mail the Notice of Settlement and Claim Form to all Putative FLSA Collective members. The Parties agree and acknowledge that, except for identifying the total number of Putative FLSA Collective Members contained therein, the Collective List, including but not limited to identification and contact information, is confidential and shall not be shared with Plaintiffs or Plaintiffs' Counsel, unless Apple consents to the disclosure or unless the Court orders the disclosure.

b. Within 10 calendar days of the Settlement Administrator's receipt of the Collective List, the Settlement Administrator shall issue the Notice of Settlement and Claim Form to all Putative FLSA Collective Members by both email and USPS first class mail. The Settlement Administrator shall provide the Notice of Settlement and Claim Form to the

9

Parties' counsel for their approval prior to emailing and mailing, and certify in writing to the Parties' counsel the date that such emailing and mailing have been made.

c.   Prior to emailing and mailing, the Settlement Administrator will use all standard skip tracing devices to verify the accuracy of all physical addresses in the Collective List to ensure, to the extent reasonably practicable, the Notice of Settlement and Claim Form are sent to all Putative FLSA Collective Members at the physical addresses most likely to result in receipt of the Notice of Settlement and Claim Form. This will include running the addresses through the National Change of Address database. It will be conclusively presumed that if an envelope so mailed containing the Notice of Settlement and Claim Form has not been returned within 30 days of the mailing that the Putative FLSA Collective Member received the mailing. With respect to returned envelopes, the Settlement Administrator will use reasonable diligence to obtain a current address and re-mail the envelope to such address within 10 calendar days of receipt of the returned envelope. Any envelopes returned undeliverable shall be traced up to two times to obtain a new address and be re-mailed by First Class U.S. Mail.

d.   Putative FLSA Collective Members shall have 60 calendar days from the date of mailing to submit their completed Claim Forms, which must be either submitted electronically on the settlement website, postmarked by, or e-mailed and received by the Claims Administrator on or before, the 60th day. To the extent any mailed envelope is returned as undeliverable, such person shall be permitted 60 calendar days from any re-mailing of the Notice to submit their Claim Form.

e.   After the claims period prescribed in subsection (d) has expired, the Claims Administrator shall calculate the individual Settlement Awards claimed by FLSA Collective Members and notify counsel for each Party the amounts claimed within 7 calendar days of the claims period expiring. The Claims Administrator shall, at each FLSA Collective Member's election, either submit an electronic payment or mail all

STIPULATION OF COLLECTIVE ACTION
SETTLEMENT AND RELEASE                                      Case No. 22-cv-03902-VC

Settlement Award checks to FLSA Collective Members within 14 calendar days of the claims period expiring.

f. Each Settlement Award check shall be valid for 180 calendar days after issuance. In the event that a check expires, the FLSA Collective Member to whom that check was issued may request, at any time within the following 180 days, that a replacement check be issued. Within 21 calendar days of a request for reissuance, a check for the amount of the expired check shall be issued to the requesting FLSA Collective Member, which shall be valid for 180 calendar days after issuance. Within 14 calendar days of the last possible day for an FLSA Collective Member to cash a check (*i.e.*, within 14 calendar days of 381 calendar days of the issuance of all checks), the Settlement Administrator shall provide a full accounting to Collective Counsel and Releasees' Counsel of the value of any uncashed checks and revert the value of any uncashed checks back to Apple.

g. All fees and costs incurred by the Settlement Administrator in administering this settlement, which shall include but not be limited to all fees and costs for: reproducing the Notice of Settlement and Claim Form; producing checks for  FLSA Collective Members; purchasing postage to send the Notice of Settlement and Claim Form and settlement checks to FLSA Collective Members; notifying the Putative FLSA Collective Members of the Lawsuit; mailing appropriate tax forms to FLSA Collective Members; and other fees reasonably incurred by the Settlement Administrator and approved by the Parties (the "**Administration Costs**") shall be paid to the Settlement Administrator by Releasees from the Gross and Collective Settlement Amount.

**9.** **Treatment of Settlement Awards**.

a. For tax purposes, half of the Settlement Award for each FLSA Collective Member will constitute liquidated damages and half will constitute back wages.

b. Payments treated as back wages shall be made net of all applicable employment taxes, including, without limitation, federal, state and local income tax withholding and the

11

employee share of the FICA tax, and shall be reported to the Internal Revenue Service ("IRS") and the payee under the payee's name and Social Security number on an IRS Form W-2.

c.    Payments treated as liquidated damages, interest, and other non-wage relief shall be made without withholding and shall be reported to the IRS and the payee, to the extent required by law, under the payee's name and Social Security number on an IRS Form 1099.

d.    The employee portion of all applicable income and payroll taxes will be the sole responsibility of the individual FLSA Collective Member.

e.    Apple makes no representations as to the taxability of any portions of the settlement payments to any FLSA Collective Members. The FLSA Collective Members assume responsibility and liability for any employee taxes owed on their respective Settlement Awards.

**10.  Collective Counsel's Attorneys' Fees and Costs**.

a.    Plaintiffs and/or Collective Counsel will petition the Court for an award of attorneys' fees in conjunction with the Parties' settlement based on the lodestar method, plus reasonable out-of-pocket expenses. Releasees reserve the right to oppose the amount of attorneys' fees and expenses requested.  Any award of attorneys' fees and expenses approved by the Court shall be taken from the Gross Settlement Amount.

b.    The funds for the payment of approved attorneys' fees and expenses shall be paid to Collective Counsel by the Settlement Administrator pursuant to the timing outlined in Paragraph 8(e) above.

c.    The attorneys' fees and costs paid by the FLSA Collective, through Releasees, shall constitute full satisfaction of Releasees' obligations to pay amounts to any person, attorney, or law firm for attorneys' fees or costs in the Lawsuit on behalf of Plaintiffs and FLSA Collective Members, and shall relieve Releasees from any other claims or

12

liability to any other attorney or law firm for any attorneys' fees or costs to which any of them may claim to be entitled on behalf of Plaintiffs and FLSA Collective Members.

    d.    An IRS Form 1099 shall be provided to Collective Counsel for the payment of attorneys' fees and expenses made to Collective Counsel through Releasees. Each firm constituting Collective Counsel shall be solely and legally responsible to pay applicable taxes on the payment made to that firm.

**11. Service Awards**.

    a.    Plaintiff Foreman and Plaintiff Pflughaupt each will seek approval of a service award not to exceed $5,000.00 respectively for their service as Claims Representatives. Releasees reserve the right to oppose the amount of such application. Any service award approved by the Court will be in addition to the amounts Plaintiffs may receive as part of their respective Settlement Awards. Any service award shall be treated as non-wage penalties and liquidated damages, to be reported on an IRS Form 1099 (box 3), and the service award shall not be subject to FICA and FUTA withholding taxes. Any service award shall be paid from the Collective Settlement Amount

    b.    Within 7 business days of the Effective Date, Plaintiffs Foreman and Pflughaupt agree to immediately destroy under the supervision of Releasees' Counsel any of Apple's documents in their possession, custody, or control, including without limitation all storage locations such as cloud-based email accounts, or cloud-based storage accounts.

**12. No Claim Based upon Distributions or Payments in Accordance with this Settlement Agreement**. No person shall have any claim against Plaintiffs, any FLSA Collective Member, Releasees, the Settlement Administrator, Collective Counsel, or Releasees' Counsel based on distributions or payments made in accordance with this Settlement Agreement.

**MISCELLANEOUS**

**13. Releasees' Legal Fees**. Releasees' legal fees, costs, and expenses in the Lawsuit shall be borne by Releasees.

13

14. **Nullification of the Settlement Agreement**. In the event the settlement does not become final for any reason, this Settlement Agreement shall be null and void, and the Parties shall be returned to their respective statuses as of the date immediately prior to the execution of this Settlement Agreement. If this occurs, the Parties shall proceed in all respects as if the Settlement Agreement had not been executed.

15. **Severability**. If for any reason any term or provision of this Settlement Agreement is held to be invalid or unenforceable to any extent, then (a) such term or provision will be interpreted, construed, or reformed to the extent reasonably required to render the same valid, enforceable, and consistent with the original intent underlying such provision; (b) such term or provision will remain in effect to the extent that it is not invalid or unenforceable; and (c) such invalidity or unenforceability will not affect any other term or provision of this Settlement Agreement; provided, however, that the paragraphs entitled Release, Gross Settlement Amount, and Collective Settlement Amount are material terms and their inclusion is essential to this Settlement Agreement. If any part of those terms or paragraphs is held to be invalid or unenforceable to any extent, or if any of those provisions are edited or reformed in any way, then this Settlement Agreement may be voided at either Party's option. The Parties agree to cooperate to address and resolve any such issues as they arise and to use reasonable, good faith efforts to uphold the settlement reached by the Parties.

16. **Inadmissibility of Settlement Agreement**. Except for purposes of settling the Lawsuit or enforcing this Settlement Agreement, neither this Settlement Agreement; nor its terms; nor any document, statement, proceeding or conduct related to this Settlement Agreement; nor any reports or accounts thereof, shall be construed as, offered or admitted in evidence as, received as, or deemed to be evidence for any purpose adverse to the Parties, including, without limitation, evidence of a presumption, concession, indication, or admission by any of the Parties of any liability, fault, wrongdoing, omission, concession or damage.

17. **Computation of Time**. For purposes of this Settlement Agreement, if the prescribed time period in which to complete any required or permitted action expires on a Saturday, Sunday,

14

or legal holiday (as defined by Federal Rule of Civil Procedure 6(a)(6)), such time period shall be continued to the following business day.

18. **Amendment or Modification**. This Settlement Agreement may be amended or modified only by a written instrument signed by the Parties or their successors in interest, or by duly authorized counsel for such persons or entities. Any such amendment or modification will only become effective upon approval by the Court.

19. **Entire Settlement Agreement**. This Settlement Agreement constitutes the entire agreement between the Parties, and no oral or written representations, warranties or inducements have been made to any Party concerning this Settlement Agreement other than the representations, warranties, and covenants contained and memorialized in this Settlement Agreement. All prior or contemporaneous negotiations, memoranda, agreements, understandings, and representations, whether written or oral, are expressly superseded hereby and are of no further force and effect. Each of the Parties acknowledges that, in entering into this Settlement Agreement, they have not relied on any promise, representation, or warranty— express or implied—not contained in this Agreement.

20. **Binding on Successors and Assigns**. This Agreement shall be binding upon, and inure to the benefit of, the Plaintiffs, the FLSA Collective, Releasees, and each of their heirs, beneficiaries, executors, administrators, successors, transferees, successors, or assigns.

21. **Counterparts**. This Settlement Agreement may be executed in one or more counterparts, including by electronic signature, facsimile, or email. All executed counterparts shall be deemed to be one and the same instrument.

22. **Cooperation and Drafting**. The Parties have cooperated in the drafting and preparation of this Settlement Agreement; hence the drafting of this Settlement Agreement shall not be construed against any of the Parties. The Parties agree that the terms and conditions of this Settlement Agreement were negotiated at arm's-length and in good faith by the Parties and/or their counsel, and the terms and conditions reflect a settlement that was reached voluntarily based upon adequate information and sufficient discovery and after consultation

with experienced legal counsel (or the full and unimpeded opportunity to consult with such legal counsel).

**23. Bona Fide Dispute**. The Parties agree this Settlement Agreement is a bona fide resolution of disputed claims. Nothing in this Settlement Agreement is a concession that Releasees violated any law.

**24. Captions**. The captions or headings of the sections and paragraphs of this Settlement Agreement have been inserted for convenience of reference only and shall have no effect on the construction or interpretation of any part of this Settlement Agreement.

**25. Authority of Releasees' Signatories**. By executing this Settlement Agreement, each Releasee represents and warrants that it is a business entity, existing and in good standing under the laws of its state of formation, and that the person executing this Settlement Agreement on its behalf is fully authorized to bind it. The person executing this Settlement Agreement on each entity's behalf likewise represents and warrants that they have been authorized to execute and enter into this Settlement Agreement on behalf of the respective entity.

**26. Signature**. An electronic or facsimile signature shall be deemed to be an original for all purposes.

**27. Choice of Law and Venue of Disputes**. This Settlement Agreement shall be construed under California law, without regard to any choice of law principles, except to the extent any law of the United States governs any matter set forth, in which case federal law shall govern. Any dispute arising under this Settlement Agreement shall have venue exclusively in the court chosen by the Parties where the new lawsuit will be filed.

**28. Acknowledgment.** Each Party executing this Settlement Agreement confirms it is doing so voluntarily and that it has read this Settlement Agreement, understood it, and entered into it after being advised by its respective counsel or after having complete opportunity to consult counsel.

16

1

2    IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as follows:

3

4

5    _____          Date: 8/16/23

6    Anthony P. Foreman

7    individually and on behalf of the Putative FLSA Collective

8

9

10

11   _____          Date: _____

12   Amy Pflughaupt

13   individually and on behalf of the Putative FLSA Collective

14

15

16

17   _____          Date: _____

18   Apple Inc.

19

20   _____

21   Deborah Rice

22

23   _____

24   Senior Director, Global Labor and Employment Law

25

26

27

28
                                              17

after being advised by its respective counsel or after having complete opportunity to consult counsel.

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as follows:


_____ Date: _____

Anthony P. Foreman

individually and on behalf of the Putative FLSA Collective


_____ Date: 08/11/23 | 8:17 AM PDT
48DA18E16D4D478... _____

Amy Pflughaupt

individually and on behalf of the Putative FLSA Collective


_____ Date: _____

Apple Inc.


_____

Kwang Kim


_____

Senior Director, Employment Law

17

1

2       IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as follows:

3

4

5       _____          Date: _____

6       Anthony P. Foreman

7       individually and on behalf of the Putative FLSA Collective

8

9

10

11      _____          Date: _____

12      Amy Pflughaupt

13      individually and on behalf of the Putative FLSA Collective

14

15

16

17      _____          Date: August 16, 2023

18      Apple Inc.

19
        *Deborah Rice*
20      _____

21      Deborah Rice

22

23      _____

24      Senior Director, Global Labor and Employment Law

25

26

27

28
                                              17

## EXHIBIT A

### NOTICE OF SETTLEMENT AND CLAIM FORM

### NOTICE OF PENDENCY OF SETTLEMENT OF WAGE CLAIMS FOR EMPLOYEES OF APPLE INC.

To all current and former hourly paid individuals employed by Apple Inc. ("Apple") in the position of Apple Solutions Consultant ("ASC") from July 1, 2019 through April 17, 2023, who did not enter into an arbitration agreement with Apple in connection with their employment with Apple.

### PLEASE READ THIS NOTICE CAREFULLY

IT MAY AFFECT YOUR LEGAL RIGHT TO COLLECT APPROXIMATELY **<<INSERT AMOUNT>>** (AFTER ANY APPLICABLE PARYOLL DEDUCTIONS) IN CONNECTION WITH THE SETTLEMENT OF A COLLECTIVE ACTION LAWSUIT.

| A.  WHAT IS THIS NOTICE ABOUT? |
|---|

A settlement agreement (the "Settlement") has been reached between Apple and Plaintiffs Anthony P. Foreman and Amy Pflughaupt ("Plaintiffs") in a lawsuit that was filed against Apple pending in the U.S. District Court for the Northern District of California (the "Court").  The case is pending in the Court as *Anthony P. Foreman v. Apple, Inc.*, Case No. 3:22-cv-03902 VC (the "Lawsuit").  Plaintiffs are pursuing the Lawsuit on behalf of themselves and individuals employed by Apple who (a) at any time from July 1, 2019 through April 17, 2023 held the position of ASC; and (b) did not enter into an arbitration agreement with Apple in connection with their employment with Apple ("Putative FLSA Collective Member").

The Court overseeing the Lawsuit has approved the Settlement, which pays money to those Putative FLSA Collective Members who timely consent to join this Settlement ("FLSA Collective").  The Court appointed Lieff Cabraser Heimann & Bernstein, LLP, Stiegler Law Firm LLC, and Robert B. Landry III, PLC to serve as Collective Counsel.  In making this appointment and approving the Settlement, the Court gave these Collective Counsel firms the authority to represent and bind Plaintiffs and the FLSA Collective regarding the Settlement.

You have received this Notice because you were identified from Apple's records as an employee who worked for Apple in the position of ASC at some point during the time period of July 1, 2019 through April 17, 2023, did not sign an arbitration agreement in connection with your employment at Apple, and who is eligible to recover money from the Settlement.  In order to recover money, you must join the Settlement.  If you do not join the Settlement, you will not receive any money.  This Notice is designed to provide you with a brief description of the Lawsuit, inform you of the terms of the Settlement, and discuss your rights in connection with the Settlement.

The Court has not determined that Apple is liable or did anything wrong.  Instead, Plaintiffs and Apple reached this Settlement to resolve the case.

| B.  WHAT IS THIS LAWSUIT ABOUT? |
|---|

The Lawsuit was filed by an employee of Apple who alleges that his and other employees' pay was affected by the alleged failure to properly calculate the regular rate of pay for overtime wages and the alleged failure to pay wages for travel time under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*.  The Lawsuit claims that Apple did not include commissions when calculating the regular rate of pay for overtime wages for ASCs and did not compensate ASCs for travel time, including travel spent in transit between mandatory work activities.

Apple denies all of these allegations.  Apple maintains that it accurately included commissions when calculating the regular rate of pay for overtime for ASCs, paid ASCs all compensable travel time, and that

Plaintiffs are not entitled to any penalties or any other remedies under the FLSA. After lengthy settlement negotiations with the assistance of a respected mediator, Plaintiffs and Apple agreed to settle the Lawsuit. The Parties and their counsel have concluded that the Settlement is advantageous, considering the risks and uncertainty to each side of continued litigation.

The Settlement represents a compromise of disputed claims. Nothing in the Settlement is intended to be or will be construed as an admission by Apple that Plaintiffs' claims in the Lawsuit have merit or that Apple did not include commissions when calculating the regular rate of pay for overtime wages for ASCs and did not compensate ASCs for travel time, including travel spent in transit between mandatory work activities, or that collective members are entitled to any penalties under the FLSA or any other law. On the contrary, Apple does not agree it did anything wrong, believes you were paid correctly and fairly during your employment, and denies any liability.

**C.  HOW MUCH WILL I RECEIVE AND HOW DO I GET THE MONEY OFFERED?**

The settlement payment for which you are eligible is based on your employment records with Apple, the number of workweeks you worked as an ASC during the relevant period, the amount you were paid by Apple, and any applicable payroll deductions. Based on this reconciliation, each employee, including you, was classified as an alleged underpaid employee. If you were classified as an alleged underpaid employee and you complete the claim form to join this settlement, you will receive one check representing wages and alleged liquidated damages, based on the amount in the settlement fund. **Your net settlement payment is expected to be approximately <<INSERT AMOUNT>>, after any applicable payroll deductions.**

**D.  SUMMARY OF THE SETTLEMENT PAYMENTS**

1.  **Gross Settlement Amount:**  Apple will pay $500,000.00 as the total settlement amount to settle the Lawsuit (the "**Gross Settlement Amount**"). The Gross Settlement Amount will cover the entirety of the amount to settle the Lawsuit, including the amounts claimed by the FLSA Collective Members, the attorneys' fees and costs approved by the Court, the Service Awards approved by the Court, and the Administration Costs approved by the Court. Apple will separately pay the employer's portion of any payroll taxes arising from the settlement.

2.  **Service Awards:**  Plaintiffs will seek approval from the Court for a payment for their time and effort in prosecuting the Lawsuit on behalf of the Putative FLSA Collective Members and for their signing a general release of all claims ("Service Awards"). The Service Awards will be paid out of the Gross Settlement Amount to Plaintiffs not to exceed $5,000.00 respectively for their service as Claims Representatives.

3.  **Collective Counsel's Attorneys' Fees and Costs:**  Plaintiffs and/or Collective Counsel may petition the Court for an award of attorneys' fees and expenses in conjunction with the Parties' Settlement and efforts litigating this Lawsuit, which Apple reserves the right to oppose, plus reasonable out-of-pocket expenses, subject to the terms of the Settlement. Any award of attorneys' fees and expenses approved by the Court will be taken from the Gross Settlement Amount.

4.  **Administration Costs:**  All fees and costs of administering the settlement will be paid from the Gross Settlement Amount. Administrative costs include the cost associated with mailing notice of the Settlement to the Putative FLSA Collective Members and processing the settlement payments to the FLSA Collective Members. The Court has appointed Simpluris to act as an independent Settlement Administrator for purposes of administering this settlement.

5. **Net Settlement Amount:**  The Net Settlement Amount means the Gross Settlement Amount less (1) the attorneys' fees and costs approved by the Court; (2) the Service Awards approved by the Court; and (3) the costs of administration approved by the Court.

6. **Settlement Award:**  Each of the FLSA Collective Members will be paid a settlement award from the Net Settlement Amount.  Each Putative FLSA Collective Member's share of the Net Settlement Amount will be based on the Putative FLSA Collective Member's number of workweeks worked as an ASC during the period of July 1, 2019 through April 17, 2023 in comparison to the total number of workweeks worked by all Putative FLSA Collective Members during the period of July 1, 2019 through April 17, 2023.  The Settlement Administrator will issue to each FLSA Collective Member an IRS W2 and Form 1099.

| **E.  WHAT ARE MY RIGHTS AS A PUTATIVE FLSA COLLECTIVE MEMBER?** |
|---|

You have two options:

| **To join the settlement:**<br><br>**COMPLETE THE CLAIM FORM** | If you choose to be included in the Settlement, all you need to do is complete the attached Consent to Join Settlement Form and return it to the Settlement Administrator by the due date. After the period to join the Settlement ends, you will receive a settlement check for your share. | **Deadline: «Date»** |
|---|---|---|
| **To stay out of the settlement:**<br><br>**DO NOTHING** | If you do not want a payment or other benefits from this settlement and you want to retain the right to sue Apple on your own about any of the wage claims that were settled in this Lawsuit, then <u>do not</u> complete the Consent to Joint Settlement Form. By doing nothing, you give up the possibility of getting money from the settlement of this Lawsuit. | **No deadline** |

If you complete the claim form, you agree to the following:

You will be acknowledging that you are represented by the Collective Counsel and that you will be bound by the terms of the attorney-client agreement signed by Plaintiffs Anthony P. Foreman and Amy Pflughaupt.  You will **not** have to pay the Collective Counsel any money directly.  Apple is paying attorneys' fees and costs as part of the settlement as a percentage of the overall recovery.

You will be releasing Releasees from the claims under the Fair Labor Standards Act (FLSA) asserted in the Lawsuit, as well as all FLSA claims that could have been asserted based on the facts alleged in the Lawsuit, for the period of July 1, 2019 through April 17, 2023, including without limitation (a) all claims under the FLSA for statutory damages, liquidated damages, penalties, interest, costs and attorneys' fees, and any other relief relating to properly including commissions in the calculation of the regular rate for payment of overtime; and (b) all claims under the FLSA for statutory damages, liquidated damages, penalties, interest, costs and attorneys' fees, and any other relief relating to compensation for time in transit, including any time in transit between mandatory work activities.

Releasees means Apple and/or each of its past and present parent companies, subsidiaries, predecessors, affiliates, divisions, supervisory employees, agents, managers, owners, members, shareholders, officers, directors, partners, investors, legal representatives, accountants, trustees, executors, administrators, real or alleged alter egos, predecessors, successors, transferees, assigns, attorneys, and insurers.

**F.  HOW LONG DO I HAVE TO MAKE A DECISION?**

**The deadline to join the settlement is 60 days after this notice was sent, which is «DATE».**

**G.  WHAT HAPPENS AFTER THE DECISION PERIOD ENDS?**

After the deadline to join the Settlement passes, the Settlement Administrator will perform a final accounting and process the settlement payments for all the employees in the Settlement.  The Settlement Administrator will then mail checks or submit electronic payment to all the employees who joined the Settlement.

If you wish to receive your settlement payment through electronic payment, you will need to provide the Settlement Administrator with the requested information for processing the payment in the Consent to Join Settlement Form.  If you receive a check, you will be able to deposit or cash the settlement check within 180 days of the date it is issued.  If you lose or damage the check during that 180-day period, you can contact the Settlement Administrator to request a replacement check be issued.  Any reissued replacement check will be valid for 180 days after the date it is issued.

**H.  GETTING MORE INFORMATION**

This Notice summarizes the proposed Settlement.  For the precise terms and conditions of the Settlement, or if you have questions about the Settlement, please see the Settlement available at <<WEB ADDRESS>>, contact the Settlement Administrator (see below contact information), contact Collective Counsel (see below contact information), or access the Court docket in this case, for a fee, through the Court's PACER system at https://ecf.cand.uscourts.gov, or visit the office of the Clerk of the Court for the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, 94102, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

<table>
<tr>
<td>

Daniel M. Hutchinson
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
phone  415.956.1000 | fax 415.956.1008
dhutchinson@lchb.com

</td>
<td>

Charles J. Stiegler
STIEGLER LAW FIRM LLC
318 Harrison Ave., Suite 104
New Orleans, LA 70124
phone  504.267.0777| fax 504.513.3084
Charles@StieglerLawFirm.com

</td>
</tr>
</table>

Robert B. Landry III
ROBERT B. LANDRY III, PLC
5420 Corporate Boulevard, Suite 303
Baton Rouge, LA 70808
phone  225.349.7460 | fax 225.349.7466
rlandry@landryfirm.com

[Insert Settlement Administrator]

**PLEASE DO NOT TELEPHONE THE COURT OR THE COURT CLERK'S OFFICE TO INQUIRE ABOUT THIS SETTLEMENT.**

**CONSENT TO JOIN SETTLEMENT OF WAGE CLAIM LAWSUIT AGAINST APPLE INC. FORM**

Printed Name: _____

1. I have received and read  the Notice regarding the settlement of the lawsuit filed against Apple Inc. ("Apple") in *Anthony P. Foreman v. Apple, Inc.*, United States District Court for the Northern District of California, Case No. 3:22-cv-03902 VC ("the Lawsuit"). I understand that the Lawsuit was brought under the Fair Labor Standards Act. I understand the case was settled and the Settlement Agreement ("Settlement") was approved by the Court.

2. I consent to join the Settlement. I understand I will receive a proportional share of the Net Settlement Amount totaling approximately $<<INSERT AMOUNT>>, after any applicable payroll deductions.

3. I understand that, in exchange for this payment, all FLSA claims against Apple asserted in the Lawsuit, as well as all FLSA claims I may have that could have been asserted based on the facts alleged in the Lawsuit will be fully and finally settled.

4. I consent to be bound by the Court's decisions.

_____        _____
Signature                                       Date

**By signing, you designate Lieff Cabraser Heimann & Bernstein, LLP, Stiegler Law Firm LLC, and Robert B. Landry III, PLC as your attorneys for your wage claims that will be settled in the Lawsuit . The information below will not be included on any public court filing:**

_____
Email Address

_____
Cell Phone Number

_____
Address

_____
City / State / Zip

| |
|---|
| **TO JOIN, RETURN THIS FORM BY MAIL OR EMAIL:**<br>**Anthony P. Foreman v. Apple Inc.**<br>**ADMINISTRATOR**<br>**Administrator's Address**<br>**Administrator's Phone / Fax**<br>**Administrator's Email**<br><br>**OR COMPLETE ONLINE:**<br>**«hyperlink»** |

| **QUESTIONS? You can contact the attorneys for the group of Apple employees:** ||
|---|---|
| Daniel M. Hutchinson<br>LIEFF CABRASER HEIMANN<br>& BERNSTEIN, LLP<br>275 Battery Street, 29th Floor<br>San Francisco, CA 94111<br>phone   415.956.1000 \| fax 415.956.1008<br>dhutchinson@lchb.com | Charles J. Stiegler<br>STIEGLER LAW FIRM LLC<br>318 Harrison Ave., Suite 104<br>New Orleans, LA 70124<br>phone   504.267.0777\| fax 504.513.3084<br>Charles@StieglerLawFirm.com<br><br>Robert B. Landry III<br>ROBERT B. LANDRY III, PLC<br>5420 Corporate Boulevard, Suite 303<br>Baton Rouge, LA 70808<br>phone   225.349.7460 \| fax 225.349.7466<br>rlandry@landryfirm.com |

**The deadline to submit this form is DATE. Forms submitted after this date WILL NOT be valid.**

**EXHIBIT B**

**FORMULA FOR DISTRIBUTION OF SETTLEMENT**

The Net Settlement Amount shall be available for allocation to the Putative FLSA Collective Members as their Settlement Award as follows:

1.      Each Putative FLSA Collective Member shall be eligible for a pro-rata share of the Net Settlement Amount based on the Putative FLSA Collective Member's number of workweeks worked as an ASC during the period of July 1, 2019 through April 17, 2023 in comparison to the total number of workweeks worked by all Putative FLSA Collective Members during the period of July 1, 2019 through April 17, 2023. For example, if a Putative FLSA Collective Member's workweeks worked as an ASC during the time period of July 1, 2019 through April 17, 2023 amounts to 5% of the total number of workweeks worked by all Putative FLSA Collective Members during the period of July 1, 2019 through April 17, 2023, that Putative FLSA Collective Member's will be eligible to receive 5% of the Net Settlement Amount if the Putative FLSA Collective Member properly consents to join the settlement and is deemed an FLSA Collective Member.

2.      Putative FLSA Collective Members or FLSA Collective Members who choose not to participate in the Settlement will not receive their pro-rata share of the Gross Settlement Amount.  Nor shall Apple be required to disburse from the Gross Settlement Amount any sums other than those claimed by Putative FLSA Collective Members or FLSA Collective Members, or approved by the Court for distribution as attorneys' fees and costs, administration costs, and service awards.

# EXHIBIT 2

# Lieff Cabraser Heimann & Bernstein

Attorneys at Law

| | |
|---|---|
| 275 Battery Street, 29th Floor<br>San Francisco, CA  94111-3339<br>Telephone:  415.956.1000<br>Facsimile:  415.956.1008 | 250 Hudson Street, 8th Floor<br>New York, NY 10013-1413<br>Telephone:  212.355.9500<br>Facsimile:  212.355.9592 |
| 222 2nd Avenue South, Suite 1640<br>Nashville, TN 37201<br>Telephone:  615.313.9000<br>Facsimile:  615.313.9965 | Frauenplatz 2<br>80331 Munich, GERMANY<br>Telephone: 49.89.25.55.2361<br>Facsimile: 49.89.25.55.2359 |

Email: mail@lchb.com
Website: www.lieffcabraser.com

***FIRM PROFILE:***

Lieff Cabraser Heimann & Bernstein, LLP, is a 100-plus attorney AV-rated law firm founded in 1972 with offices in San Francisco, New York, Nashville, and Munich. We have a diversified practice, successfully representing plaintiffs in the fields of personal injury and mass torts, securities and financial fraud, employment discrimination and unlawful employment practices, product defect, consumer protection, antitrust, environmental and toxic exposures, False Claims Act, digital privacy and data security, and human rights. Our clients include individuals, classes and groups of people, businesses, and public and private entities.

Lieff Cabraser has served as Court-appointed Plaintiffs' Lead or Class Counsel in state and federal coordinated, multi-district, and complex litigation throughout the United States. With co-counsel, we have represented clients across the globe in cases filed in American courts. Lieff Cabraser is among the largest firms in the United States that only represent plaintiffs.

Described by *The American Lawyer* as "one of the nation's premier plaintiffs' firms," Lieff Cabraser enjoys a national reputation for professional integrity and the successful prosecution of our clients' claims. We possess sophisticated legal skills and the financial resources necessary for the handling of large, complex cases, and for litigating against some of the nation's largest corporations. We take great pride in the leadership roles our firm plays in many of this country's major cases, including those resulting in landmark decisions and precedent-setting rulings.

Lieff Cabraser has litigated and resolved thousands of individual lawsuits and hundreds of class and group actions, including some of the most important civil cases in the United States over the past four decades. We have assisted our clients in recovering over $124 billion in verdicts and settlements. Twenty-eight cases have been resolved for over $1 billion; another 55 have resulted in verdicts or settlements at or in excess of $100 million.

*The National Law Journal* has recognized Lieff Cabraser as one of the nation's top plaintiffs' law firms for fourteen years, and we are a member of its Plaintiffs' Hot List Hall of Fame, "representing the best qualities of the plaintiffs' bar and demonstrating unusual dedication and creativity." *The National Law Journal* separately recognized Lieff Cabraser as one of the "50 Leading Plaintiffs Firms in America." In December 2019, *The American Lawyer* included Lieff Cabraser in its "Top 50 Litigation Departments in the U.S.," the only all-plaintiff-side litigation firm included among the firms recognized. In March of 2020, *Benchmark Litigation* named Lieff Cabraser its "California Plaintiff Firm of the Year" for the second year in a row, and we were finalists the previous year for the publication's national "Plaintiff Law Firm of the Year" award.

In September of 2019, *Law360* named Lieff Cabraser a "California Powerhouse" for litigation after naming our firm its "Class Action Firm of the Year" in January 2019. In July of 2019, Public Justice awarded Lieff Cabraser its "Trial Lawyer of the Year" award. Lieff Cabraser has 21 lawyers named to the "Best Lawyers in America" 2020 listing, and *The National Law Journal* awarded our firm its 2019 "Elite Trial Lawyer" awards in the fields of Consumer Protection and Cybersecurity/Data Breach. We had 38 firm lawyers named to the 2019 *Super Lawyers* "Super Lawyer" and "Rising Star" lists, and were named the *Daily Journal's* "California Lawyers of the Year 2018" as well as having eight lawyers named to *Benchmark's* "40 and Under Hot List 2018."

*U.S. News* and *Best Lawyers* has selected Lieff Cabraser as a national "Law Firm of the Year" six times in the last nine years, in categories including Mass Torts Litigation/Class Actions – Plaintiffs and Employment Law – Individuals. In 2017, Lieff Cabraser's Digital Privacy and Data Security practice group was named "Privacy Group of the Year" by *Law360*, and the firm's Consumer Protection practice group was named "Consumer Protection Group of the Year" by the publication as well.

In 2016, *Benchmark Litigation* named Lieff Cabraser to its "Top 10 Plaintiff Firms in America" list, *The National Law Journal* chose our firm as one of nine "Elite Trial Lawyers" nationwide, and *Law360* selected Lieff Cabraser as one of the "Top 50 Law Firms Nationwide for Litigation." The publication separately noted that our firm "persists as a formidable agency of change, producing world class legal work against some of the most powerful corporate players in the world today."

***CASE PROFILES:***

**I.     Personal Injury and Products Liability Litigation**

    **A.     Current Cases**

        1.    ***John Doe v. University of Michigan and The Regents of the University of Michigan***, Case No. 2:20-cv-10629 (E.D. Mich.). Lieff Cabraser serves as Plaintiffs' Interim Co-Class Counsel in the sexual abuse litigation against the University of Michigan and Dr. Robert E. Anderson pending in the U.S. District Court for the Eastern District of Michigan. The lawsuit, brought on behalf of former student-patients, alleges that Anderson abused his position to repeatedly and regularly sexually assault University students in the guise of providing medical care, and that the University of Michigan and its Regents allowed and enabled that abuse during his employment at the University from 1968 through 2003. A University of Michigan press release notes that the sexual abuse allegations against Anderson are said to be "disturbing and very serious," and include claims of unnecessary and intimate exams by a doctor with unrestricted access to male college athletes over a period extending over three decades.

        2.    ***Southern California Fire Cases (California Thomas Wildfire & Mudslide Litigation)***, JCCP No. 4965 (Cal. Supr. Ct.). Lieff Cabraser partners Lexi J. Hazam and Robert J. Nelson serve as Co-Lead Counsel in consolidated individual and class action lawsuits against Southern California Edison over the role of the utility's equipment in starting the devastating Thomas Fire that ravaged Southern California in December 2017 and the resulting subsequent mudslides in Montecito that killed 21 people. The action seeks restitution for personal and business losses alleged to have occurred as a result of Southern California Edison's failure to properly and safely maintain its electrical infrastructure in Santa Barbara and Ventura Counties.

            Thorough post-fire investigations through the spring of 2019 have determined that what became known as the Thomas Fire was a result of the merging of the Ventura County Koenigstein Fire (caused by the separation of an energized conductor near an insulator on an SCE-operated power pole, which then fell to the ground along with molten metal particles and ignited the dry vegetation below) and the ThomaFvolkds Fire (caused by power lines owned by SCE coming into contact with each other during high winds). Both the Koenigstein Fire and the Thomas Fire started on the same electrical circuit; hours after they began, the Koenigstein Fire merged with the Thomas Fire and collectively became known as the Thomas Fire. The fire burned a total of 281,893

acres, destroying 1,063 structures and resulting in one civilian and one firefighter fatality.

3.   ***2017 California North Bay Fire Cases***, JCCP No. 4955 (Cal. Supr. Ct.). Lieff Cabraser founding partner Elizabeth Cabraser and firm partner Lexi Hazam serve as Chairs of the Class Action Committee in the consolidated lawsuits against Pacific Gas & Electric relating to losses from the 2017 San Francisco Bay Wine Country Fires. Cabraser and Hazam also serve on the Individual Plaintiffs Executive Committee in the litigation. In November of 2017, Lieff Cabraser filed individual and class action lawsuits against PG&E for losses relating to the devastating October 2017 North Bay Fires. The lawsuit sought to hold PG&E accountable for damages to real and personal property, loss of income, and loss of business arising from the fires. In the wake of the devastating fires that burned throughout northern California in October of 2017, more than 50 separate lawsuits were filed in multiple courts seeking to hold PG&E liable.

In January 2018, the lawsuits were consolidated into a single action in San Francisco Superior Court. Cal Fire has determined that of the 21 major fires last fall in Northern California, at least 17 were caused by power lines, poles and other equipment owned by Pacific Gas and Electric Company. PG&E had attempted to coordinate the actions in five separate clusters, including in counties that to date have no pertinent cases, but the Court held that issues of commonality and efficiency mandated coordination on a single court in San Francisco.

PG&E made multiple demurrers to plaintiffs' inverse condemnation claims, seeking the outright dismissal of plaintiff's claims for damages against the utility unless PG&E was granted the right to pass any damages award on to its ratepaying customers. In May 2018, the Court issued an order overruling PG&E's demurrers. The Court disagreed with PG&E's arguments on all counts, holding in favor of plaintiffs and directing PG&E to answer plaintiffs' pending complaints. In June of 2018, PG&E announced that it expected to be held liable for damage from most if not all of the deadly and widespread fires that coursed through the North San Francisco Bay Area in October of 2017, recording so far a $2.5 billion charge to cover losses. PG&E noted that the $2.5 billion charge represents the low end of its anticipated potential losses.

4.   ***Camp Fire Cases***, JCCP No. 4995 (Cal. Supr. Court). Lieff Cabraser represents the family of Ernest Francis "Ernie" Foss, beloved father and musician, who was killed in the November 2018 Camp Fire, the deadliest and most destructive wildfire in modern California history. The fire broke out in Northern California near Chico in early November 2018 and quickly grew to massive size, affecting over 140,000 acres and killing at

least 80 people, destroying nearly 14,000 homes and nearly obliterating the town of Paradise, and causing the evacuation of over 50,000 area residents.

In addition, Lieff Cabraser represents plaintiffs in a class action lawsuit as well as hundreds of individual suits filed against PG&E for the devastating property damage, economic losses, and disruption to homes, businesses, and livelihoods caused by the Camp wildfire. The lawsuits allege the Camp Fire was started by unsafe electrical infrastructure owned, operated, and improperly maintained by PG&E. The plaintiffs further claim that despite PG&E's knowledge that electrical infrastructure was aging, unsafe, and vulnerable to environmental conditions, PG&E failed to take action that could have prevented the deadliest and most destructive wildfire in California's history.

5.     ***In re PG&E Corporation***, Case No. 19-30088 and In re Pacific Gas and Electric Company, Case No. 19-30089 (U.S. Bankruptcy Court, N.D. Cal. – San Francisco Division). In January of 2019, in the face of overwhelming liability from pending wildfire litigation, including the North Bay and Camp Fire JCCPs, PG&E Corporation and Pacific Gas and Electric Company filed voluntary petitions for relief under Chapter 11 of the federal Bankruptcy Code. As a result of the bankruptcy filing, the Camp Fire and North Bay Fires proceedings in state court have been stayed. In February 2019, Andrew R. Vara, the Acting United States Trustee for Region 3, appointed an official committee of tort claimants to represent the interests and act on behalf of all persons with tort claims against PG&E, including wildfire victims, in the bankruptcy proceedings. Lieff Cabraser represents Angela Foss Loo as a member of the Official Committee of Tort Claimants.

6.     ***Woolsey Fire Cases***, JCCP No. 5000 (Cal Supr. Ct.). Judge William F. Highberger named Lexi J. Hazam as Co-Lead Counsel for Individual Plaintiffs in the coordinated Woolsey Fire Cases against Southern California Edison relating to the devastating 2018 fire that burned more than 1000 homes and 96,000 acres in Los Angeles and Ventura Counties. The action includes claims for negligence, trespass, inverse condemnation, and violation of the California Public Utilities and Health and Safety codes, and seeks damages for the fires victims' losses.

7.     ***In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation***, MDL No. 2151 (C.D. Cal.).  Lieff Cabraser serves as Co-Lead Counsel for the plaintiffs in the Toyota injury cases in federal court representing individuals injured, and families of loved ones who died, in Toyota unintended acceleration accidents. The complaints charge that Toyota took no action despite years of complaints that its vehicles accelerated suddenly and could not be

stopped by proper application of the brake pedal. The complaints further allege that Toyota breached its duty to manufacture and sell safe automobiles by failing to incorporate a brake override system and other readily available safeguards that could have prevented unintended acceleration.

In December 2013, Toyota announced its intention to begin to settle the cases. In 2014, Lieff Cabraser played a key role in turning Toyota's intention into a reality through assisting in the creation of an innovative resolution process that has settled scores of cases in streamlined, individual conferences. The settlements are confidential. Before Toyota agreed to settle the litigation, plaintiffs' counsel overcame significant hurdles in the challenging litigation. In addition to defeating Toyota's motion to dismiss the litigation, Lieff Cabraser and co-counsel demonstrated that the highly-publicized government studies that denied unintended acceleration, or attributed it to mechanical flaws and driver error, were flawed and erroneous.

8.     **Individual General Motors Ignition Switch Defect Injury Lawsuits**, MDL No. 2543 (S.D.N.Y.).  Lieff Cabraser represents over 100 persons injured nationwide, and families of loved ones who died, in accidents involving GM vehicles sold with a defective ignition switch. Without warning, the defect can cause the car's engine and electrical system to shut off, disabling the air bags.  For over a decade GM was aware of this defect and failed to inform government safety regulators and public.  The defect has been has been implicated in the deaths of over 300 people in crashes where the front air bags did not deploy.  On August 15, 2014, U.S. District Court Judge Jesse M. Furman appointed Elizabeth J. Cabraser as Co-Lead Plaintiffs' Counsel in the GM ignition switch litigation in federal court.

9.     **Retrievable Inferior Vena Cava Blood Filter Injuries, In re Bard IVC Filters Prods. Liab. Litig.**, MDL No. 2641 (D. Ariz.). Inferior Vena Cava blood filters or IVC filters are small, basket-like medical devices that are inserted into the inferior vena cava, the main blood vessel that returns blood from the lower half of the body to the heart.  Tens of thousands of patients in the U.S. are implanted with IVC filters in order to provide temporary protection from pulmonary embolisms.  However, these devices have resulted in multiple complications including device fracture, device migration, perforation of various organs, and an increased risk for venous thrombosis.  Due to these complications, patients may have to undergo invasive device removal surgery or suffer heart attacks, hemorrhages, or other major injuries.  We represent injured patients and their families in individual personal injury and wrongful death lawsuits against IVC filter manufacturers, and Lieff Cabraser attorney Wendy R. Fleishman serves

on the Plaintiffs Executive Committee in the IVC Filter cases in the federal multidistrict litigation.

10.   ***Injury and Death Lawsuits Involving Wrongful Driver Conduct and Defective Tires, Transmissions, Cars and/or Vehicle Parts (Seat Belts, Roof Crush, Defective seats, and Other Defects).***  Lieff Cabraser has an active practice prosecuting claims for clients injured, or the families of loved ones who have died, by wrongful driver conduct and by unsafe and defective vehicles, tires, restraint systems, seats, and other automotive equipment.  The firm also represent clients in actions involving fatalities and serious injuries from tire and transmission failures as well as rollover accidents (and defective roofs, belts, seat back and other parts) as well as defective transmissions and/or shifter gates that cause vehicles to self-shift from park or false park into reverse.  Our attorneys have received awards and recognition from *California Lawyer* magazine (Lawyer of the Year Award), the Consumer Attorneys of California, and the San Francisco Trial Lawyers Association for their dedication to their clients and outstanding success in vehicle injury cases.

11.   ***In Re: Abilify (Aripiprazole) Products Liability Litigation***, MDL No. 2734 (N.D. Fla.).  We represent clients who have incurred crippling financial losses and pain and suffering from compulsive gambling caused by the drug Abilify. In May 2016 the FDA warned that Abilify can lead to damaging compulsive behaviors, including uncontrollable gambling. The gambling additions can be so severe that patients lose their homes, livelihoods, and marriages. The $6+ billion a year-earning drug was prescribed for nearly 9 million patients in 2014 alone.  In December 2016, Lieff Cabraser partner Lexi Hazam was appointed by the court overseeing the nationwide Abilify gambling injuries MDL litigation to the Plaintiffs Executive Committee and Co-Chairs the Science and Expert Sub-Committee for the nationwide Abilify MDL litigation. Discovery in the case is ongoing.

12.   ***In re Engle Cases***, No. 3:09-cv-10000-J-32 JBT (M.D. Fl.).  Lieff Cabraser represents Florida smokers, and the spouses and families of loved ones who died, in litigation against the tobacco companies for their 50-year conspiracy to conceal the hazards of smoking and the addictive nature of cigarettes.

On February 25th, 2015, a settlement was announced of more than 400 Florida smoker lawsuits against the major cigarette companies Philip Morris USA Inc., R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company.  As a part of the settlement, the companies will collectively pay $100 million to injured smokers or their families. This was the first

settlement ever by the cigarette companies of smoker cases on a group basis.

Lieff Cabraser attorneys tried over 20 cases in Florida federal court against the tobacco industry on behalf of individual smokers or their estates, and with co-counsel obtained over $105 million in judgments for our clients.  Two of the jury verdicts Lieff Cabraser attorneys obtained in the litigation were ranked by *The National Law Journal* as among the Top 100 Verdicts of 2014.

13.   ***In re Takata Airbag Litigation***, MDL No. 2599 (S.D. Fl.). Lieff Cabraser serves on the Plaintiffs Steering Committee in the national litigation related to Takata Corporation's defective and dangerous airbags manufactured by Japan-based Takata Corporation. Nearly 42 million vehicles have been recalled worldwide, making this the largest automotive recall in U.S. history.

The airbags contain an unstable propellant that can cause the airbag to explode upon impact in an accident, shooting metal casing debris towards drivers and passengers. Close to 300 injuries, including 23 deaths, have been linked to the airbags. The complaints charge that the company knew of defects in its airbags a decade ago after conducting secret tests of the products that showed dangerous flaws. Rather than alert federal safety regulators to these risks, Takata allegedly ordered its engineers to delete the test data. The complaints also allege that the vehicle manufacturers who used these airbags ignored numerous warning signs that they were not safe.

To date, Lieff Cabraser and our co-counsel have secured over $1.5 billion in settlements from Honda, Toyota, Ford, Nissan, BMW, Subaru, and Mazda. Litigation continues against Volkswagen, Mercedes, Fiat Chrysler, and General Motors.

14.   ***Stryker Metal Hip Implant Litigation***, MDL No. 2441 (D. Minn.). Lieff Cabraser represents over 60 hip replacement patients nationwide who received the recalled Stryker Rejuvenate and ABG II modular hip implant systems.  Wendy Fleishman serves on the Plaintiffs' Lead Counsel Committee of the multidistrict litigation cases.  These patients have suffered tissue damage and have high metal particle levels in their blood stream.  For many patients, the Stryker hip implant failed necessitating painful revision surgery to extract and replace the artificial hip.

On November 3, 2014, a settlement was announced in the litigation against Stryker Corporation for the recall of its Rejuvenate and ABG II artificial hip implants. Under the settlement, Stryker will provide a base payment of $300,000 to patients that received the Rejuvenate or ABG II hip systems and underwent revision surgery by November 3, 2014, to

remove and replace the devices.  Stryker's liability is not capped.  It is expected that the total amount of payments under the settlement will far exceed $1 billion dollars. Payments under the settlement program are projected for disbursement at the end of 2015.

15.     ***DePuy Metal Hip Implants Litigation***, MDL No. 2244 (N.D. Tex.). Lieff Cabraser represents nearly 200 patients nationwide who received the ASR XL Acetabular and ASR Hip Resurfacing systems manufactured by DePuy Orthopedics, a unit of Johnson & Johnson.  In 2010, DePuy Orthopedics announced the recall of its all-metal ASR hip implants, which were implanted in approximately 40,000 U.S. patients from 2006 through August 2010.  The complaints allege that DePuy Orthopedics was aware its ASR hip implants were failing at a high rate, yet continued to manufacture and sell the device.  In January 2011, in *In re DePuy Orthopaedics, Inc.* ASR Hip Implant Products, MDL No. 2197, the Court overseeing all DePuy recall lawsuits in federal court appointed Lieff Cabraser partner Wendy R. Fleishman to the Plaintiffs' Steering Committee for the organization and coordination of the litigation.  In July 2011, in the coordinated proceedings in California state court, the Court appointed Lieff Cabraser partner Robert J. Nelson to serve on the Plaintiffs' Steering Committee.

In 2013, Johnson & Johnson announced its agreement to pay at least $2.5 billion to resolve thousands of defective DePuy ASR hip implant lawsuits. Under the settlement, J&J offers to pay a base award of $250,000 to U.S. citizens and residents who are more than 180 days from their hip replacement surgery, and prior to August 31, 2013, had to undergo revision surgery to remove and replace their faulty DePuy hip ASR XL or ASR resurfacing hip.  The $250,000 base award payment will be adjusted upward or downward depending on medical factors specific to each patient.  Lieff Cabraser also represents nearly 100 patients whose DePuy Pinnacle artificial hips containing a metal insert called the Ultamet metal liner have prematurely failed.

16.     ***Mirena Litigation***.  A widely-used, plastic intrauterine device (IUD) that releases a hormone into the uterus to prevent pregnancy, Mirena is manufactured by Bayer Healthcare Pharmaceuticals.  Lieff Cabraser represents patients who have suffered serious injuries linked to the IUD. These injuries include uterine perforation (the IUD tears through the cervix or the wall of the uterus), ectopic pregnancy (when the embryo implants outside the uterine cavity), pelvic infections and pelvic inflammatory disease, and thrombosis (blood clots).

17.     ***Birth Defects Litigation***.  Lieff Cabraser represents children and their parents who have suffered birth defects as a result of problematic pregnancies and improper medical care, improper prenatal genetic

screening, ingestion by the mother of prescription drugs during pregnancy which had devastating effects on their babies. These birth defects range from heart defects, physical malformations, and severe brain damage associated with complex emotional and developmental delays. Taking of antidepressants during pregnancy has been linked to multiple types of birth defects, neonatal abstinence syndrome from experiencing withdrawal of the drug, and persistent pulmonary hypertension of the newborn (PPHN).

18.     ***Vaginal Surgical Mesh Litigation***.  Lieff Cabraser represents more than 300 women nationwide who have been seriously injured as a result of polypropylene vaginal surgical mesh implantation as a treatment for pelvic organ prolapse or stress urinary incontinence. Manufactured by Johnson & Johnson, Boston Scientific, AMS, Bard, Caldera, Coloplast, and others, these products have been linked to serious side effects including erosion into the vaginal wall or other organs, infection, internal organ damage, and urinary problems. As of early 2016, the firm is in all phases of litigation and settlement on these cases.

19.     ***Xarelto Litigation.***  Lieff Cabraser represents patients prescribed Xarelto sold in the U.S. by Janssen Pharmaceuticals, a subsidiary of Johnson & Johnson.  The complaints charge that Xarelto, approved to prevent blood clots, is a dangerous and defective drug because it triggers in certain patients uncontrolled bleeding and other life-threatening complications. Unlike Coumadin, an anti-clotting drug approved over 50 years ago, the concentration of Xarelto in a patient's blood cannot be reversed in the case of overdose or other serious complications.  If a Xarelto patient has an emergency bleeding event -- such as from a severe injury or major brain or GI tract bleeding -- the results can be fatal.

20.     ***Benicar Litigation***, MDL No. 2606 (D. N.J.).  Lieff Cabraser represents patients prescribed the high blood pressure medication Benicar who have experienced chronic diarrhea with substantial weight loss, severe gastrointestinal problems, and the life-threatening conditions of sprue-like enteropathy and villous atrophy in litigation against Japan-based Daiichi Sankyo, Benicar's manufacturer, and Forest Laboratories, which marketed Benicar in the U.S.

The complaints allege that Benicar was insufficiently tested and not accompanied by adequate instructions and warnings to apprise consumers of the full risks and side effects associated with its use.  Lieff Cabraser attorney Lexi J. Hazam serves on the Plaintiffs' Steering Committee for the nationwide Benicar MDL litigation and was appointed Co-Chair of the Benicar MDL Plaintiffs' Science and Experts Committee. Plaintiffs recently filed motions to compel defense to produce additional discovery. The judge ruled with plaintiffs in the fall of 2015. In August

2017, a settlement with Daiichi Sankyo Inc. and Forest Laboratories Inc. valued at $300 million covering approximately 2,300 Benicar injury cases in both state and federal courts was announced.

21.     ***Risperdal Litigation***.  In 2013, Johnson & Johnson and its subsidiary Janssen Pharmaceuticals, the manufacture of the antipsychotic prescription drugs Risperdal and Invega, entered into a $2.2 billion settlement with the U.S. Department of Justice for over promoting the drugs.  The government alleged that J&J and Janssen knew Risperdal triggered the production of prolactin, a hormone that stimulates breast development (gynecomastia) and milk production.

Lieff Cabraser represents parents whose sons developed abnormally large breasts while prescribed Risperdal and Invega in lawsuits charging that Risperdal is a defective and dangerous prescription drug and seeking monetary damages for the mental anguish and physical injuries the young men suffered.

22.     ***Power Morcellators Litigation***, MDL No. 2652 (D. Kan.).  Lieff Cabraser represents women who underwent a hysterectomy (the removal of the uterus) or myomectomy (the removal of uterine fibroids) in which a laparoscopic power morcellator was used.  In November 2014, the FDA warned surgeons that they should avoid the use of laparoscopic power morcellators for removing uterine tissue in the vast majority of cases due to the risk of the devices spreading unsuspected cancer.  Based on current data, the FDA estimates that 1 in 350 women undergoing hysterectomy or myomectomy for the treatment of fibroids have an unsuspected uterine sarcoma, a type of uterine cancer that includes leiomyosarcoma.

23.     ***In re New England Compounding Pharmacy Inc. Products Liability Litigation***, MDL No. 2419 (D. Mass.). Lieff Cabraser represents patients injured or killed by a nationwide fungal meningitis outbreak in 2012. More than 14,000 patients across the U.S. were injected with a contaminated medication that caused the outbreak. The New England Compounding Center ("NECC") in Framingham, Massachusetts, manufactured and sold the drug – an epidural steroid treatment designed to relieve back pain.  The contaminated steroid was sold to patients at a number of pain clinics. Nearly 800 patients developed fungal meningitis, and more than 70 patients died.

Lieff Cabraser is a member of the Plaintiffs' Steering Committee in the multi-district litigation, and our attorneys act as federal-state liaison counsel. In May 2015, the U.S. Bankruptcy Court approved a $200 million partial settlement for victims of the outbreak. Bellwether trials against remaining defendants commenced in 2016. Lieff Cabraser is expected to play a lead role in the bellwether trials.

B.     **Successes**

1.     ***Multi-State Tobacco Litigation***.  Lieff Cabraser represented the
       Attorneys General of Massachusetts, Louisiana and Illinois, several
       additional states, and 21 cities and counties in California, in litigation
       against Philip Morris, R.J. Reynolds and other cigarette manufacturers.
       The suits were part of the landmark $206 billion settlement announced in
       November 1998 between the tobacco industry and the states' attorneys
       general.  The states, cities and counties sought both to recover the public
       costs of treating smoking-related diseases and require the tobacco
       industry to undertake extensive modifications of its marketing and
       promotion activities in order to reduce teenage smoking.  In California
       alone, Lieff Cabraser's clients were awarded an estimated $12.5 billion to
       be paid through 2025.

2.     ***In re Vioxx Products Liability Litigation***, MDL No. 1657 (E.D. La.).
       Lieff Cabraser represented patients who suffered heart attacks or strokes,
       and the families of loved ones who died, after having been prescribed the
       arthritis and pain medication Vioxx. In individual personal injury lawsuits
       against Merck, the manufacturer of Vioxx, our clients allege that Merck
       falsely promoted the safety of Vioxx and failed to disclose the full range of
       the drug's dangerous side effects.  In April 2005, in the federal
       multidistrict litigation, the Court appointed Elizabeth J. Cabraser to the
       Plaintiffs' Steering Committee, which has the responsibility of conducting
       all pretrial discovery of Vioxx cases in federal court and pursuing all
       settlement options with Merck.  In August 2006, Lieff Cabraser was co-
       counsel in *Barnett v. Merck*, which was tried in the federal court in New
       Orleans.  Lieff Cabraser attorneys Don Arbitblit and Jennifer Gross
       participated in the trial, working closely with attorneys Mark Robinson
       and Andy Birchfield. The jury reached a verdict in favor of Mr. Barnett,
       finding that Vioxx caused his heart attack, and that Merck's conduct
       justified an award of punitive damages.  In November 2007, Merck
       announced it had entered into an agreement with the executive
       committee of the Plaintiffs' Steering Committee as well as representatives
       of plaintiffs' counsel in state coordinated proceedings.  Merck paid
       $4.85 billion into a settlement fund for qualifying claims.

3.     ***In re Silicone Gel Breast Implants Products Liability
       Litigation***, MDL No. 926 (N.D. Ala.). Lieff Cabraser served on the
       Plaintiffs' Steering Committee and was one of five members of the
       negotiating committee which achieved a $4.25 billion global settlement
       with certain defendants of the action. This was renegotiated in 1995, and
       is referred to as the Revised Settlement Program ("RSP").  Over 100,000
       recipients have received initial payments, reimbursement for the
       explanation expenses and/or long term benefits.

4.      ***Fen-Phen ("Diet Drugs") Litigation***.  Since the recall was announced in 1997, Lieff Cabraser has represented individuals who suffered injuries from the "Fen-Phen" diet drugs fenfluramine (sold as Pondimin) and/or dexfenfluramine (sold as Redux).  The firm served as counsel for the plaintiff who filed the first nationwide class action lawsuit against the diet drug manufacturers alleging that they had failed to adequately warn physicians and consumers of the risks associated with the drugs.  In *In re Diet Drugs (Phentermine / Fenfluramine / Dexfenfluramine) Products Liability Litigation*, MDL No. 1203 (E.D. Pa.), the Court appointed Elizabeth J. Cabraser to the Plaintiffs' Management Committee which organized and directed the Fen-Phen diet drugs litigation in federal court.  In August 2000, the Court approved a $4.75 billion settlement offering both medical monitoring relief for persons exposed to the drug and compensation for persons with qualifying damage.  Lieff Cabraser represented over 2,000 persons that suffered valvular heart disease, pulmonary hypertension or other problems (such as needing echocardiogram screening for damage) due to  and/or following exposure to Fen-Phen and obtained more than $350 million in total for clients in individual cases and/or claims.

5.      ***In re Actos (Pioglitazone) Products Liability Litigation***, MDL No. 2299 (W.D. La.).  Lieff Cabraser represents 90 diabetes patients who developed bladder cancer after exposure to the prescription drug pioglitazone, sold as Actos by Japan-based Takeda Pharmaceutical Company and its American marketing partner, Eli Lilly.

Lieff Cabraser is a member of the Plaintiffs' Steering Committee in the Actos MDL. In 2014, Lieff Cabraser served on the trial team in the case of *Allen v. Takeda*, working closely with lead trial counsel in federal court in Louisiana. The jury awarded $9 billion in punitive damages, finding that Takeda and Lilly failed to adequately warn about the bladder cancer risks of Actos and had acted with wanton and reckless disregard for patient safety. The trial judge reduced the punitive damage award but upheld the jury's findings of misconduct, and ruled that a multiplier of 25 to 1 for punitive damages was justified.

In April 2015, Takeda agreed to settle all bladder cancer claims brought by Type 2 diabetes patients who took Actos prior to December 1, 2011 and who were diagnosed with bladder cancer on or before April 28, 2015 and were represented by counsel by May 1, 2015. The settlement amount is $2.4 billion. Average payments of about $250,000 per person will be increased for more severe injuries.

6.      ***Jane Doe et al. v. George Tyndall and the University of Southern California***, Case No. 2:18-cv-05010 (C.D. Cal.). In June of 2018, Lieff Cabraser and co-counsel filed a class action lawsuit on behalf

of women who were sexually abused, harassed, and molested by gynecologist George Tyndall, M.D., while they were students at University of Southern California ("USC"). As alleged in the complaint, despite the fact that USC has publicly admitted that it received numerous complaints of Tyndall's sexually abusive behavior, dating back to at least the year 2000, USC actively and deliberately concealed Tyndall's sexual abuse for years, continuing to grant Tyndall unfettered sexual access to the female USC students in his care. USC hid the complaints despite the fact that many of the complaints came directly from its own employees and staff, including nurses and medical assistants who were physically present during the examinations as "chaperones," and witnessed the sexual misconduct firsthand. Despite receiving years of serious complaints of significant misconduct about Tyndall, including sexual misconduct, USC failed to take any meaningful action to address the complaints until it was finally forced to do so in June 2016.

On February 12, 2019, University of Southern California (USC) students and alumni filed a class action settlement agreement resolving claims related to gynecologist George Tyndall, M.D. that will require USC to adopt and implement significant and permanent procedures for identification, prevention, and reporting of sexual and racial misconduct, as well as recognize all of Tyndall's patients through a $215 million fund that gives every survivor a choice in how to participate. The settlement proposes a tiered structure for recovery that allows victims to choose the level of engagement they wish to have with the claims process and how they wish to communicate their stories. All women who USC's records show saw Tyndall for a women's health visit will automatically get a $2,500 check, and the further tiers are structured to allow victims to choose their level of engagement with the process – if they only want to submit claims in writing, they can choose that, which allows them a certain range of potential claim payments above the 2,500 floor; if they are willing and able to provide an interview, they can be eligible for a range up to the highest $250,000 amount. But at all levels, the settlement is designed to provide victims with a safe process within which to come forward, where they have control over how much they want to engage at their chosen level of comfort.

On February 19, 2020, Judge Steven V. Wilson of the U.S. District Court for the Central District of California granted final approval to the $215 million settlement of the gender violence and sexual abuse class action litigation filed on behalf of nearly 18,000 women against Dr. George Tyndall and the University of Southern California.

7.  ***Yaz and Yasmin Litigation***.  Lieff Cabraser represented women prescribed Yasmin and Yaz oral contraceptives who suffered blood clots, deep vein thrombosis, strokes, and heart attacks, as well as the families of

loved ones who died suddenly while taking these medications.  The complaints alleged that Bayer, the manufacturer of Yaz and Yasmin, failed to adequately warn patients and physicians of the increased risk of serious adverse effects from Yasmin and Yaz.  The complaints also charged that these oral contraceptives posed a greater risk of serious side effects than other widely available birth control drugs. To date, Bayer has announced settlements of 7,660 claims – totaling $1.6 billion – in the Yaz birth control lawsuits.

8.   ***Sulzer Hip and Knee Prosthesis Liability Litigation***.  In December 2000, Sulzer Orthopedics, Inc., announced the recall of approximately 30,000 units of its Inter-Op Acetabular Shell Hip Implant, followed in May 2001 with a notification of failures of its Natural Knee II Tibial Baseplate Knee Implant.  In coordinated litigation in California state court, *In re Hip Replacement Cases*, JCCP 4165, Lieff Cabraser served as Court-appointed Plaintiffs' Liaison Counsel and Co-Lead Counsel.  In the federal litigation, *In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation*, MDL No. 1410, Lieff Cabraser played a significant role in negotiating a revised global settlement of the litigation valued at more than $1 billion.  The revised settlement, approved by the Court in May 2002, provided patients with defective implants almost twice the cash payment as under an initial settlement.  On behalf of our clients, Lieff Cabraser objected to the initial settlement.

9.   ***In re Bextra/Celebrex Marketing Sales Practices and Products Liability Litigation***, MDL No. 1699 (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Liaison Counsel and Elizabeth J. Cabraser chaired the Plaintiffs' Steering Committee (PSC) charged with overseeing all personal injury and consumer litigation in federal courts nationwide arising out of the sale and marketing of the COX-2 inhibitors Bextra and Celebrex, manufactured by Pfizer, Inc. and its predecessor companies Pharmacia Corporation and G.D. Searle, Inc.

Under the global resolution of the multidistrict tort and consumer litigation announced in October 2008, Pfizer paid over $800 million to claimants, including over $750 million to resolve death and injury claims.

In a report adopted by the Court on common benefit work performed by the PSC, the Special Master stated:

> [L]eading counsel from both sides, and the attorneys from the PSC who actively participated in this litigation, demonstrated the utmost skill and professionalism in dealing with numerous complex legal and factual issues.  The briefing presented to the Special Master, and also to the Court, and the development of evidence by both sides was exemplary.  The Special Master particularly

wishes to recognize that leading counsel for both sides
worked extremely hard to minimize disputes, and when
they arose, to make sure that they were raised with a
minimum of rancor and a maximum of candor before the
Special Master and Court.

10.     ***In re Guidant Implantable Defibrillators Products Liability
Litigation***, MDL No. 1708 (D. Minn.).  Lieff Cabraser served as
Plaintiffs' Co-Lead Counsel in litigation in federal court arising out of the
recall of Guidant cardiac defibrillators implanted in patients because of
potential malfunctions in the devices.  At the time of the recall, Guidant
admitted it was aware of 43 reports of device failures, and two patient
deaths. Guidant subsequently acknowledged that the actual rate of failure
may be higher than the reported rate and that the number of associated
deaths may be underreported since implantable cardio-defibrillators are
not routinely evaluated after death.  In January 2008, the parties reached
a global settlement of the action. Guidant's settlements of defibrillator-
related claims will total $240 million.

11.     ***In re Copley Pharmaceutical, Inc., "Albuterol" Products
Liability Litigation***, MDL No. 1013 (D. Wyo.).  Lieff Cabraser served
on the Plaintiffs' Steering Committee in a class action lawsuit against
Copley Pharmaceutical, which manufactured Albuterol, a bronchodilator
prescription pharmaceutical.  Albuterol was the subject of a nationwide
recall in January 1994 after a microorganism was found to have
contaminated the solution, allegedly causing numerous injuries including
bronchial infections, pneumonia, respiratory distress and, in some cases,
death.  In October 1994, the District Court certified a nationwide class on
liability issues.  *In re Copley Pharmaceutical*, 161 F.R.D. 456 (D. Wyo.
1995).  In November 1995, the District Court approved a $150 million
settlement of the litigation.

12.     ***In re Telectronics Pacing Systems Inc., Accufix Atrial "J"
Leads Products Liability Litigation***, MDL No. 1057 (S.D. Ohio).
Lieff Cabraser served on the Court-appointed Plaintiffs' Steering
Committee in a nationwide products liability action alleging that
defendants placed into the stream of commerce defective pacemaker
leads.  In April 1997, the District Court re-certified a nationwide class of
"J" Lead implantees with subclasses for the claims of medical monitoring,
negligence and strict product liability.  A summary jury trial, utilizing jury
instructions and interrogatories designed by Lieff Cabraser, occurred in
February 1998.  A partial settlement was approved thereafter by the
District Court but reversed by the Court of Appeals.  In March 2001, the
District Court approved a renewed settlement that included a $58 million
fund to satisfy all past, present and future claims by patients for their
medical care, injuries, or damages arising from the lead.

13. ***Mraz v. DaimlerChrysler***, No. BC 332487 (Cal. Supr. Ct.).  In March 2007, the jury returned a $54.4 million verdict, including $50 million in punitive damages, against DaimlerChrysler for intentionally failing to cure a known defect in millions of its vehicles that led to the death of Richard Mraz, a young father.  Mr. Mraz suffered fatal head injuries when the 1992 Dodge Dakota pickup truck he had been driving at his work site ran him over after he exited the vehicle believing it was in park.  The jury found that a defect in the Dodge Dakota's automatic transmission, called a park-to-reverse defect, played a substantial factor in Mr. Mraz's death and that DaimlerChrysler was negligent in the design of the vehicle for failing to warn of the defect and then for failing to adequately recall or retrofit the vehicle.

For their outstanding service to their clients in Mraz and advancing the rights of all persons injured by defective products, Lieff Cabraser partner Robert J. Nelson, the lead trial counsel, received the 2008 California Lawyer of the Year (CLAY) Award in the field of personal injury law, and was also selected as finalists for Attorney of the Year by the Consumer Attorneys of California and the San Francisco Trial Lawyers Association.

In March 2008, a Louisiana-state jury found DaimlerChrysler liable for the death of infant Collin Guillot and injuries to his parents Juli and August Guillot and their then 3-year-old daughter, Madison. The jury returned a unanimous verdict of $5,080,000 in compensatory damages. The jury found that a defect in the Jeep Grand Cherokee's transmission, called a park-to-reverse defect, played a substantial factor in Collin Guillot's death and the severe injuries suffered by Mr. and Mrs. Guillot and their daughter.  Lieff Cabraser served as co-counsel in the trial.

14. ***Craft v. Vanderbilt University***, Civ. No. 3-94-0090 (M.D. Tenn.). Lieff Cabraser served as Lead Counsel of a certified class of over 800 pregnant women and their children who were intentionally fed radioactive iron isotopes without consent while receiving prenatal care at the Vanderbilt University hospital as part of a study on iron absorption during pregnancy. The women were not informed of the nature and risks of the study. Instead, they were told that the solution they were fed was a "vitamin cocktail." In the 1960's, Vanderbilt conducted a follow-up study to determine the health effects of the plaintiffs' prior radiation exposure. Throughout the follow-up study, Vanderbilt concealed from plaintiffs the fact that they had been involuntarily exposed to radiation, and that the purpose of the follow-up study was to determine whether there had been an increased rate of childhood cancers among those exposed *in utero*. Vanderbilt also did not inform plaintiffs of the results of the follow-up study, which revealed a disproportionately high incidence of cancers among the children born to the women fed the radioactive iron.

The facts surrounding the administration of radioactive iron to the pregnant women and their children in utero only came to light as a result of U.S. Energy Secretary Hazel O'Leary's 1993 disclosures of government-sponsored human radiation experimentation during the Cold War. Defendants' attempts to dismiss the claims and decertify the class were unsuccessful. 18 F. Supp.2d 786 (M.D. Tenn. 1998). The case was settled in July 1998 for a total of $10.3 million and a formal apology from Vanderbilt.

15.     ***Simply Thick Litigation***.  Lieff Cabraser represented parents whose infants died or suffered gave injuries linked to Simply Thick, a thickening agent for adults that was promoted to parents, caregivers, and health professional for use by infants to assist with swallowing.  The individual lawsuits alleged that Simply Thick when fed to infants caused necrotizing enterocolitis (NEC), a life-threatening condition characterized by the inflammation and death of intestinal tissue.  In 2014, the litigation was resolved on confidential terms.

16.     ***Medtronic Infuse Litigation***.  Lieff Cabraser represented patients who suffered serious injuries from the off-label use of the Infuse bone graft, manufactured by Medtronic Inc.  The FDA approved Infuse for only one type of spine surgery, the anterior lumbar fusion.  Many patients, however, received an off-label use of Infuse and were never informed of the off-label nature of the surgery. Serious complications associated with Infuse included uncontrolled bone growth and chronic pain from nerve injuries.  In 2014, the litigation was settled on confidential terms.

17.     ***Wright Medical Hip Litigation***.  The Profemur-Z system manufactured by Wright Medical Technology consisted of three separate components:  a femoral head, a modular neck, and a femoral stem.  Prior to 2009, Profemur-Z hip system included a titanium modular neck adapter and stem which was implanted in 10,000 patients.  Lieff Cabraser represented patients whose Profemur-Z hip implant fractured, requiring a revision surgery.  In 2013 and 2014, the litigation was resolved on confidential terms.

18.     ***In re Zimmer Durom Cup Product Liability Litigation***, MDL No. 2158 (D. N.J.).  Lieff Cabraser served as Co-Liaison Counsel for patients nationwide injured by the defective Durom Cup manufactured by Zimmer Holdings.  First sold in the U.S. in 2006, Zimmer marketed its 'metal-on-metal' Durom Cup implant as providing a greater range of motion and less wear than traditional hip replacement components.  In July 2008, Zimmer announced the suspension of Durom sales.  The complaints charged that the Durom cup was defective and led to the premature failure of the implant.  In 2011 and 2012, the patients represented by Lieff Cabraser settled their cases with Zimmer on favorable, confidential terms.

19.     ***Luisi v. Medtronic***, No. 07 CV 4250 (D. Minn.).  Lieff Cabraser represented over seven hundred heart patients nationwide who were implanted with recalled Sprint Fidelis defibrillator leads manufactured by Medtronic Inc.  Plaintiffs charge that Medtronic has misrepresented the safety of the Sprint Fidelis leads and a defect in the device triggered their receiving massive, unnecessary electrical shocks.  A settlement of the litigation was announced in October 2010.

20.     ***Blood Factor VIII and Factor IX Litigation***, MDL No. 986 (N.D. Il.)  Working with counsel in Asia, Europe, Central and South America and the Middle East, Lieff Cabraser represented over 1,500 hemophiliacs worldwide, or their survivors and estates, who contracted HIV and/or Hepatitis C (HCV), and Americans with hemophilia who contracted HCV, from contaminated and defective blood factor products produced by American pharmaceutical companies.  In 2004, Lieff Cabraser was appointed Plaintiffs' Lead Counsel of the "second generation" Blood Factor MDL litigation presided over by Judge Grady in the Northern District of Illinois.  The case was resolved through a global settlement signed in 2009.

21.     ***In Re Yamaha Motor Corp. Rhino ATV Products Liability Litigation***, MDL No. 2016 (W.D. Ky.)  Lieff Cabraser served as Plaintiffs' Lead Counsel in the litigation in federal court and Co-Lead Counsel in coordinated California state court litigation arising out of serious injuries and deaths in rollover accidents involving the Yamaha Rhino.  The complaints charged that the Yamaha Rhino contained numerous design flaws, including the failure to equip the vehicles with side doors, which resulted in repeated broken or crushed legs, ankles or feet for riders.  Plaintiffs alleged also that the Yamaha Rhino was unstable due to a narrow track width and high center of gravity leading to rollover accidents that killed and/or injured scores of persons across the nation.

On behalf of victims and families of victims and along with the Center for Auto Safety, and the San Francisco Trauma Foundation, Lieff Cabraser advocated for numerous safety changes  to the Rhino in reports submitted to the U.S. Consumer Product Safety Commission (CPSC).  On March 31, 2009, the CPSC, in cooperation with Yamaha Motor Corp. U.S.A., announced a free repair program for all Rhino 450, 660, and 700 models to improve safety, including  the addition of spacers and removal of a rear only anti-sway bar.

22.     ***Advanced Medical Optics Complete MoisturePlus Litigation***. Lieff Cabraser represented consumers nationwide in personal injury lawsuits filed against Advanced Medical Optics arising out of the May 2007 recall of AMO's Complete MoisturePlus Multi-Purpose Contact Lens Solution.  The product was recalled due to reports of a link between a

rare, but serious eye infection, *Acanthamoeba keratitis*, caused by a parasite and use of AMO's contact lens solution.  Though AMO promoted Complete MoisturePlus Multi-Purpose as "effective against the introduction of common ocular microorganisms," the complaints charged that AMO's lens solution was ineffective and vastly inferior to other multipurpose solutions on the market.  In many cases, patients were forced to undergo painful corneal transplant surgery to save their vision and some have lost all or part of their vision permanently.  The patients represented by Lieff Cabraser resolved their cases with AMO on favorable, confidential terms.

23.   ***Gol Airlines Flight 1907 Amazon Crash***.  Lieff Cabraser served as Plaintiffs' Liaison Counsel and represents over twenty families whose loved ones died in the Gol Airlines Flight 1907 crash.  On September 29, 2006, a brand-new Boeing 737-800 operated by Brazilian air carrier Gol plunged into the Amazon jungle after colliding with a smaller plane owned by the American company ExcelAire Service, Inc.  None of the 149 passengers and six crew members on board the Gol flight survived the accident.

The complaint charged that the pilots of the ExcelAire jet were flying at an incorrect altitude at the time of the collision, failed to operate the jet's transponder and radio equipment properly, and failed to maintain communication with Brazilian air traffic control in violation of international civil aviation standards.  If the pilots of the ExcelAire aircraft had followed these standards, the complaint charged that the collision would not have occurred.

At the time of the collision, the ExcelAire aircraft's transponder, manufactured by Honeywell, was not functioning.  A transponder transmits a plane's altitude and operates its automatic anti-collision system.  The complaint charged that Honeywell shares responsibility for the tragedy because it defectively designed the transponder on the ExcelAire jet, and failed to warn of dangers resulting from foreseeable uses of the transponder.  The cases settled after they were sent to Brazil for prosecution.

24.   ***Comair CRJ-100 Commuter Flight Crash in Lexington, Kentucky***.  A Bombardier CRJ-100 commuter plane operated by Comair, Inc., a subsidiary of Delta Air Lines, crashed on August 27, 2006 shortly after takeoff at Blue Grass Airport in Lexington, Kentucky, killing 47 passengers and two crew members. The aircraft attempted to take off from the wrong runway.  The families represented by Lieff Cabraser obtained substantial economic recoveries in a settlement of the case.

25.   ***In re ReNu With MoistureLoc Contact Lens Solution Products Liability Litigation***, MDL No. 1785 (D. S.C.).  Lieff Cabraser served on

the Plaintiffs' Executive Committee in federal court litigation arising out of Bausch & Lomb's 2006 recall of its ReNu with MoistureLoc contact lens solution.  Consumers who developed *Fusarium keratitis*, a rare and dangerous fungal eye infection, as well as other serious eye infections, alleged the lens solution was defective.  Some consumers were forced to undergo painful corneal transplant surgery to save their vision; others lost all or part of their vision permanently.  The litigation was resolved under favorable, confidential settlements with Bausch & Lomb.

26.   ***Helios Airways Flight 522 Athens, Greece Crash***.  On August 14, 2005, a Boeing 737 operating as Helios Airways flight 522 crashed north of Athens, Greece, resulting in the deaths of all passengers and crew. The aircraft was heading from Larnaca, Cyprus to Athens International Airport when ground controllers lost contact with the pilots, who had radioed in to report problems with the air conditioning system. Press reports about the official investigation indicate that a single switch for the pressurization system on the plane was not properly set by the pilots, and eventually both were rendered unconscious, along with most of the passengers and cabin crew.

Lieff Cabraser represented the families of several victims, and filed complaints alleging that a series of design defects in the Boeing 737-300 contributed to the pilots' failure to understand the nature of the problems they were facing. Foremost among those defects was a confusing pressurization warning "horn" which uses the same sound that alerts pilots to improper takeoff and landing configurations. The families represented by Lieff Cabraser obtained substantial economic recoveries in a settlement of the case.

27.   ***Legend Single Engine "Turbine Legend" Kit Plane Crash***.  On November 19, 2005, a single engine "Turbine Legend" kit plane operated by its owner crashed shortly after takeoff from a private airstrip in Tucson, Arizona, killing both the owner/pilot and a passenger. Witnesses report that the aircraft left the narrow runway during the takeoff roll and although the pilot managed to get the plane airborne, it rolled to the left and crashed.

Lieff Cabraser investigated the liability of the pilot and others, including the manufacturer of the kit and the operator of the airport from which the plane took off. The runway was 16 feet narrower than the minimum width recommended by the Federal Aviation Administration.  Lieff Cabraser represented the widow of the passenger, and the case was settled on favorable, confidential terms.

28.   ***Manhattan Tourist Helicopter Crash***. On June 14, 2005, a Bell 206 helicopter operated by Helicopter Flight Services, Inc. fell into the East River shortly after taking off for a tourist flight over New York City. The

pilot and six passengers were immersed upside-down in the water as the helicopter overturned. Lieff Cabraser represented a passenger on the helicopter and the case was settled on favorable, confidential terms.

29. ***U.S. Army Blackhawk Helicopter Tower Collision***. Lieff Cabraser represented the family of a pilot who died in the November 29, 2004 crash of a U.S. Army Black Hawk Helicopter.  The Black Hawk was flying during the early morning hours at an altitude of approximately 500 feet when it hit cables supporting a 1,700 foot-tall television tower, and subsequently crashed 30 miles south of Waco, Texas, killing both pilots and five passengers, all in active Army service.  The tower warning lights required by government regulations were inoperative.  The case was resolved through a successful, confidential settlement.

30. ***Air Algerie Boeing 737 Crash***. Together with French co-counsel, Lieff Cabraser represented the families of several passengers who died in the March 6, 2003 crash of a Boeing 737 airplane operated by Air Algerie. The aircraft crashed soon after takeoff from the Algerian city of Tamanrasset, after one of the engines failed. All but one of the 97 passengers were killed, along with six crew members. The families represented by Lieff Cabraser obtained economic recoveries in a settlement of the case.

31. ***In re Baycol Products Litigation***, MDL No. 1431 (D. Minn.).  Baycol was one of a group of drugs called statins, intended to reduce cholesterol. In August 2001, Bayer A.G. and Bayer Corporation, the manufacturers of Baycol, withdrew the drug from the worldwide market based upon reports that Baycol was associated with serious side effects and linked to the deaths of over 100 patients worldwide.  In the federal multidistrict litigation, Lieff Cabraser served as a member of the Plaintiffs' Steering Committee (PSC) and the Executive Committee of the PSC.  In addition, Lieff Cabraser represented approximately 200 Baycol patients who suffered injuries or family members of patients who died allegedly as a result of ingesting Baycol.  In these cases, our clients reached confidential favorable settlements with Bayer.

32. ***United Airlines Boeing 747 Disaster***. Lieff Cabraser served as Plaintiffs' Liaison Counsel on behalf of the passengers and families of passengers injured and killed in the United Airlines Boeing 747 cargo door catastrophe near Honolulu, Hawaii on February 24, 1989. Lieff Cabraser organized the litigation of the case, which included claims brought against United Airlines and The Boeing Company.

Among other work, Lieff Cabraser developed a statistical system for settling the passengers' and families' damages claims with certain defendants, and coordinated the prosecution of successful individual damages trials for wrongful death against the non-settling defendants.

33. ***Aeroflot-Russian International Airlines Airbus Disaster***. Lieff
Cabraser represented the families of passengers who were on Aeroflot-
Russian International Airlines Flight SU593 that crashed in Siberia on
March 23, 1994. The plane was en route from Moscow to Hong Kong. All
passengers on board died.

According to a transcript of the cockpit voice recorder, the pilot's two
children entered the cockpit during the flight and took turns flying the
plane. The autopilot apparently was inadvertently turned off during this
time, and the pilot was unable to remove his son from the captain's seat in
time to avert the plane's fatal dive.

Lieff Cabraser, alongside French co-counsel, filed suit in France, where
Airbus, the plane's manufacturer, was headquartered.  The families Lieff
Cabraser represented obtained substantial economic recoveries in
settlement of the action.

34. ***Lockheed F-104 Fighter Crashes***.  In the late 1960s and extending
into the early 1970s, the United States sold F-104 Star Fighter jets to the
German Air Force that were manufactured by Lockheed Aircraft
Corporation in California. Although the F-104 Star Fighter was designed
for high-altitude fighter combat, it was used in Germany and other
European countries for low-level bombing and attack training missions.

Consequently, the aircraft had an extremely high crash rate, with over
300 pilots killed. Commencing in 1971, the law firm of Belli Ashe Ellison
Choulos & Lieff filed hundreds of lawsuits for wrongful death and other
claims on behalf of the widows and surviving children of the pilots.

Robert Lieff continued to prosecute the cases after the formation of our
firm.  In 1974, the lawsuits were settled with Lockheed on terms favorable
to the plaintiffs. This litigation helped establish the principle that citizens
of foreign countries could assert claims in United States courts and obtain
substantial recoveries against an American manufacturer, based upon
airplane accidents or crashes occurring outside the United States.

## II.   Securities and Financial Fraud

### A.   Current Cases

1. ***BlackRock Global Allocation Fund, Inc., et al. v. Valeant
Pharmaceuticals International, Inc., et al.***, No. 3:18-cv-00343
(D.N.J.) ("Valeant").  Lieff Cabraser represents certain funds and
accounts of institutional investor BlackRock in an individual action
against Valeant Pharmaceuticals International, Inc. and certain of
Valeant's senior officers and directors for violations of the Securities Act
of 1933 and/or the Securities Exchange Act of 1934 arising from

Defendants' scheme to generate revenues through massive price increases for Valeant-branded drugs while concealing from investors the truth regarding the Company's business operations, financial results, and other material facts.  In September 2018, the court denied defendants' partial motions to dismiss, and BlackRock plaintiffs filed an amended complaint. The parties are currently engaged in discovery.

2. ***Houston Municipal Employees Pension System v. BofI Holding, Inc., et al.,*** No. 3:15-cv-02324-GPC-KSC (S.D. Cal.).  Lieff Cabraser serves as lead counsel for court-appointed lead plaintiff, Houston Municipal Employees Pension System ("HMEPS"), in this securities fraud class action against BofI Holding, Inc. and certain of its senior officers.  The action charges defendants with issuing materially false and misleading statements and failing to disclose material adverse facts about BofI's business, operations, and performance.  On March 21, 2018, the court issued an order and entered judgment dismissing the third amended complaint, which HMEPS appealed to the Ninth Circuit. The appellate court recently reversed in part the lower court's ruling, and remanded the case for further proceedings.

3. ***Steinhoff International Holdings N.V. Securities Class Litigation.*** Lieff Cabraser, together with co-counsel, is currently funding a vehicle for investor recovery against Steinhoff International Holdings N.V. ("Steinhoff"), a Dutch corporation based in South Africa that sells retail brands of furniture and household goods throughout the world.  The vehicle, called the Stichting Steinhoff Investors Losses Foundation, is a Dutch legal entity governed by an independent board of directors.  It seeks recovery of investor losses caused by the massive, multi-year accounting fraud at Steinhoff that has wiped out billions of dollars in shareholder value.  The litigation is ongoing.

4. ***In re The Boeing Company Derivative Litigation***, Consol. C.A. No. 2019-0907-AGB (Delaware Chancery Court).  Lieff Cabraser serves as Court-appointed Co-Lead Counsel representing Co-Lead Plaintiffs the New York State Comptroller Thomas P. DiNapoli, as trustee of the New York State Common Retirement, and the Fire and Police Pension Association of Colorado, in shareholder derivative litigation against current and former officers and directors of The Boeing Company ("Boeing"). Co-Lead Plaintiffs' amended complaint, filed September 2, 2020, alleges that Boeing's officers and directors breached their fiduciary duties to the company by dismantling Boeing's lauded safety-engineering corporate culture in favor of what became a financial-engineering corporate culture. Despite numerous safety-related red flags, the Board and officers failed to monitor the safety of Boeing's aircraft. Ultimately, the Board and officers' consistent disregard for safety resulted in the

flawed design of Boeing's 737 MAX, leading to the tragic deaths of 346 passengers and the grounding of all 737 Max aircraft.

5.     ***Perrigo Company plc Securities Class Litigation***. Lieff Cabraser represents certain funds and accounts of BlackRock in an individual securities fraud action against Perrigo Company plc ("Perrigo") and certain of Perrigo's former senior executives for violations of the Securities Exchange Act of 1934.  The action charges defendants with misrepresenting and failing to disclose to investors that Perrigo was engaged in a generic drugs price-fixing scheme, that Perrigo was insulated from pricing pressures in the generic pharmaceuticals industry, and that Perrigo had successfully integrated Omega Pharma NV, the company's largest acquisition.

6.     ***Danske Bank A/S Securities Class Litigation.*** Lieff Cabraser, together with co-counsel, represents a large coalition of institutional investors, including state and government pension and treasury systems, in litigation pending in Denmark against Danske Bank A/S ("Danske"). The litigation arises from Danske's failure to disclose that its reported financial performance was inflated by illegal sources of income and that it was subject to significant risks as a result of such business activities. The litigation is ongoing.

**B.     Successes**

1.     ***In re Wells Fargo & Company Shareholder Derivative Litigation***, No. 3:16-cv-05541 (N.D. Cal.).  Lieff Cabraser was appointed as Co-Lead Counsel for Lead Plaintiffs FPPACO and The City of Birmingham Retirement and Relief System in this consolidated shareholder derivative action alleging that, since at least 2011, the Board and executive management of Wells Fargo knew or consciously disregarded that Wells Fargo employees were illicitly creating millions of deposit and credit card accounts for their customers, without those customers' consent, as part of Wells Fargo's intense effort to drive up its "cross-selling" statistics. Revelations regarding the scheme, and the defendants' knowledge or blatant disregard of it, have deeply damaged Wells Fargo's reputation and cost it millions of dollars in regulatory fines and lost business. In May and October 2017, the court largely denied Wells Fargo's and the Director and Officer Defendants' motions to dismiss Lead Plaintiffs' amended complaint. In April 2020, U.S. District Judge Jon S. Tigar granted final approval to a settlement of $240 million cash payment, the largest insurer-funded cash settlement of a shareholder derivative action, and corporate governance reforms.

2.     ***Arkansas Teacher Retirement System v. State Street Corp.***, Case No. 11cv10230 (MLW) (D. Mass.).   Lieff Cabraser served as co-counsel for a nationwide class of institutional custodial clients of State

Street, including public pension funds and ERISA plans, who allege that defendants deceptively charged class members on FX trades done in connection with the purchase and sale of foreign securities. The complaint charged that between 1999 and 2009, State Street consistently incorporated hidden and excessive mark-ups or mark-downs relative to the actual FX rates applicable at the times of the trades conducted for State Street's custodial FX clients.

State Street allegedly kept for itself, as an unlawful profit, the "spread" between the prices for foreign currency available to it in the FX marketplace and the rates it charged to its customers. Plaintiffs sought recovery under Massachusetts' Consumer Protection Law and common law tort and contract theories. On November 2, 2016, U.S. District Senior Judge Mark L. Wolf granted final approval to a $300 million settlement of the litigation.

3. ***Janus Overseas Fund, et al. v. Petróleo Brasileiro S.A. - Petrobras, et al.***, No. 1:15-cv-10086-JSR (S.D.N.Y.); ***Dodge & Cox Global Stock Fund, et al. v. Petróleo Brasileiro S.A. - Petrobras, et al.***, No. 1:15-cv-10111-JSR (S.D.N.Y.). Lieff Cabraser represented certain Janus and Dodge & Cox funds and investment managers in these individual actions against Petróleo Brasileiro S.A. – Petrobras ("Petrobras"), related Petrobras entities, and certain of Petrobras's senior officers and directors for misrepresenting and failing to disclose a pervasive and long-running scheme of bribery and corruption at Petrobras. As a result of the misconduct, Petrobras overstated the value of its assets by billions of dollars and materially misstated its financial results during the relevant period. The actions charged defendants with violations of the Securities Act of 1933 (the "Securities Act") and/or the Securities Exchange Act of 1934 ("Exchange Act"). The action recently settled on confidential terms favorable to plaintiffs.

4. ***Normand, et al. v. Bank of New York Mellon Corp.***, No. 1:16-cv-00212-LAK-JLC (S.D.N.Y.). Lieff Cabraser, together with co-counsel, represented a proposed class of holders of American Depositary Receipts ("ADRs") (negotiable U.S. securities representing ownership of publicly traded shares in a non-U.S. corporation), for which BNY Mellon served as the depositary bank. Plaintiffs alleged that under the contractual agreements underlying the ADRs, BNY Mellon was responsible for "promptly" converting cash distributions (such as dividends) received for ADRs into U.S. dollars for the benefit of ADR holders, and was required to act without bad faith. Plaintiffs alleged that, instead, when doing the ADR cash conversions, BNY Mellon used the range of exchange rates available during the trading session in a manner that was unfavorable for ADR holders, and in doing so, improperly skimmed profits from distributions

owed and payable to the class.  In 2019, the court granted final approval to a $72.5 million settlement of the action.

5. ***In re Facebook, Inc. IPO Securities and Derivative Litigation***, MDL No. 12-2389 (RWS) (S.D.N.Y.).  Lieff Cabraser is counsel for two individual investor class representatives in the securities class litigation arising under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") concerning Facebook's initial public offering in May 2012.  In 2018, the court granted plaintiffs' motion for final approval of a settlement of the litigation.

6. ***The Regents of the University of California v. American International Group***, No. 1:14-cv-01270-LTS-DCF (S.D.N.Y.).  Lieff Cabraser represented The Regents of the University of California in this individual action against American International Group, Inc. ("AIG") and certain of its officers and directors for misrepresenting and omitting material information about AIG's financial condition and the extent of its exposure to the subprime mortgage market.  The complaint charged defendants with violations of the Exchange Act, as well as common law fraud and unjust enrichment.  The litigation settled in 2015.

7. ***Biotechnology Value Fund, L.P. v. Celera Corp.***, 3:13-cv-03248-WHA (N.D. Cal.).  Lieff Cabraser represented a group of affiliated funds investing in biotechnology companies in this individual action arising from misconduct in connection with Quest Diagnostics Inc.'s 2011 acquisition of Celera Corporation.  Celera, Celera's individual directors, and Credit Suisse were charged with violations of Sections 14(e) and 20(a) of the Exchange Act and breach of fiduciary duty.  In February 2014, the Court denied in large part defendants' motion to dismiss the second amended complaint.  In September 2014, the plaintiffs settled with Credit Suisse for a confidential amount.  After the completion of fact and expert discovery, and prior to a ruling on defendants' motion for summary judgment, the plaintiffs settled with the Celera defendants in January 2015 for a confidential amount.

8. ***The Charles Schwab Corp. v. BNP Paribas Sec. Corp.***, No. CGC-10-501610 (Cal. Super. Ct.); ***The Charles Schwab Corp. v. J.P. Morgan Sec., Inc.***, No. CGC-10-503206 (Cal. Super. Ct.); ***The Charles Schwab Corp. v. J.P. Morgan Sec., Inc.***, No. CGC-10-503207 (Cal. Super. Ct.); and ***The Charles Schwab Corp. v. Banc of America Sec. LLC***, No. CGC-10-501151 (Cal. Super. Ct.).  Lieff Cabraser, along with co-counsel, represents Charles Schwab in four separate individual securities actions against certain issuers and sellers of mortgage-backed securities ("MBS") for materially misrepresenting the quality of the loans underlying the securities in violation of California state law.  Charles Schwab Bank, N.A., a subsidiary of Charles Schwab, suffered significant

damages by purchasing the securities in reliance on defendants' misstatements. The court largely overruled defendants' demurrers in January 2012. Settlements have been reached with dozens of defendants for confidential amounts.

9.   ***Honeywell International Inc. Defined Contribution Plans Master Savings Trust. v. Merck & Co.***, No. 14-cv 2523-SRC-CLW (S.D.N.Y.); ***Janus Balanced Fund v. Merck & Co.***, No. 14-cv-3019-SRC-CLW (S.D.N.Y.); ***Lord Abbett Affiliated Fund v. Merck & Co.***, No. 14-cv-2027-SRC-CLW (S.D.N.Y.); ***Nuveen Dividend Value Fund (f/k/a Nuveen Equity Income Fund), on its own behalf and as successor in interest to Nuveen Large Cap Value Fund (f/k/a First American Large Cap Value Fund) v. Merck & Co.***, No. 14-cv-1709-SRC-CLW (S.D.N.Y.). Lieff Cabraser represented certain Nuveen, Lord Abbett, and Janus funds, and two Honeywell International trusts in these individual actions against Merck & Co., Inc. ("Merck") and certain of its senior officers and directors for misrepresenting the cardiovascular safety profile and commercial viability of Merck's purported "blockbuster" drug, VIOXX. The actions charged defendants with violations of the Exchange Act. The action settled on confidential terms.

10.   ***In re First Capital Holdings Corp. Financial Products Securities Litigation***, MDL No. 901 (C.D. Cal.). Lieff Cabraser served as Co-Lead Counsel in a class action brought to recover damages sustained by policyholders of First Capital Life Insurance Company and Fidelity Bankers Life Insurance Company policyholders resulting from the insurance companies' allegedly fraudulent or reckless investment and financial practices, and the manipulation of the companies' financial statements. This policyholder settlement generated over $1 billion in restored life insurance policies. The settlement was approved by both federal and state courts in parallel proceedings and then affirmed by the Ninth Circuit on appeal.

11.   ***In re Bank of New York Mellon Corp. Foreign Exchange Transactions Litigation***, MDL 2335 (S.D.N.Y.). Lieff Cabraser served as co-lead class counsel for a proposed nationwide class of institutional custodial customers of The Bank of New York Mellon Corporation ("BNY Mellon"). The litigation stemmed from alleged deceptive overcharges imposed by BNY Mellon on foreign currency exchanges (FX) that were done in connection with custodial customers' purchases or sales of foreign securities. Plaintiffs alleged that for more than a decade, BNY Mellon consistently charged its custodial customers hidden and excessive mark-ups on exchange rates for FX trades done pursuant to "standing instructions," using "range of the day" pricing, rather than the rates readily available when the trades were actually executed.

In addition to serving as co-lead counsel for a nationwide class of affected custodial customers, which included public pension funds, ERISA funds, and other public and private institutions, Lieff Cabraser was one of three firms on Plaintiffs' Executive Committee tasked with managing all activities on the plaintiffs' side in the multidistrict consolidated litigation. Prior to the cases being transferred and consolidated in the Southern District of New York, Lieff Cabraser defeated, in its entirety, BNY Mellon's motion to dismiss claims brought on behalf of ERISA and other funds under California's and New York's consumer protection laws.

The firm's clients and class representatives in the consolidated litigation included the Ohio Police & Fire Pension Fund, the School Employees Retirement System of Ohio, and the International Union of Operating Engineers, Stationary Engineers Local 39 Pension Trust Fund.

In March 2015, a global resolution of the private and governmental enforcement actions against BNY Mellon was announced, in which $504 million will be paid back to BNY Mellon customers ($335 million of which is directly attributable to the class litigation).

On September 24, 2015, U.S. District Court Judge Lewis A. Kaplan granted final approval to the settlement. Commenting on the work of plaintiffs' counsel, Judge Kaplan stated, "This really was an extraordinary case in which plaintiff's counsel performed, at no small risk, an extraordinary service. They did a wonderful job in this case, and I've seen a lot of wonderful lawyers over the years. This was a great performance. They were fought tooth and nail at every step of the road. It undoubtedly vastly expanded the costs of the case, but it's an adversary system, and sometimes you meet adversaries who are heavily armed and well financed, and if you're going to win, you have to fight them and it costs money. This was an outrageous wrong committed by the Bank of New York Mellon, and plaintiffs' counsel deserve a world of credit for taking it on, for running the risk, for financing it and doing a great job."

12.   ***In re Broadcom Corporation Derivative Litigation***, No. CV 06-3252-R (C.D. Cal.).  Lieff Cabraser served as Court-appointed Lead Counsel in a shareholders derivative action arising out of stock options backdating in Broadcom securities.  The complaint alleged that defendants intentionally manipulated their stock option grant dates between 1998 and 2003 at the expense of Broadcom and Broadcom shareholders. By making it seem as if stock option grants occurred on dates when Broadcom stock was trading at a comparatively low per share price, stock option grant recipients were able to exercise their stock option grants at exercise prices that were lower than the fair market value of Broadcom stock on the day the options were actually granted.  In December 2009, U.S. District Judge Manuel L. Real granted final

approval to a partial settlement in which Broadcom Corporation's insurance carriers paid $118 million to Broadcom.  The settlement released certain individual director and officer defendants covered by Broadcom's directors' and officers' policy.

Plaintiffs' counsel continued to pursue claims against William J. Ruehle, Broadcom's former Chief Financial Officer, Henry T. Nicholas, III, Broadcom's co-founder and former Chief Executive Officer, and Henry Samueli, Broadcom's co-founder and former Chief Technology Officer.  In May 2011, the Court approved a settlement with these defendants.  The settlement provided substantial consideration to Broadcom, consisting of the receipt of cash and cancelled options from Dr. Nicholas and Dr. Samueli totaling $53 million in value, plus the release of a claim by Mr. Ruehle, which sought damages in excess of $26 million.

Coupled with the earlier $118 million partial settlement, the total recovery in the derivative action was $197 million, which constitutes the third-largest settlement ever in a derivative action involving stock options backdating.

13.     ***In re Scorpion Technologies Securities Litigation I***, No. C-93-20333-EAI (N.D. Cal.); ***Dietrich v. Bauer***, No. C-95-7051-RWS (S.D.N.Y.); ***Claghorn v. Edsaco***, No. 98-3039-SI (N.D. Cal.).  Lieff Cabraser served as Lead Counsel in class action suits arising out of an alleged fraudulent scheme by Scorpion Technologies, Inc., certain of its officers, accountants, underwriters and business affiliates to inflate the company's earnings through reporting fictitious sales.  In Scorpion I, the Court found plaintiffs had presented sufficient evidence of liability under Federal securities acts against the accounting firm Grant Thornton for the case to proceed to trial.  In re Scorpion Techs., 1996 U.S. Dist. LEXIS 22294 (N.D. Cal. Mar. 27, 1996).  In 1988, the Court approved a $5.5 million settlement with Grant Thornton.  In 2000, the Court approved a $950,000 settlement with Credit Suisse First Boston Corporation.  In April 2002, a federal jury in San Francisco, California returned a $170.7 million verdict against Edsaco Ltd.  The jury found that Edsaco aided Scorpion in setting up phony European companies as part of a scheme in which Scorpion reported fictitious sales of its software to these companies, thereby inflating its earnings.  Included in the jury verdict, one of the largest verdicts in the U.S. in 2002, was $165 million in punitive damages.  Richard M. Heimann conducted the trial for plaintiffs.

On June 14, 2002, U.S. District Court Judge Susan Illston commented on Lieff Cabraser's representation:  "[C]ounsel for the plaintiffs did a very good job in a very tough situation of achieving an excellent recovery for the class here.  You were opposed by extremely capable lawyers.  It was an uphill battle.  There were some complicated questions, and then there was

the tricky issue of actually collecting anything in the end.  I think based on the efforts that were made here that it was an excellent result for the class. . .  [T]he recovery that was achieved for the class in this second trial is remarkable, almost a hundred percent."

14. ***In re Diamond Foods, Inc., Securities Litigation***, No. 11-cv-05386-WHA (N.D. Cal.).  Lieff Cabraser served as local counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi ("MissPERS") and the class of investors it represented in this securities class action lawsuit arising under the PSLRA.  The complaint charged Diamond Foods and certain senior executives of the company with violations of the Exchange Act for knowingly understating the cost of walnuts Diamond Foods purchased in order to inflate the price of Diamond Foods' common stock.  In January 2014, the Court granted final approval of a settlement of the action requiring Diamond Foods to pay $11 million in cash and issue 4.45 million common shares worth $116.3 million on the date of final approval based on the stock's closing price on that date.

15. ***Merrill Lynch Fundamental Growth Fund and Merrill Lynch Global Value Fund  v. McKesson HBOC***, No. 02-405792 (Cal. Supr. Ct.).  Lieff Cabraser served as counsel for two Merrill Lynch sponsored mutual funds in a private lawsuit alleging that a massive accounting fraud occurred at HBOC & Company ("HBOC") before and following its 1999 acquisition by McKesson Corporation ("McKesson").  The funds charged that defendants, including the former CFO of McKesson HBOC, the name McKesson adopted after acquiring HBOC, artificially inflated the price of securities in McKesson HBOC, through misrepresentations and omissions concerning the financial condition of HBOC, resulting in approximately $135 million in losses for plaintiffs.  In a significant discovery ruling in 2004, the California Court of Appeal held that defendants waived the attorney-client and work product privileges in regard to an audit committee report and interview memoranda prepared in anticipation of shareholder lawsuits by disclosing the information to the U.S. Attorney and SEC.  *McKesson HBOC, Inc. v. Supr. Court*, 115 Cal. App. 4th 1229 (2004).  Lieff Cabraser's clients recovered approximately $145 million, representing nearly 104% of damages suffered by the funds.  This amount was approximately $115-120 million more than the Merrill Lynch funds would have recovered had they participated in the federal class action settlement.

16. ***Informix/Illustra Securities Litigation***, No. C-97-1289-CRB (N.D. Cal.).  Lieff Cabraser represented Richard H. Williams, the former Chief Executive Officer and President of Illustra Information Technologies, Inc. ("Illustra"), and a class of Illustra shareholders in a class action suit on behalf of all former Illustra securities holders who tendered their Illustra

preferred or common stock, stock warrants or stock options in exchange for securities of Informix Corporation ("Informix") in connection with Informix's 1996 purchase of Illustra.  Pursuant to that acquisition, Illustra stockholders received Informix securities representing approximately 10% of the value of the combined company.  The complaint alleged claims for common law fraud and violations of Federal securities law arising out of the acquisition.  In October 1999, U.S. District Judge Charles E. Breyer approved a global settlement of the litigation for $136 million, constituting one of the largest settlements ever involving a high technology company alleged to have committed securities fraud.  Our clients, the Illustra shareholders, received approximately 30% of the net settlement fund.

17.    ***In re Qwest Communications International Securities and "ERISA" Litigation (No. II)***, No. 06-cv-17880-REB-PAC (MDL No. 1788) (D. Colo.).  Lieff Cabraser represented the New York State Common Retirement Fund, Fire and Police Pension Association of Colorado, Denver Employees' Retirement Plan, San Francisco Employees' Retirement System, and over thirty BlackRock managed mutual funds in individual securities fraud actions ("opt out" cases) against Qwest Communications International, Inc., Philip F. Anschutz, former co-chairman of the Qwest board of directors,  and other senior executives at Qwest.  In each action, the plaintiffs charged defendants with massively overstating Qwest's publicly-reported growth, revenues, earnings, and earnings per share from 1999 through 2002.  The cases were filed in the wake of a $400 million settlement of a securities fraud class action against Qwest  that was announced in  early 2006.  The cases brought by Lieff Cabraser's clients settled in October 2007 for recoveries totaling more than $85 million, or more than 13 times what the clients would have received had they remained in the class.

18.    ***In re AXA Rosenberg Investor Litigation***, No. CV 11-00536 JSW (N.D. Cal).  Lieff Cabraser served as Co-Lead Counsel for a class of institutional investors, ERISA-covered plans, and other investors in quantitative funds managed by AXA Rosenberg Group, LLC and its affiliates ("AXA"). Plaintiffs alleged that AXA breached its fiduciary duties and violated ERISA by failing to discover a material computer error that existed in its system for years, and then failing to remedy it for months after its eventual discovery in 2009. By the time AXA disclosed the error in 2010, investors had suffered losses and paid substantial investment management fees to AXA. After briefing motions to dismiss and working with experts to analyze data obtained from AXA relating to the impact of the error, Lieff Cabraser reached a $65 million settlement with AXA that the Court approved in April 2012.

19.    ***In re National Century Financial Enterprises, Inc. Investment Litigation***, MDL No. 1565 (S.D. Ohio).  Lieff Cabraser served as outside counsel for the New York City Employees' Retirement System, Teachers' Retirement System for the City of New York, New York City Police Pension Fund, and New York City Fire Department Pension Fund in this multidistrict litigation arising from fraud in connection with NCFE's issuance of notes backed by healthcare receivables.  The New York City Pension Funds recovered more than 70% of their $89 million in losses, primarily through settlements achieved in the federal litigation and another NCFE-matter brought on their behalf by Lieff Cabraser.

20.    ***BlackRock Global Allocation Fund v. Tyco International Ltd., et al.***, No. 2:08-cv-519 (D. N.J.); ***Nuveen Balanced Municipal and Stock Fund v. Tyco International Ltd., et al.***, No. 2:08-cv-518 (D. N.J.).  Lieff Cabraser represented multiple funds of the investment firms BlackRock Inc. and Nuveen Asset Management in separate, direct securities fraud actions against Tyco International Ltd., Tyco Electronics Ltd., Covidien Ltd, Covidien (U.S.), L. Dennis Kozlowski, Mark H. Swartz, and Frank E. Walsh, Jr.  Plaintiffs alleged that defendants engaged in a massive criminal enterprise that combined the theft of corporate assets with fraudulent accounting entries that concealed Tyco's financial condition from investors.  As a result, plaintiffs purchased Tyco common stock and other Tyco securities at artificially inflated prices and suffered losses upon disclosures revealing Tyco's true financial condition and defendants' misconduct.  In 2009, the parties settled the claims against the corporate defendants (Tyco International Ltd., Tyco Electronics Ltd., Covidien Ltd., and Covidien (U.S.).  The litigation concluded in 2010.  The total settlement proceeds paid by all defendants were in excess of $57 million.

21.    ***Kofuku Bank and Namihaya Bank v. Republic New York Securities Corp.***, No. 00 CIV 3298 (S.D.N.Y.); and Kita Hyogo Shinyo-Kumiai v. Republic New York Securities Corp., No. 00 CIV 4114 (S.D.N.Y.).  Lieff Cabraser represented Kofuku Bank, Namihaya Bank and Kita Hyogo Shinyo-Kumiai (a credit union) in individual lawsuits against, among others, Martin A. Armstrong and HSBC, Inc., the successor-in-interest to Republic New York Corporation, Republic New York Bank and Republic New York Securities Corporation for alleged violations of federal securities and racketeering laws.  Through a group of interconnected companies owned and controlled by Armstrong—the Princeton Companies—Armstrong and the Republic Companies promoted and sold promissory notes, known as the "Princeton Notes," to more than eighty of the largest companies and financial institutions in Japan.  Lieff Cabraser's lawsuits, as well as the lawsuits of dozens of other Princeton Note investors, alleged that the Princeton and Republic Companies made fraudulent misrepresentations and non-disclosures in connection with the

promotion and sale of Princeton Notes, and that investors' monies were commingled and misused to the benefit of Armstrong, the Princeton Companies and the Republic Companies.  In December 2001, the claims of our clients and those of the other Princeton Note investors were settled. As part of the settlement, our clients recovered more than $50 million, which represented 100% of the value of their principal investments less money they received in interest or other payments.

22.   ***Alaska State Department of Revenue v. America Online***, No. 1JU-04-503 (Alaska Supr. Ct.).  In December 2006, a $50 million settlement was reached in a securities fraud action brought by the Alaska State Department of Revenue, Alaska State Pension Investment Board and Alaska Permanent Fund Corporation against defendants America Online, Inc. ("AOL"), Time Warner Inc. (formerly known as AOL Time Warner ("AOLTW")), Historic TW Inc.  When the action was filed, the Alaska Attorney General estimated total losses at $70 million.  The recovery on behalf of Alaska was approximately 50 times what the state would have received as a member of the class in the federal securities class action settlement.  The lawsuit, filed in 2004 in Alaska State Court, alleged that defendants misrepresented advertising revenues and growth of AOL and AOLTW along with the number of AOL subscribers, which artificially inflated the stock price of AOL and AOLTW to the detriment of Alaska State funds.

The Alaska Department of Law retained Lieff Cabraser to lead the litigation efforts under its direction. "We appreciate the diligence and expertise of our counsel in achieving an outstanding resolution of the case," said Mark Morones, spokesperson for the Department of Law, following announcement of the settlement.

23.   ***Allocco v. Gardner***, No. GIC 806450 (Cal. Supr. Ct.).  Lieff Cabraser represented Lawrence L. Garlick, the co-founder and former Chief Executive Officer of Remedy Corporation and 24 other former senior executives and directors of Remedy Corporation in a private (non-class) securities fraud lawsuit against Stephen P. Gardner, the former Chief Executive Officer of Peregrine Systems, Inc., John J. Moores, Peregrine's former Chairman of the Board, Matthew C. Gless, Peregrine's former Chief Financial Officer, Peregrine's accounting firm Arthur Andersen and certain entities that entered into fraudulent transactions with Peregrine. The lawsuit, filed in California state court, arose out of Peregrine's August 2001 acquisition of Remedy.  Plaintiffs charged that they were induced to exchange their Remedy stock for Peregrine stock on the basis of false and misleading representations made by defendants.  Within months of the Remedy acquisition, Peregrine began to reveal to the public that it had grossly overstated its revenue during the years 2000-2002, and eventually restated more than $500 million in revenues.

After successfully defeating demurrers brought by defendants, including third parties who were customers of Peregrine who aided and abetted Peregrine's accounting fraud under California common law, plaintiffs reached a series of settlements. The settling defendants included Arthur Andersen, all of the director defendants, three officer defendants and the third party customer defendants KPMG, British Telecom, Fujitsu, Software Spectrum and Bindview. The total amount received in settlements was approximately $45 million.

24. ***In re Cablevision Systems Corp. Shareholder Derivative Litigation***, No. 06-cv-4130-DGT-AKT (E.D.N.Y.). Lieff Cabraser served as Co-Lead Counsel in a shareholders' derivative action against the board of directors and numerous officers of Cablevision. The suit alleged that defendants intentionally manipulated stock option grant dates to Cablevision employees between 1997 and 2002 in order to enrich certain officer and director defendants at the expense of Cablevision and Cablevision shareholders. According to the complaint, Defendants made it appear as if stock options were granted earlier than they actually were in order to maximize the value of the grants. In September 2008, the Court granted final approval to a $34.4 million settlement of the action. Over $24 million of the settlement was contributed directly by individual defendants who either received backdated options or participated in the backdating activity.

25. ***In re Media Vision Technology Securities Litigation***, No. CV-94-1015 (N.D. Cal.). Lieff Cabraser served as Co-Lead Counsel in a class action lawsuit which alleged that certain Media Vision's officers, outside directors, accountants and underwriters engaged in a fraudulent scheme to inflate the company's earnings and issued false and misleading public statements about the company's finances, earnings and profits. By 1998, the Court had approved several partial settlements with many of Media Vision's officers and directors, accountants and underwriters which totaled $31 million. The settlement proceeds have been distributed to eligible class members. The evidence that Lieff Cabraser developed in the civil case led prosecutors to commence an investigation and ultimately file criminal charges against Media Vision's former Chief Executive Officer and Chief Financial Officer. The civil action against Media Vision's CEO and CFO was stayed pending the criminal proceedings against them. In the criminal proceedings, the CEO pled guilty on several counts, and the CFO was convicted at trial. In October 2003, the Court granted Plaintiffs' motions for summary judgment and entered a judgment in favor of the class against the two defendants in the amount of $188 million.

26. ***In re California Micro Devices Securities Litigation***, No. C-94-2817-VRW (N.D. Cal.). Lieff Cabraser served as Liaison Counsel for the Colorado Public Employees' Retirement Association and the California

State Teachers' Retirement System, and the class they represented.  Prior to 2001, the Court approved $19 million in settlements.  In May 2001, the Court approved an additional settlement of $12 million, which, combined with the earlier settlements, provided class members an almost complete return on their losses.  The settlement with the company included multi-million dollar contributions by the former Chairman of the Board and Chief Executive Officer.

Commenting in 2001 on Lieff Cabraser's work in Cal Micro Devices, U.S. District Court Judge Vaughn R. Walker stated, "It is highly unusual for a class action in the securities area to recover anywhere close to the percentage of loss that has been recovered here, and counsel and the lead plaintiffs have done an admirable job in bringing about this most satisfactory conclusion of the litigation."  One year later, in a related proceeding and in response to the statement that the class had received nearly a 100% recovery, Judge Walker observed, "That's pretty remarkable.  In these cases, 25 cents on the dollar is considered to be a magnificent recovery, and this is [almost] a hundred percent."

27.     ***In re Network Associates, Inc. Securities Litigation***, No. C-99-1729-WHA (N.D. Cal.).  Following a competitive bidding process, the Court appointed Lieff Cabraser as Lead Counsel for the Lead Plaintiff and the class of investors.  The complaint alleged that Network Associates improperly accounted for acquisitions in order to inflate its stock price.  In May 2001, the Court granted approval to a $30 million settlement.

In reviewing the *Network Associates* settlement, U.S. District Court Judge William H. Alsup observed, "[T]he class was well served at a good price by excellent counsel . . .  We have class counsel who's one of the foremost law firms in the country in both securities law and class actions.  And they have a very excellent reputation for the conduct of these kinds of cases . . ."

28.     ***In re FPI/Agretech Securities Litigation***, MDL No. 763 (D. Haw., Real, J.).  Lieff Cabraser served as Lead Class Counsel for investors defrauded in a "Ponzi-like" limited partnership investment scheme. The Court approved $15 million in partial, pretrial settlements. At trial, the jury returned a $24 million verdict, which included $10 million in punitive damages, against non-settling defendant Arthur Young & Co. for its knowing complicity and active and substantial assistance in the marketing and sale of the worthless limited partnership offerings. The Appellate Court affirmed the compensatory damages award and remanded the case for a retrial on punitive damages. In 1994, the Court approved a $17 million settlement with Ernst & Young, the successor to Arthur Young & Co.

29.    ***Nguyen v. FundAmerica***, No. C-90-2090 MHP (N.D. Cal., Patel, J.), 1990 Fed. Sec. L. Rep. (CCH) ¶¶ 95,497, 95,498 (N.D. Cal. 1990). Lieff Cabraser served as Plaintiffs' Class Counsel in this securities/RICO/tort action seeking an injunction against alleged unfair "pyramid" marketing practices and compensation to participants. The District Court certified a nationwide class for injunctive relief and damages on a mandatory basis and enjoined fraudulent overseas transfers of assets. The Bankruptcy Court permitted class proof of claims. Lieff Cabraser obtained dual District Court and Bankruptcy Court approval of settlements distributing over $13 million in FundAmerica assets to class members.

30.    ***In re Brooks Automation, Inc. Securities Litigation***, No. 06 CA 11068 (D. Mass.). Lieff Cabraser served as Court-Appointed Lead Counsel for Lead Plaintiff the Los Angeles County Employees Retirement Association and co-plaintiff Sacramento County Employees' Retirement System in a class action lawsuit on behalf of purchasers of Brooks Automation securities. Plaintiffs charged that Brooks Automation, its senior corporate officers and directors violated federal securities laws by backdating company stock options over a six-year period, and failed to disclose the scheme in publicly filed financial statements. Subsequent to Lieff Cabraser's filing of a consolidated amended complaint in this action, both the Securities and Exchange Commission and the United States Department of Justice filed complaints against the Company's former C.E.O., Robert Therrien, related to the same alleged practices. In October 2008, the Court approved a $7.75 million settlement of the action.

31.    ***In re A-Power Energy Generation Systems, Ltd. Securities Litigation***, No. 2:11-ml-2302-GW- (CWx) (C.D. Cal.). Lieff Cabraser served as Court-appointed Lead Counsel for Lead Plaintiff in this securities class action that charged defendants with materially misrepresenting A-Power Energy Generation Systems, Ltd.'s financial results and business prospects in violation of the antifraud provisions of the Securities Exchange Act of 1934. The Court approved a $3.675 million settlement in August 2013.

32.    ***Bank of America-Merrill Lynch Merger Securities Cases***. In two cases—*DiNapoli, et al. v. Bank of America Corp.*, No. 10 CV 5563 (S.D.N.Y.) and *Schwab S&P 500 Index Fund, et al. v. Bank of America Corp., et al.*, No. 11-cv- 07779 PKC (S.D.N.Y.). Lieff Cabraser sought recovery on a direct, non-class basis for losses that a number of public pension funds and mutual funds incurred as a result of Bank of America's alleged misrepresentations and concealment of material facts in connection with its acquisition of Merrill Lynch & Co., Inc. Lieff Cabraser represented the New York State Common Retirement Fund, the New York State Teachers' Retirement System, the Public Employees' Retirement Association of Colorado, and fourteen mutual funds managed by Charles

Schwab Investment Management.  Both cases settled in 2013 on confidential terms favorable for our clients.

33.   ***Albert v. Alex. Brown Management Services; Baker v. Alex. Brown Management Services*** (Del. Ch. Ct.).  In May 2004, on behalf of investors in two investment funds controlled, managed and operated by Deutsche Bank and advised by DC Investment Partners, Lieff Cabraser filed lawsuits for alleged fraudulent conduct that resulted in an aggregate loss of hundreds of millions of dollars.  The suits named as defendants Deutsche Bank and its subsidiaries Alex. Brown Management Services and Deutsche Bank Securities, members of the funds' management committee, as well as DC Investments Partners and two of its principals.  Among the plaintiff-investors were 70 high net worth individuals.  In the fall of 2006, the cases settled by confidential agreement.

### III.   Employment Discrimination and Unfair Employment Practices

### A.   Current Cases

1.   ***Chen-Oster v. Goldman Sachs***, No. 10-6950 (S.D.N.Y.).  Lieff Cabraser serves as Co-Lead Counsel for plaintiffs in a gender discrimination class action lawsuit against Goldman Sachs alleging Goldman Sachs has engaged in systemic and pervasive discrimination against its female professional employees in violation of Title VII of the Civil Rights Act of 1964 and New York City Human Rights Law.  The complaint charges that, among other things, Goldman Sachs pays its female professionals less than similarly situated males, disproportionately promotes men over equally or more qualified women, and offers better business opportunities and professional support to its male professionals. In 2012, the Court denied defendant's motion to strike class allegations.

On March 10, 2015, Magistrate Judge James C. Francis IV issued a recommendation against certifying the class.  In April of 2017, District Court Judge Analisa Torres granted plaintiffs' motion to amend their complaint and add new representative plaintiffs, denied Goldman Sachs' motions to dismiss the new plaintiffs' claims, and ordered the parties to submit proposals by April 26, 2017, on a process for addressing Magistrate Judge Francis' March 2015 Report and Recommendation on class certification.

On March 30, 2018, Judge Torres issued an order certifying the plaintiffs' damages class under Federal Rule of Civil Procedure Rule 23(b)(3). Judge Torres certified plaintiffs' claims for both disparate impact and disparate treatment discrimination, relying on statistical evidence of discrimination in pay, promotions, and performance evaluations, as well as anecdotal evidence of Goldman's hostile work environment. In so ruling, the court also granted plaintiffs' motion to exclude portions of Goldman's expert

evidence as unreliable, and denied all of Goldman's motions to exclude plaintiffs' expert evidence.

2. ***Kassman v. KPMG, LLP***, Case No. 11-03743 (S.D.N.Y.). Lieff Cabraser serves as Co-Lead Counsel for plaintiffs in a gender discrimination class and collective action lawsuit alleging that KPMG has engaged in systemic and pervasive discrimination against its female Client Service and Support Professionals in pay and promotion, discrimination based on pregnancy, and chronic failure to properly investigate and resolve complaints of discrimination and harassment. The complaint alleges violations of the Equal Pay Act, Title VII of the Civil Rights Act of 1964, the New York Executive Law § 296, and the New York City Administrative Code § 8-107. For purposes of the Equal Pay Act claim, plaintiffs represent a conditionally-certified collective of 1,100 female Client Service and Support Professionals who have opted in to the lawsuit.

On November 27, 2018, Plaintiffs filed a motion in U.S. District Court for the Southern District of New York seeking class certification in the long-running lawsuit challenging gender disparities in pay and promotion on behalf of approximately 10,000 female Advisory and Tax professionals. Plaintiffs also sought final certification of the Equal Pay Act collective on behalf of the approximately 1,100 opt-in plaintiffs.

On November 30, 2018, the Court declined to certify the class and decertified the Equal Pay Act collective. While the Court acknowledged KPMG's common pay and promotion policies and its gender disparities in pay and promotion, the Court held that the women challenging KPMG's pay and promotion policies cannot pursue their claims together. On December 14, 2018, Plaintiffs filed a Petition to Appeal the Denial of Class Certification under Rule 23(f) with the United States Court of Appeals for the Second Circuit. Plaintiffs are awaiting a decision from the Court of Appeals about whether to hear the appeal.

3. ***Strauch v. Computer Sciences Corporation***, No. 2:14-cv-00956 (D. Conn.). In 2005, Computer Sciences Corporation ("CSC") settled for $24 million a nationwide class and collective action lawsuit alleging that CSC misclassified thousands of its information technology support workers as exempt from overtime pay in violation of in violation of the federal Fair Labor Standards Act ("FLSA") and state law. Notwithstanding that settlement, a complaint filed on behalf of current and former CSC IT workers in 2014 by Lieff Cabraser and co-counsel alleges that CSC misclassifies many information technology support workers as exempt even though they perform primarily nonexempt work. Plaintiffs are current and former CSC System Administrators assigned the primary duty of the installation, maintenance, and/or support of computer software and/or hardware for CSC clients. On June 9, 2015, the Court granted

plaintiffs' motion for conditional certification of a FLSA collective action. Since then, more than 1,000 System Administrators have opted into the case.  On June 30, 2017, the Court granted plaintiffs motion for certification of Rule 23 classes for System Administrators in California and Connecticut.

On December 20, 2017, a jury in federal court in Connecticut ruled that Computer Sciences Corporation (CSC), which recently merged with Hewlett Packard Enterprise Services to form DXC Technology (NYSE: DXC), wrongly and willfully denied overtime pay to approximately 1,000 current and former technology support workers around the country. After deliberating over two days, the Connecticut jury unanimously rejected CSC's claim that its System Administrators in the "Associate Professional" and "Professional" job titles are exempt under federal, Connecticut and California law, ruling instead that the workers should have been classified as nonexempt and paid overtime. The jury found CSC's violations to be willful, triggering additional damages. The misclassifications were made despite the fact that, in 2005, CSC paid $24 million to settle similar claims from a previous group of technical support workers. Following the issuance of a Report and Recommendation from a Court-appointed special master, the Court entered judgment ordering CSC to pay damages totaling $18,755,016.46 to class members. That judgment is currently on appeal to the Second Circuit Court of Appeals.

4.  ***Senne v. Major League Baseball***, No. 14-cv-00608 (N.D. Cal.).  Lieff Cabraser represents current and former Minor League Baseball players employed under uniform player contracts in a class and collective action seeking unpaid overtime and minimum wages under the Fair Labor Standards Act and state laws.  The complaint alleges that Major League Baseball ("MLB"), the MLB franchises, and other defendants paid minor league players a uniform monthly fixed salary that, in light of the hours worked, amounts to less than the minimum wage and an unlawful denial of overtime pay. In August 2019, the Ninth Circuit Court of Appeals upheld certification of a California Class, overturned the denial of certification of the Arizona and Florida Classes, and affirmed the certification of an FLSA collective action.  The defendants have petitioned the Supreme Court for a writ of certiorari.

**B.    Successes**

1.  ***Kalodimos v. Meredith Corporation d/b/a Wsmv Channel 4***, No. 3:18-cv-01321 (M.D. Tenn.).  Lieff Cabraser represented Demetria Kalodimos, the longest running anchor in the history of Middle Tennessee's Channel 4 news network, in sex and age discrimination claims against the network.  Ms. Kalodimos was the longest running anchor in the history of Channel 4, known within the community as the

"face of Channel 4," and had received both local and national accolades for journalistic excellence when she was terminated in 2017.  On behalf of Ms. Kalodimos, Lieff Cabraser litigated claims for violation of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Tennessee Human Rights Act, and the common law.  The parties resolved these disputes in 2019, following a private mediation.

2.   ***Butler v. Home Depot***, No. C94-4335 SI (N.D. Cal.).  Lieff Cabraser and co-counsel represented a class of approximately 25,000 female employees and applicants for employment with Home Depot's West Coast Division who alleged gender discrimination in connection with hiring, promotions, pay, job assignment, and other terms and conditions of employment.  The class was certified in January 1995.  In January 1998, the Court approved a $87.5 million settlement of the action that included comprehensive injunctive relief over the term of a five-year Consent Decree.  Under the terms of the settlement, Home Depot modified its hiring, promotion, and compensation practices to ensure that interested and qualified women were hired for, and promoted to, sales and management positions.

On January 14, 1998, U.S. District Judge Susan Illston commented that the settlement provides "a very significant monetary payment to the class members for which I think they should be grateful to their counsel. . . . Even more significant is the injunctive relief that's provided for . . ."  By 2003, the injunctive relief had created thousands of new job opportunities in sales and management positions at Home Depot, generating the equivalent of over approximately $100 million per year in wages for female employees.

In 2002, Judge Illston stated that the injunctive relief has been a "win/win . . . for everyone, because . . . the way the Decree has been implemented has been very successful and it is good for the company as well as the company's employees."

3.   ***Rosenburg v. IBM***, No. C 06-0430 PJH (N.D. Cal.).  In July 2007, the Court granted final approval to a $65 million settlement of a class action suit by current and former technical support workers for IBM seeking unpaid overtime.  The settlement constitutes a record amount in litigation seeking overtime compensation for employees in the computer industry.  Plaintiffs alleged that IBM illegally misclassified its employees who install or maintain computer hardware or software as "exempt" from the overtime pay requirements of federal and state labor laws.

4.   ***Satchell v. FedEx Express***, No. C 03-2659 SI; C 03-2878 SI (N.D. Cal.).  In 2007, the Court granted final approval to a $54.9 million settlement of the race discrimination class action lawsuit by African American and Latino employees of FedEx Express.  The settlement

requires FedEx to reform its promotion, discipline, and pay practices. Under the settlement, FedEx will implement multiple steps to promote equal employment opportunities, including making its performance evaluation process less discretionary, discarding use of the "Basic Skills Test" as a prerequisite to promotion into certain desirable positions, and changing employment policies to demonstrate that its revised practices do not continue to foster racial discrimination. The settlement, covering 20,000 hourly employees and operations managers who have worked in the western region of FedEx Express since October 1999, was approved by the Court in August 2007.

5.  ***Gonzalez v. Abercrombie & Fitch Stores***, No. C03-2817 SI (N.D. Cal.). In April 2005, the Court approved a settlement, valued at approximately $50 million, which requires the retail clothing giant Abercrombie & Fitch to provide monetary benefits of $40 million to the class of Latino, African American, Asian American and female applicants and employees who charged the company with discrimination. The settlement included a six-year period of injunctive relief requiring the company to institute a wide range of policies and programs to promote diversity among its workforce and to prevent discrimination based on race or gender. Lieff Cabraser served as Lead Class Counsel and prosecuted the case with a number of co-counsel firms, including the Mexican American Legal Defense and Education Fund, the Asian Pacific American Legal Center and the NAACP Legal Defense and Educational Fund, Inc.

6.  ***Giles v. Allstate***, JCCP Nos. 2984 and 2985. Lieff Cabraser represented a class of Allstate insurance agents seeking reimbursement of out-of-pocket costs. The action settled for approximately $40 million.

7.  ***Calibuso v. Bank of America Corporation, Merrill Lynch & Co.***, No. CV10-1413 (E.D. N.Y.). Lieff Cabraser served as Co-Lead Counsel for female Financial Advisors who alleged that Bank of America and Merrill Lynch engaged in a pattern and practice of gender discrimination with respect to business opportunities and compensation. The complaint charged that these violations were systemic, based upon company-wide policies and practices. In December 2013, the Court approved a $39 million settlement. The settlement included three years of programmatic relief, overseen by an independent monitor, regarding teaming and partnership agreements, business generation, account distributions, manager evaluations, promotions, training, and complaint processing and procedures, among other things. An independent consultant also conducted an internal study of the bank's Financial Advisors' teaming practices.

8.  ***Frank v. United Airlines***, No. C-92-0692 MJJ (N.D. Cal.). Lieff Cabraser and co-counsel obtained a $36.5 million settlement in February

2004 for a class of female flight attendants who were required to weigh less than comparable male flight attendants.  Former U.S. District Court Judge Charles B. Renfrew (ret.), who served as a mediator in the case, stated, "As a participant in the settlement negotiations, I am familiar with and know the reputation, experience and skills of lawyers involved.  They are dedicated, hardworking and able counsel who have represented their clients very effectively."  U.S. District Judge Martin J. Jenkins, in granting final approval to the settlement, found "that the results achieved here could be nothing less than described as exceptional," and that the settlement "was obtained through the efforts of outstanding counsel."

9.    ***Barnett v. Wal-Mart***, No. 01-2-24553-SNKT (Wash.).  The Court approved in July 2009 a settlement valued at up to $35 million on behalf of workers in Washington State who alleged they were deprived of meal and rest breaks and forced to work off-the-clock at Wal-Mart stores and Sam's Clubs.  In addition to monetary relief, the settlement provided injunctive relief benefiting all employees.  Wal-Mart was required to undertake measures to prevent wage and hour violations at its 50 stores and clubs in Washington, measures that included the use of new technologies and compliance tools.

Plaintiffs filed their complaint in 2001.  Three years later, the Court certified a class of approximately 40,000 current and former Wal-Mart employees.  The eight years of litigation were intense and adversarial.  Wal-Mart, currently the world's third largest corporation, vigorously denied liability and spared no expense in defending itself.

This lawsuit and similar actions filed against Wal-Mart across America served to reform the pay procedures and employment practices for Wal-Mart's 1.4 million employees nationwide.  In a press release announcing the Court's approval of the settlement, Wal-Mart spokesperson Daphne Moore stated, "This lawsuit was filed years ago and the allegations are not representative of the company we are today."  Lieff Cabraser served as Court-appointed Co-Lead Class Counsel.

10.    ***Amochaev. v. Citigroup Global Markets, d/b/a Smith Barney***, No. C 05-1298 PJH (N.D. Cal.).  In August 2008, the Court approved a $33 million settlement for the 2,411 members of the Settlement Class in a gender discrimination case against Smith Barney.  Lieff Cabraser represented Female Financial Advisors who charged that Smith Barney, the retail brokerage unit of Citigroup, discriminated against them in account distributions, business leads, referral business, partnership opportunities, and other terms of employment.  In addition to the monetary compensation, the settlement included comprehensive injunctive relief for four years designed to increase business opportunities and promote equality in compensation for female brokers.

11.     ***Vedachalam v. Tata Consultancy Services***, C 06-0963 CW (N.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel for 12,700 foreign nationals sent by the Indian conglomerate Tata to work in the U.S.  After 7 years of hard-fought litigation, the District Court in July 2013 granted final approval to a $29.75 million settlement.  The complaint charged that Tata breached the contracts of its non-U.S.-citizen employees by requiring them to sign over their federal and state tax refund checks to Tata, and by failing to pay its non-U.S.-citizen employees the monies promised to those employees before they came to the United States.  In 2007 and again in 2008, the District Court denied Tata's motions to compel arbitration of Plaintiffs' claims in India.  The Court held that no arbitration agreement existed because the documents purportedly requiring arbitration in India applied one set of rules to the Plaintiffs and another set to Tata.  In 2009, the Ninth Circuit Court of Appeals affirmed this decision.  In July 2011, the District Court denied in part Tata's motion for summary judgment, allowing Plaintiffs' legal claims for breach of contract and certain violations of California wage laws to go forward.  In 2012, the District Court found that the plaintiffs satisfied the legal requirements for a class action and certified two classes.

12.     ***Giannetto v. Computer Sciences Corporation***, No. 03-CV-8201 (C.D. Cal.).  In one of the largest overtime pay dispute settlements ever in the information technology industry, the Court approved a $24 million settlement with Computer Sciences Corporation in 2005.  Plaintiffs charged that the global conglomerate had a common practice of refusing to pay overtime compensation to its technical support workers involved in the installation and maintenance of computer hardware and software in violation of the Fair Labor Standards Act, California's Unfair Competition Law, and the wage and hour laws of 13 states.

13.     ***Curtis-Bauer v. Morgan Stanley & Co.***, Case No. C-06-3903 (TEH). In October 2008, the Court approved a $16 million settlement in the class action against Morgan Stanley.  The complaint charged that Morgan Stanley discriminated against African-American and Latino Financial Advisors and Registered Financial Advisor Trainees in the Global Wealth Management Group of Morgan Stanley in compensation and business opportunities.  The settlement included comprehensive injunctive relief regarding account distributions, partnership arrangements, branch manager promotions, hiring, retention, diversity training, and complaint processing, among other things. The settlement also provided for the appointment of an independent Diversity Monitor and an independent Industrial Psychologist to effectuate the terms of the agreement.

14.     ***Church v. Consolidated Freightways***, No. C90-2290 DLJ (N.D. Cal.).  Lieff Cabraser was the Lead Court-appointed Class Counsel in this class action on behalf of the exempt employees of Emery Air Freight, a

freight forwarding company acquired by Consolidated Freightways in 1989. On behalf of the employee class, Lieff Cabraser prosecuted claims for violation of the Employee Retirement Income Security Act, the securities laws, and the Age Discrimination in Employment Act. The case settled in 1993 for $13.5 million.

15. ***Gerlach v. Wells Fargo & Co.***, No. C 05-0585 CW (N.D. Cal.). In January 2007, the Court granted final approval to a $12.8 million settlement of a class action suit by current and former business systems employees of Wells Fargo seeking unpaid overtime. Plaintiffs alleged that Wells Fargo illegally misclassified those employees, who maintained and updated Wells Fargo's business tools according to others' instructions, as "exempt" from the overtime pay requirements of federal and state labor laws.

16. ***Buccellato v. AT&T Operations***, No. C10-00463-LHK (N.D. Cal.). Lieff Cabraser represented a group of current and former AT&T technical support workers who alleged that AT&T misclassified them as exempt and failed to pay them for all overtime hours worked, in violation of federal and state overtime pay laws. In June 2011, the Court approved a $12.5 million collective and class action settlement.

17. ***Buttram v. UPS***, No. C-97-01590 MJJ (N.D. Cal.). Lieff Cabraser and several co-counsel represented a class of approximately 14,000 African-American part-time hourly employees of UPS's Pacific and Northwest Regions alleging race discrimination in promotions and job advancement. In 1999, the Court approved a $12.14 million settlement of the action. Under the injunctive relief portion of the settlement, Class Counsel monitored the promotions of African-American part-time hourly employees to part-time supervisor and full-time package car drivers.

18. ***Goddard, et al. v. Longs Drug Stores Corporation, et al.***, No. RG04141291 (Cal. Supr. Ct.). Store managers and assistant store managers of Longs Drugs charged that the company misclassified them as exempt from overtime wages. Managers regularly worked in excess of 8 hours per day and 40 hours per week without compensation for their overtime hours. Following mediation, in 2005, Longs Drugs agreed to settle the claims for a total of $11 million. Over 1,000 current and former Longs Drugs managers and assistant managers were eligible for compensation under the settlement, over 98% of the class submitted claims.

19. ***Trotter v. Perdue Farms***, No. C 99-893-RRM (JJF) (MPT) (D. Del.). Lieff Cabraser represented a class of chicken processing employees of Perdue Farms, Inc., one of the nation's largest poultry processors, for wage and hour violations. The suit challenged Perdue's failure to compensate its assembly line employees for putting on, taking off, and

cleaning protective and sanitary equipment in violation of the Fair Labor Standards Act, various state wage and hour laws, and the Employee Retirement Income Security Act.  Under a settlement approved by the Court in 2002, Perdue paid $10 million for wages lost by its chicken processing employees and attorneys' fees and costs.  The settlement was in addition to a $10 million settlement of a suit brought by the Department of Labor in the wake of Lieff Cabraser's lawsuit.

20.    ***Gottlieb v. SBC Communications***, No. CV-00-04139 AHM (MANx) (C.D. Cal.).  With co-counsel, Lieff Cabraser represented current and former employees of SBC and Pacific Telesis Group ("PTG") who participated in AirTouch Stock Funds, which were at one time part of PTG's salaried and non-salaried savings plans.  After acquiring  PTG, SBC sold AirTouch, which PTG had owned, and caused the AirTouch Stock Funds that were included in the PTG employees' savings plans to be liquidated.  Plaintiffs alleged that in eliminating the AirTouch Stock Funds, and in allegedly failing to adequately communicate with employees about the liquidation, SBC breached its duties to 401k plan participants under the Employee Retirement Income Security Act.  In 2002, the Court granted final approval to a $10 million settlement.

21.    ***Ellis v. Costco Wholesale Corp.***, No. 04-03341-EMC (N.D. Cal.). Lieff Cabraser served as Co-Lead Counsel for current and former female employees who charged that Costco discriminated against women in promotion to management positions.  In January 2007, the Court certified a class consisting of over 750 current and former female Costco employees nationwide who were denied promotion to General Manager or Assistant Manager since January 3, 2002.  Costco appealed.  In September 2011, the U.S. Court of Appeals for the Ninth Circuit remanded the case to the District Court to make class certification findings consistent with the U.S. Supreme Court's ruling in *Wal-Mart v. Dukes*, 131 S.Ct. 2541 (2011).  In September 2012, U.S. District Court Judge Edward M. Chen granted plaintiffs' motion for class certification and certified two classes of over 1,250 current and former female Costco employees, one for injunctive relief and the other for monetary relief.  On May 27, 2014, the Court approved an $8 million settlement.

22.    ***In Re Farmers Insurance Exchange Claims Representatives' Overtime Pay Litigation***, MDL No. 1439 (D. Or.).  Lieff Cabraser and co-counsel represented claims representatives of Farmers' Insurance Exchange seeking unpaid overtime.  Lieff Cabraser won a liability phase trial on a classwide basis, and then litigated damages on an individual basis before a special master.  The judgment was partially upheld on appeal.  In August 2010, the Court approved an $8 million settlement.

23. **Zuckman v. Allied Group**, No. 02-5800 SI (N.D. Cal.). In September 2004, the Court approved a settlement with Allied Group and Nationwide Mutual Insurance Company of $8 million plus Allied/Nationwide's share of payroll taxes on amounts treated as wages, providing plaintiffs a 100% recovery on their claims. Plaintiffs, claims representatives of Allied / Nationwide, alleged that the company misclassified them as exempt employees and failed to pay them and other claims representatives in California overtime wages for hours they worked in excess of eight hours or forty hours per week. In approving the settlement, U.S. District Court Judge Susan Illston commended counsel for their "really good lawyering" and stated that they did "a splendid job on this" case.

24. **Thomas v. California State Automobile Association**, No. CH217752 (Cal. Supr. Ct.). With co-counsel, Lieff Cabraser represented 1,200 current and former field claims adjusters who worked for the California State Automobile Association ("CSAA"). Plaintiffs alleged that CSAA improperly classified their employees as exempt, therefore denying them overtime pay for overtime worked. In May 2002, the Court approved an $8 million settlement of the case.

25. **Higazi v. Cadence Design Systems**, No. C 07-2813 JW (N.D. Cal.). In July 2008, the Court granted final approval to a $7.664 million settlement of a class action suit by current and former technical support workers for Cadence seeking unpaid overtime. Plaintiffs alleged that Cadence illegally misclassified its employees who install, maintain, or support computer hardware or software as "exempt" from the overtime pay requirements of federal and state labor laws.

26. **Zaborowski v. MHN Government Services**, No. 12-CV-05109-SI (N.D. Cal.) Lieff Cabraser represented current and former Military and Family Life Consultants ("MFLCs") in a class action lawsuit against MHN Government Services, Inc. ("MHN") and Managed Health Network, Inc., seeking overtime pay under the federal Fair Labor Standards Act and state laws. The complaint charged that MHN misclassified the MFLCs as independent contractors and as "exempt" from overtime and failed to pay them overtime pay for hours worked over 40 per week. In April 2013, the Court denied MHN's motion to compel arbitration and granted plaintiff's motion for conditional certification of a FLSA collective action. In December 2014, the U.S. Court of Appeals for the Ninth Circuit upheld the district court's determination that the arbitration clause in MHN's employee contract was procedurally and substantively unconscionable. MHN appealed to the United States Supreme Court.

MHN did not contest that its agreement had several unconscionable components; instead, it asked the Supreme Court to sever the unconscionable terms of its arbitration agreement and nonetheless send

the MFLCs' claims to arbitration. The Supreme Court granted MHN's petition for certiorari on October 1, 2015, and was scheduled to hear the case in the 2016 spring term in *MHN Gov't Servs., Inc. v. Zaborowski*, No. 14-1458. While the matter was pending before the Supreme Court, an arbitrator approved a class settlement in the matter, which resulted in payment of $7,433,109.19 to class members.

27.   ***Sandoval v. Mountain Center, Inc., et al.***,  No. 03CC00280 (Cal. Supr. Ct.).  Cable installers in California charged that defendants owed them overtime wages, as well as damages for missed meal and rest breaks and reimbursement for expenses incurred on the job.  In 2005, the Court approved a $7.2 million settlement of the litigation, which was distributed to the cable installers who submitted claims.

28.   ***Martin v. Bohemian Club,*** No. SCV-258731 (Cal. Supr. Ct.). Lieff Cabraser and co-counsel represented a class of approximately 659 individuals who worked seasonally as camp valets for the Bohemian Club.  Plaintiffs alleged that they had been misclassified as independent contractors, and thus were not paid for overtime or meal-and-rest breaks as required under California law.  The Court granted final approval of a $7 million settlement resolving all claims in September 2016.

29.   ***Lewis v. Wells Fargo***, No. 08-cv-2670 CW (N.D. Cal.).  Lieff Cabraser served as Lead Counsel on behalf of approximately 330 I/T workers who alleged that Wells Fargo had a common practice of misclassifying them as exempt and failing to pay them for all overtime hours worked in violation of federal and state overtime pay laws.  In April 2011, the Court granted collective action certification of the FLSA claims and approved a $6.72 million settlement of the action.

30.   ***Kahn v. Denny's***, No. BC177254 (Cal. Supr. Ct.).  Lieff Cabraser brought a lawsuit alleging that Denny's failed to pay overtime wages to its General Managers and Managers who worked at company-owned restaurants in California.  The Court approved a $4 million settlement of the case in 2000.

31.   ***Wynne v. McCormick & Schmick's Seafood Restaurants***, No. C 06-3153 CW (N.D. Cal.).  In August 2008, the Court granted final approval to a settlement valued at $2.1 million, including substantial injunctive relief, for a class of African American restaurant-level hourly employees.  The consent decree created hiring benchmarks to increase the number of African Americans employed in front of the house jobs (*e.g.*, server, bartender, host/hostess, waiter/waitress, and cocktail server), a registration of interest program to minimize discrimination in promotions, improved complaint procedures, and monitoring and enforcement mechanisms.

32. ***Sherrill v. Premera Blue Cross***, No. 2:10-cv-00590-TSZ (W.D. Wash.). In April 2010, a technical worker at Premera Blue Cross filed a lawsuit against Premera seeking overtime pay from its misclassification of technical support workers as exempt.  In June 2011, the Court approved a collective and class action settlement of $1.45 million.

33. ***Holloway v. Best Buy***, No. C05-5056 PJH (N.D. Cal.).  Lieff Cabraser, with co-counsel, represented a class of current employees of Best Buy that alleged Best Buy stores nationwide discriminated against women, African Americans, and Latinos.  The complaint charged that these employees were assigned to less desirable positions and denied promotions, and that class members who attained managerial positions were paid less than white males.  In November 2011, the Court approved a settlement of the class action in which Best Buy agreed to changes to its personnel policies and procedures that will enhance the equal employment opportunities of the tens of thousands of women, African Americans, and Latinos employed by Best Buy nationwide.

34. ***Lyon v. TMP Worldwide***, No. 993096 (Cal. Supr. Ct.).  Lieff Cabraser served as Class Counsel for a class of certain non-supervisory employees in an advertising firm.  The settlement, approved in 2000, provided almost a 100% recovery to class members.  The suit alleged that TMP failed to pay overtime wages to these employees.

35. ***Lusardi v. McHugh, Secretary of the Army***, No. 0120133395 (U.S. EEOC).  Lieff Cabraser and the Transgender Law Center represent Tamara Lusardi, a transgender civilian software specialist employed by the U.S. Army.  In a groundbreaking decision in April 2015, the Equal Employment Opportunity Commission reversed a lower agency decision and held that the employer subjected Lusardi to disparate treatment and harassment based on sex in violation of Title VII of the Civil Rights Act of 1964 when (1) the employer restricted her from using the common female restroom (consistent with her gender identity) and (2) a team leader intentionally and repeatedly referred to her by male pronouns and made hostile remarks about her transition and gender.

Lieff Cabraser attorneys have had experience representing employees in additional cases, including cases involving race, gender, sexual orientation, gender identity, and age discrimination; False Claims Act (whistleblower) claims; breach of contract claims; unpaid wages or exempt misclassification (wage/hour) claims; pension plan abuses under ERISA; and other violations of the law.  For example, as described in the Antitrust section of this resume, Lieff Cabraser served as plaintiffs' Co-Lead Counsel in a class action charging that Adobe Systems Inc., Apple Inc., Google Inc., and Intel Corporation violated antitrust laws by conspiring to suppress the wages of certain salaried employees.

Lieff Cabraser is currently investigating charges of discrimination, wage/hour violations, and wage suppression claims against several companies.  In addition, our attorneys frequently write amicus briefs on cutting-edge legal issues involving employment law.

In 2015, *The Recorder* named Lieff Cabraser's employment group as a Litigation Department of the Year in the category of California Labor and Employment Law.  The Litigation Department of the Year awards recognize "California litigation practices that deliver standout results on their clients' most critical matters."  *The Recorder* editors consider the degree of difficulty, dollar value and importance of each matter to the client; the depth and breadth of the practice; and the use of innovative approaches.

*U.S. News* and Best Lawyers selected Lieff Cabraser as a 2013 national "Law Firm of the Year" in the category of Employment Law – Individuals.  *U.S. News* and Best Lawyers ranked firms nationally in 80 different practice areas based on extensive client feedback and evaluations from 70,000 lawyers nationwide.  Only one law firm in the U.S. in each practice area receives the "Law Firm of the Year" designation.

*Benchmark Plaintiff*, a guide to the nation's leading plaintiffs' firms, has given Lieff Cabraser's employment practice group a Tier 1 national ranking, its highest rating.  *The Legal 500* guide to the U.S. legal profession has recognized Lieff Cabraser as having one of the leading plaintiffs' employment practices in the nation for the past four years.

Kelly M. Dermody chairs the firm's employment practice group and leads the firm's employment cases.  She also serves as Managing Partner of Lieff Cabraser's San Francisco office.

In 2015, the College of Labor and Employment Lawyers named Ms. Dermody a Fellow. Nomination to the College is by ones colleagues only, and recognizes those lawyers who have demonstrated sustained and exceptional services to their clients, bar, bench, and public, and the highest level of character, integrity, professional expertise, and leadership.

*The Daily Journal* has selected Ms. Dermody as one of the top 100 attorneys in California (2012-2015), top 75 labor and employment lawyers in California (2011-2015), and top 100 women litigators in California (2007, 2010, 2012-2016).  She has been named a Northern California "Super Lawyer" every year since 2004, including being named a "Top 10 Lawyer" in 2014.

Since 2010, Ms. Dermody has annually been recognized by her peers for inclusion in *The Best Lawyers in America* in the fields of Employment Law – Individuals and Litigation – Labor and Employment.  In 2014, she was named "Lawyer of the Year" by Best Lawyers in the category of Employment Law – Individuals in San Francisco.  In 2007, *California Lawyer* magazine awarded Ms. Dermody its prestigious California Lawyer Attorney of the Year (CLAY) Award.

In 2019, the American Bar Association honored Ms. Dermody with its Margaret Brent Women Lawyers of Achievement Award, considered to be the highest award for women in the legal profession.

## IV.    Consumer Protection

### A.    Current Cases

1.    ***In re Arizona Theranos, Inc. Litigation***, No. 2:16-cv-2138-HRH (D. Ariz.). This class action alleges that Walgreens and startup company Theranos Inc. (along with its two top executives) committed fraud and battery by prematurely marketing to consumers blood testing services that were still in-development, not ready-for-market, and dangerously unreliable.  Hundreds of thousands of consumers in Arizona and California submitted to these "testing" services and blood draws under false pretenses.  Consumers also made major health decisions (including taking actions and medication, and refraining from taking actions and medications) in reliance on these unreliable tests.  Plaintiffs allege that Walgreens' and Theranos' conduct violates Arizona and California consumer protection statutes and common law.

2.    ***Fiat Chrysler Dodge Jeep Ecodiesel Litigation***, 17-MD-02777-EMC. Lieff Cabraser represents owners and lessors of affected Fiat Chrysler vehicles in litigation accusing Fiat Chrysler of using secret software to allow excess emissions in violation of the law for at least 104,000 2014-2016 model year diesel vehicles, including Jeep Grand Cherokees and Dodge Ram 1500 trucks with 3-liter diesel engines sold in the United States from late 2013 through 2016 (model years 2014, 2015, and 2016). In June 2017, Judge Edward M. Chen of the Northern District of California named Elizabeth Cabraser sole Lead Counsel for Plaintiffs and Chair of the Plaintiffs' Steering Committee for consolidated litigation of the case.

     In May 2019, Judge Chen granted final approval to a $307.5 million settlement of the case, which will provide eligible owners and lessees with substantial cash payments and an extended warranty following the completion of a government-mandated emissions modification to affected vehicles.

     Under the agreement between consumers and FCA and Bosch, approximately 100,000 owners and lessees of Ram 1500 and Jeep Grand Cherokee 3.0-liter diesel vehicles from model years 2014 to 2016 are eligible to file claims and receive the settlement's benefits. Most owners will receive $3,075 once the repair – a software reflash – is completed. Current owners and lessees have until February 3, 2021 to submit a claim, and until May 3, 2021 to complete the repair and receive compensation.

3.    ***In Re: General Motors Corp. Air Conditioning Marketing and Sales Practices Litigation***, MDL No. 2818 (E.D. Mich.). Lieff Cabraser serves as Co-Lead Plaintiffs' Counsel in a consumer fraud class action MDL against General Motors Company consolidated in Michigan

federal court on behalf of all persons who purchased or leased certain GM vehicles equipped with an allegedly defective air conditioning systems. The lawsuit claims the vehicles have a serious defect that causes the air conditioning systems to crack and leak refrigerant, lose pressure, and fail to function properly to provide cooled air into the vehicles. These failures lead owners and lessees to incur significant costs for repair, often successive repairs as the repaired parts prove defective as well. The complaint lists causes of action for violations of various states' Consumer Protection Acts, fraudulent concealment, breach of warranty, and unjust enrichment, and seeks declaratory and injunctive relief, including an order requiring GM to permanently repair the affected vehicles within a reasonable time period, as well as compensatory, exemplary, and statutory damages.

4. ***In re Checking Account Overdraft Litigation***, MDL No. 2036 (S.D. Fl.).  Lieff Cabraser serves on the Plaintiffs' Executive Committee ("PEC") in Multi-District Litigation against 35 banks, including Bank of America, Chase, Citizens, PNC, Union Bank, and U.S. Bank.  The complaints alleged that the banks entered debit card transactions from the "largest to the smallest" to draw down available balances more rapidly and maximize overdraft fees.  In March 2010, the Court denied defendants' motions to dismiss the complaints.  The Court has approved nearly $1 billion in settlements with the banks.

In November 2011, the Court granted final approval to a $410 million settlement of the case against Bank of America.  Lieff Cabraser was the lead plaintiffs' law firm on the PEC that prosecuted the case against Bank of America.  In approving the settlement with Bank of America, U.S. District Court Judge James Lawrence King stated, "This is a marvelous result for the members of the class."  Judge King added, "[B]ut for the high level of dedication, ability and massive and incredible hard work by the Class attorneys . . . I do not believe the Class would have ever seen . . . a penny."

In September 2012, the Court granted final approval to a $35 million of the case against Union Bank.  In approving the settlement, Judge King again complimented plaintiffs' counsel for their outstanding work and effort in resolving the case:  "The description of plaintiffs' counsel, which is a necessary part of the settlement, is, if anything, understated.  In my observation of the diligence and professional activity, it's superb.  I know of no other class action case anywhere in the country in the last couple of decades that's been handled as efficiently as this one has, which is a tribute to the lawyers."

5. ***Hale, et al. v. State Farm Mut. Auto. Ins. Co., et al.***, Case No. 3:12-cv-00660-DRH-SCW.  In 1997, Lieff Cabraser and co-counsel filed a

class action in Illinois state court, accusing State Farm of approving the use of lower-quality non-original equipment manufacturer (non-OEM) automotive parts for repairs to the vehicles of more than 4 million State Farm policyholders, contrary to the company's policy language.  Plaintiffs won a verdict of more than nearly $1.2 billion that included $600 million in punitive damages.  The state appeals court affirmed the judgment, but reduced it slightly to $1.05 billion.  State Farm appealed to the Illinois Supreme Court in May 2013.

A two-plus-year delay in that Court's decision led to a vacancy in the Illinois Supreme Court.  Plaintiffs alleged that State Farm recruited a little-known trial judge, Judge Lloyd A. Karmeier, to run for the vacant Supreme Court seat, and then managed his campaign behind the scenes, and secretly funded it to the tune of almost $4 million.  Then, after Justice Karmeier was elected, State Farm hid its involvement in his campaign to ensure that Justice Karmeier could participate in the pending appeal of the $1.05 billion judgment.  State Farm's scheme was successful: Justice Karmeier joined the otherwise "deadlocked" deliberations and voted to decertify the class and overturn the judgment.

In a 2012 lawsuit filed in federal court, Plaintiffs alleged that this secretive scheme to seat a sympathetic justice—and then to lie about it, so as secure that justice's participation in the pending appeal—violated the Racketeer Influenced and Corrupt Organization Act ("RICO"), and deprived Plaintiffs of their interest in the billion-dollar judgment.  Judge David R. Herndon certified the class in October 2016, and the Seventh Circuit denied State Farm's petition to appeal the ruling in December 2016 and again in May 2017.  On August 21, 2018, Judge David R. Herndon issued two new Orders favorable to plaintiffs relating to evidence and testimony to be included in the trial. On September 4, 2018, the day the trial was to begin, Judge Herndon gave preliminary approval to a $250 million settlement of the case, and on December 13, 2018, Judge Herndon gave the settlement final approval.

6.  ***Dover v. British Airways***, Case No. 1:12-cv-05567 (E.D.N.Y.).  Lieff Cabraser represents participants in British Airways' ("BA") frequent flyer program, known as the Executive Club, in a breach of contract class action lawsuit.  BA imposes a very high "fuel surcharge," often in excess of $500, on Executive Club reward tickets.  Plaintiffs alleged that the "fuel surcharge" was not based upon the price of fuel, and that it therefore violated the terms of the contract. The case was heavily litigated for five years, and settled on the verge of trial for a $42.5 million common fund. Class members have the choice of a cash refund or additional flyer miles based on the number of tickets redeemed during the class period. If all class members claim the miles instead of the cash, the total settlement value will be up to $63 million. U.S. Magistrate Judge Cheryl Pollak

signed off on the settlement on May 30, 2018: "In light of the court's experience throughout the course of this litigation — and particularly in light of the contentiousness of earlier proceedings, the inability of the parties to settle during previous mediation attempts and the parties' initial positions when they appeared for the settlement conferences with the court — the significant benefit that the settlement will provide to class members is remarkable."

7.  ***Telephone Consumer Protection Act Litigation***.  Lieff Cabraser serves as a leader in nationwide Telephone Consumer Protection Act ("TCPA") class actions challenging abusing and harassing automated calls.  Based on Lieff Cabraser's experience and expertise in these cases, courts have appointed Lieff Cabraser as co-lead counsel in certified TCPA class actions against DIRECTV.  ***Brown v. DirecTV, LLC***, No. CV 13-1170 DMG (EX), 2019 WL 1434669 (C.D. Cal. Mar. 29, 2019); ***Cordoba v. DirecTV, LLC***, 320 F.R.D. 582 (N.D. Ga. 2017).  Lieff Cabraser also maintains leadership roles in ongoing nationwide class actions against several other companies that make automated debt-collection or telemarketing calls, including National Grid (***Jenkins v. National Grid USA, et al.***, Case No. 2:15-cv-01219-JS-GRB (E.D.N.Y.).

8.  ***Rushing v. The Walt Disney Company, et al.***, Case No. 3:17-cv-4419 (N.D. Cal.); ***Rushing v. Viacom, Inc., et al.***, Case No. 3:17-cv-4492 (N.D. Cal.); ***McDonald, et al. v. Kiloo Aps, et al.***, Case No. 3:17-cv-4344 (N.D. Cal.). Lieff Cabraser represents parents, on behalf of their children, in federal class action litigation against numerous online game and app producers including Disney, Viacom, and the makers of the vastly popular Subway Surfers game (Kiloo and Sybo), over allegations the companies unlawfully collected, used, and disseminated the personal information of children who played the gaming apps on smart phones, tablets, and other mobile device.  The actions are proceeding under time-honored laws protecting privacy: a California common law invasion of privacy claim, a California Constitution right of privacy claim, a California unfair competition claim, a New York General Business Law claim, a Massachusetts Unfair and Deceptive Trade Practices claim, and a Massachusetts statutory right to privacy claim.

9.  ***The People of the State of California v. J.C. Penny Corporation, Inc.***, Case No. BC643036 (Los Angeles County Sup. Ct); ***The People of the State of California v. Kohl's Department Stores, Inc.***, Case No. BC643037 (Los Angeles County Sup. Ct); ***The People of the State of California v. Macy's, Inc.***, Case No. BC643040 (Los Angeles County Sup. Ct); ***The People of the State of California v. Sears, Roebuck and Co., et al.***, Case No. BC643039 (Los Angeles County Sup. Ct). Working with the office of the Los Angeles City Attorney, Lieff Cabraser and co-counsel represent the People of California in consumer

fraud and false advertising civil enforcement actions against national retailers J.C. Penney, Kohl's, Macy's, and Sears alleging that each of these companies has pervasively used "false reference pricing" schemes — whereby the companies advertise products at a purported "discount" from false "original" or "regular" prices — to mislead customers into believing they are receiving bargains. Because such practices are misleading — and effective — California law prohibits them. The suits seek civil penalties and injunctive relief. The cases are ongoing.

10.  *Cody v. SoulCycle, Inc.*, Case No. 2:15-cv-06457 (C.D. Cal.). Lieff Cabraser represents consumers in a class action lawsuit alleging that indoor cycling fitness company SoulCycle sells illegally expiring gift certificates. The suit alleges that SoulCycle defrauded customers by forcing them to buy gift certificates with short enrollment windows and keeping the expired certificates' unused balances in violation of the U.S. Electronic Funds Transfer Act and California's Unfair Competition Law, and seeks reinstatement of expired classes or customer reimbursements as well as policy changes. In October of 2017, U.S. District Judge Michael W. Fitzgerald  granted final approval to a settlement of the litigation valued between $6.9 million and $9.2 million that provides significant economic consideration to settlement class members as well as meaningful changes to SoulCycle's business practices.

11.  *Moore v. Verizon Communications*, No. 09-cv-01823-SBA (N.D. Cal.); *Nwabueze v. AT&T*, No. 09-cv-1529 SI (N.D. Cal.); *Terry v. Pacific Bell Telephone Co.*, No. RG 09 488326 (Alameda County Sup. Ct.).  Lieff Cabraser, with co-counsel, represents nationwide classes of landline telephone customers subjected to the deceptive business practice known as "cramming."  In this practice, a telephone company bills customers for unauthorized third-party charges assessed by billing aggregators on behalf of third-party providers.  A U.S. Senate committee has estimated that Verizon, AT&T, and Qwest place 300 million such charges on customer bills each year (amounting to $2 billion in charges), many of which are unauthorized.  Various sources estimate that 90-99% of third-party charges are unauthorized.  Both Courts have granted preliminary approval of settlements that allow customers to receive 100% refunds for all unauthorized charges from 2005 to the present, plus extensive injunctive relief to prevent cramming in the future.  The Nwabueze and Terry cases are ongoing.

12.  *James v. UMG  Recordings, Inc.*, No. CV-11-1613 (N.D. Cal); *Zombie v. UMG Recordings, Inc.*, No. CV-11-2431 (N.D. Cal).  Lieff Cabraser and its co-counsel represent music recording artists in a proposed class action against Universal Music Group.  Plaintiffs allege that Universal failed to pay the recording artists full royalty income earned from customers' purchases of digitally downloaded music

from vendors such as Apple iTunes.  The complaint alleges that Universal licenses plaintiffs' music to digital download providers, but in its accounting of the royalties plaintiffs have earned, treats such licenses as "records sold" because royalty rate for "records sold" is lower than the royalty rate for licenses.  Plaintiffs legal claims include breach of contract and violation of California unfair competition laws.  In November 2011 the Court denied defendant's motion to dismiss plaintiffs' unfair competition law claims.

13.     ***White v. Experian Information Solutions***, No. 05-CV-1070 DOC (C.D. Cal.).  In 2005, plaintiffs filed nationwide class action lawsuits on behalf of 750,000 claimants against the nation's three largest repositories of consumer credit information, Experian Information Solutions, Inc., Trans Union, LLC, and Equifax Information Services, LLC.  The complaints charged that defendants violated the Fair Credit Reporting Act ("FCRA") by recklessly failing to follow reasonable procedures to ensure the accurate reporting of debts discharged in bankruptcy and by refusing to adequately investigate consumer disputes regarding the status of discharged accounts.  In April 2008, the District Court approved a partial settlement of the action that established an historic injunction.  This settlement required defendants comply with detailed procedures for the retroactive correction and updating of consumers' credit file information concerning discharged debt (affecting one million consumers who had filed for bankruptcy dating back to 2003), as well as new procedures to ensure that debts subject to future discharge orders will be similarly treated.  As noted by the District Court, "Prior to the injunctive relief order entered in the instant case, however, no verdict or reported decision had ever required Defendants to implement procedures to cross-check data between their furnishers and their public record providers."  In 2011, the District Court approved a $45 million settlement of the class claims for monetary relief.  In April 2013, the Court of Appeals for the Ninth Circuit reversed the order approving the monetary settlement and remanded the case for further proceedings.

14.     ***Healy v. Chesapeake Appalachia***, No. 1:10cv00023 (W.D. Va.); ***Hale v. CNX Gas***, No. 1:10cv00059 (W.D. Va.); ***Estate of Holman v. Noble Energy***, No. 03 CV 9 (Dist. Ct., Co.); ***Droegemueller v. Petroleum Development Corporation***, No. 07 CV 2508 JLK (D. Co.); ***Anderson v. Merit Energy Co.***, No. 07 CV 00916 LTB (D. Co.); ***Holman v. Petro-Canada Resources (USA)***, No. 07 CV 416 (Dist. Ct., Co.).  Lieff Cabraser serves as Co-Lead Counsel in several cases pending in federal court in Virginia, in which plaintiffs allege that certain natural gas companies improperly underpaid gas royalties to the owners of the gas.  In one case that recently settled, the plaintiffs recovered approximately 95% of the damages they suffered.  Lieff Cabraser also achieved settlements on behalf of natural gas royalty owners in five other

class actions outside Virginia.  Those settlements -- in which class members recovered between 70% and 100% of their damages, excluding interest -- were valued at more than $160 million.

15. ***Marcus A. Roberts et al. v. AT&T Mobility LLC***, No. 3:15-cv-3418 (N.D. Cal.). Lieff Cabraser represents consumers in a proposed class action lawsuit against AT&T claiming that AT&T falsely advertised that its "unlimited" mobile phone plans provide "unlimited" data, while purposefully failing to disclose that it regularly "throttles" (*i.e.*, intentionally slows) customers' data speed once they reach certain data usage thresholds. The lawsuit also challenges AT&T's attempts to force consumers into non-class arbitration, claiming that AT&T's arbitration clause in its Wireless Customer Agreement violates consumers' fundamental constitutional First Amendment right to petition courts for a redress of grievances.

## B.    Successes

1. ***In re Volkswagen 'Clean Diesel' Marketing, Sales Practices, and Products Liability Litigation***, MDL No. 2672 (N.D. Cal.). In September of 2015, the U.S. Environmental Protection Agency issued a Notice of Violation to Volkswagen relating to 475,000 diesel-powered cars in the United States sold since 2008 under the VW and Audi brands on which VW installed "cheat device" software that intentionally changed the vehicles' emissions production during official testing. Only when the programming detected that the vehicles were undergoing official emissions testing did the cars turn on their full emission control systems. The controls were turned off during actual road use, producing up to 40x more pollutants than the testing amounts in an extraordinary violation of U.S. clean air laws.

Private vehicle owners, state governments, agencies, and attorneys general, as well as federal agencies, all sought compensation and relief from VW through litigation in U.S. courts. More than 1,000 individual civil cases and numerous accompanying government claims were consolidated in federal court in Northern California, and U.S. District Judge Charles R. Breyer appointed Lieff Cabraser founding partner Elizabeth Cabraser as Lead Counsel and Chair of the 22-member Plaintiffs Steering Committee in February of 2016.

After nine months of intensive negotiation and extraordinary coordination led on the class plaintiffs' side by Elizabeth Cabraser, a set of interrelated settlements totaling $14.7 billion were given final approval by Judge Breyer on October 25, 2016. The settlements offer owners and lessees of Volkswagen and Audi 2.0-liter diesel vehicles substantial compensation through buybacks and lease terminations, government-approved emissions modifications, and cash payments, while fixing or

removing these polluting vehicles from the road. On May 11, 2017, a further settlement with a value of at least $1.2 billion relating to VW's 3.0-liter engine vehicles received final approval. This deal offers a combination of a projected emissions modification or buybacks for older 3.0-liter models. If a government-approved modification can't be found, VW will have to buy back all the vehicles, which could increase its costs for the 3.0-liter model settlement to as much as $4 billion.

The consumer class settlements have garnered overwhelming approval and response. Over 380,000 diesel owners have already signed up for the settlement, most doing so even before final approval was granted by Judge Breyer, who is overseeing all federal "clean diesel" litigation.

The Volkswagen emissions settlement is one of the largest payments in American history and the largest known consumer class settlement. It exemplifies the best of the American judicial system, illustrating the resolution of a significant portion of one of the most massive multidistrict class actions at what *Law360* referred to as "lightning speed." The settlements are unprecedented also for their scope and complexity, involving the Department of Justice, Environmental Protection Agency (EPA), California Air Resources Board (CARB) and California Attorney General, the Federal Trade Commission (FTC) and private plaintiffs.

2.   ***Williamson v. McAfee, Inc.***, No. 14-cv-00158-EJD (N.D. Cal.).  This nationwide class action alleged that McAfee falsely represented the prices of its computer anti-virus software to customers enrolled in its "auto-renewal" program.  Plaintiffs alleged that McAfee: (a) offers *non*-auto-renewal subscriptions at stated "discounts" from a "regular" sales price; however, the stated discounts are false because McAfee does not ever sell subscriptions at the stated "regular" price to *non*-auto-renewal customers; and (b) charges the auto-renewal customers the amount of the false "regular" sales price, claiming it to be the "current" regular price even though it does not sell subscriptions at that price to any other customer.  Plaintiffs alleged that McAfee's false reference price scheme violated California's and New York's unfair competition and false advertising laws.  In 2017, a class settlement was approved that included monetary payments to claimants and practice changes.

3.   ***Hansell v. TracFone Wireless***, No. 13-cv-3440-EMC (N.D. Cal.); ***Blaqmoor v. TracFone Wireless***, No. 13-cv-05295-EMC (N.D. Cal.); ***Gandhi v. TracFone Wireless***, No. 13-cv-05296-EMC (N.D. Cal.).  In January 2015, Michael W. Sobol, the chair of Lieff Cabraser's consumer protection practice group, announced that consumers nationwide who purchased service plans with "unlimited data" from TracFone Wireless, Inc., were eligible to receive payments under a $40 million settlement of a series of class action lawsuits.  One of the nation's largest wireless

carriers, TracFone uses the brands Straight Talk, Net10, Telcel America, and Simple Mobile to sell mobile phones with prepaid wireless plans at Walmart and other retail stores nationwide. The class action alleged that TracFone falsely advertised its wireless mobile phone plans as providing "unlimited data," while actually maintaining monthly data usage limits that were not disclosed to customers. It further alleged that TracFone regularly throttled (*i.e.* significantly reduces the speed of) or terminated customers' data plans pursuant to the secret limits. Approved by the Court in July 2015, the settlement permanently enjoins TracFone from making any advertisement or other representation about amount of data its cell phone plans offer without disclosing clearly and conspicuously all material restrictions on the amount and speed of the data plan. Further, TracFone and its brands may not state in their advertisements and marketing materials that any plan provides "unlimited data" unless there is also clear, prominent, and adjoining disclosure of any applicable throttling caps or limits. The litigation is notable in part because, following two years of litigation by class counsel, the Federal Trade Commission joined the litigation and filed a Consent Order with TracFone in the same federal court where the class action litigation is pending. All compensation to consumers will be provided through the class action settlement.

4.  ***Gutierrez v. Wells Fargo Bank***, No. C 07-05923 WHA (N.D. Cal.). Following a two week bench class action trial, U.S. District Court Judge William Alsup in August 2010 issued a 90-page opinion holding that Wells Fargo violated California law by improperly and illegally assessing overdraft fees on its California customers and ordered $203 million in restitution to the certified class. Instead of posting each transaction chronologically, the evidence presented at trial showed that Wells Fargo deducted the largest charges first, drawing down available balances more rapidly and triggering a higher volume of overdraft fees.

Wells Fargo appealed. In December 2012, the Appellate Court issued an opinion upholding and reversing portions of Judge Alsup's order, and remanded the case to the District Court for further proceedings. In May 2013, Judge Alsup reinstated the $203 million judgment against Wells Fargo and imposed post-judgment interest bringing the total award to nearly $250 million. On October 29, 2014, the Appellate Court affirmed the Judge Alsup's order reinstating the judgment.

For his outstanding work as Lead Trial Counsel and the significance of the case, *California Lawyer* magazine recognized Richard M. Heimann with a California Lawyer Attorney of the Year (CLAY) Award. In addition, the Consumer Attorneys of California selected Mr. Heimann and Michael W. Sobol as Finalists for the Consumer Attorney of the Year Award for their success in the case.

In reviewing counsel's request for attorneys' fees, Judge Alsup stated on May 21, 2015: "Lieff, Cabraser, on the other hand, entered as class counsel and pulled victory from the jaws of defeat. They bravely confronted several obstacles including the possibility of claim preclusion based on a class release entered in state court (by other counsel), federal preemption, hard-fought dispositive motions, and voluminous discovery. They rescued the case [counsel that originally filed] had botched and secured a full recovery of $203 million in restitution plus injunctive relief.  Notably, Attorney Richard Heimann's trial performance ranks as one of the best this judge has seen in sixteen years on the bench.  Lieff, Cabraser then twice defended the class on appeal. At oral argument on the present motion, in addition to the cash restitution, Wells Fargo acknowledged that since 2010, its posting practices changed nationwide, in part, because of the injunction.  Accordingly, this order allows a multiplier of 5.5 mainly on account of the fine results achieved on behalf of the class, the risk of non-payment they accepted, the superior quality of their efforts, and the delay in payment."

5.    ***Kline v. The Progressive Corporation***, Circuit No. 02-L-6 (Circuit Court of the First Judicial Circuit, Johnson County, Illinois).  Lieff Cabraser served as settlement class counsel in a nationwide consumer class action challenging Progressive Corporation's private passenger automobile insurance sales practices.  Plaintiffs alleged that the Progressive Corporation wrongfully concealed from class members the availability of lower priced insurance for which they qualified.  In 2002, the Court approved a settlement valued at approximately $450 million, which included both cash and equitable relief.  The claims program, implemented upon a nationwide mail and publication notice program, was completed in 2003.

6.    ***Catholic Healthcare West Cases***, JCCP No. 4453 (Cal. Supr. Ct.).  Plaintiff alleged that Catholic Healthcare West ("CHW") charged uninsured patients excessive fees for treatment and services, at rates far higher than the rates charged to patients with private insurance or on Medicare.  In January 2007, the Court approved a settlement that provides discounts, refunds and other benefits for CHW patients valued at $423 million.  The settlement requires that CHW lower its charges and end price discrimination against all uninsured patients, maintain generous charity case policies allowing low-income and uninsured patients to receive free or heavily discounted care, and protect uninsured patients from unfair collections practices.  Lieff Cabraser served as Lead Counsel in the coordinated action.

7.    ***In re Neurontin Marketing and Sales Practices Litigation***, MDL No. 1629 (D. Mass.).  Lieff Cabraser served on the Plaintiffs' Steering Committee in multidistrict litigation arising out of the sale and marketing

of the prescription drug Neurontin, manufactured by Parke-Davis, a division of Warner-Lambert Company, which was later acquired by Pfizer, Inc. Lieff Cabraser served as co-counsel to Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals ("Kaiser") in Kaiser's trial against Pfizer in the litigation. On March 25, 2010, a federal court jury determined that Pfizer violated a federal antiracketeering law by promoting its drug Neurontin for unapproved uses and found Pfizer must pay Kaiser damages up to $142 million. At trial, Kaiser presented evidence that Pfizer knowingly marketed Neurontin for unapproved uses without proof that it was effective. Kaiser said it was misled into believing neuropathic pain, migraines, and bipolar disorder were among the conditions that could be treated effectively with Neurontin, which was approved by the FDA as an adjunctive therapy to treat epilepsy and later for post-herpetic neuralgia, a specific type of neuropathic pain. In November 2010, the Court issued Findings of Fact and Conclusions of Law on Kaiser's claims arising under the California Unfair Competition Law, finding Pfizer liable and ordering that it pay restitution to Kaiser of approximately $95 million. In April 2013, the First Circuit Court of Appeals affirmed both the jury's and the District Court's verdicts. In November 2014, the Court approved a $325 million settlement on behalf of a nationwide class of third party payors.

8.    ***Sutter Health Uninsured Pricing Cases***, JCCP No. 4388 (Cal. Supr. Ct.). Plaintiffs alleged that they and a Class of uninsured patients treated at Sutter hospitals were charged substantially more than patients with private or public insurance, and many times above the cost of providing their treatment. In December 2006, the Court granted final approval to a comprehensive and groundbreaking settlement of the action. As part of the settlement, Class members were entitled to make a claim for refunds or deductions of between 25% to 45% from their prior hospital bills, at an estimated total value of $276 million. For a three year period, Sutter agreed to provide discounted pricing policies for uninsureds. In addition, Sutter agreed to maintain more compassionate collections policies that will protect uninsureds who fall behind in their payments. Lieff Cabraser served as Lead Counsel in the coordinated action.

9.    ***Citigroup Loan Cases***, JCCP No. 4197 (San Francisco Supr. Ct., Cal.). In 2003, the Court approved a settlement that provided approximately $240 million in relief to former Associates' customers across America. Prior to its acquisition in November 2000, Associates First Financial, referred to as The Associates, was one of the nation's largest "subprime" lenders. Lieff Cabraser represented former customers of The Associates charging that the company added unwanted and unnecessary insurance products onto mortgage loans and engaged in improper loan refinancing practices. Lieff Cabraser served as nationwide Plaintiffs' Co-Liaison Counsel.

10.     ***Telephone Consumer Protection Act Litigation***.  Lieff Cabraser
has spearheaded a series of groundbreaking class actions under the
Telephone Consumer Protection Act ("TCPA"), which prohibits abusive
telephone practices by lenders and marketers, and places strict limits on
the use of autodialers to call or send texts to cell phones.  The settlements
in these cases have collectively put a stop to millions of harassing calls by
debt collectors and others and resulted in the recovery by consumers
across America of over $380 million.

In 2012, Lieff Cabraser achieved a $24.15 million class settlement with
Sallie Mae – the then-largest settlement in the history of the TCPA.  See
***Arthur v. Sallie Mae, Inc.***, No. C10-0198 JLR, 2012 U.S. Dist. LEXIS
132413 (W.D. Wash. Sept. 17, 2012).  In subsequent cases, Lieff Cabraser
and co-counsel eclipsed this record, including a $32,083,905 settlement
with Bank of America (***Duke v. Bank of America***, No. 5:12-cv-04009-
EJD (N.D. Cal.)), a $39,975,000 settlement with HSBC (***Wilkins v.
HSBC Bank Nev., N.A.***, Case No. 14-cv-190 (N.D. Ill.)), a
$75,455,098.74 settlement with Capital One (***In re Capital One
Telephone Consumer Protection Act Litigation***, Master Docket
No. 1:12-cv-10064 (N.D. Ill.)), and six settlements with Wells Fargo
totaling over $95 million (***Dunn v. Wells Fargo Bank, N.A.***, Case:
1:17-cv-00481 (N.D. Ill.)).   In the ***HSBC*** matter, Judge James F.
Holderman commented on "the excellent work" and "professionalism" of
Lieff Cabraser and its co-counsel.  As noted above, Lieff Cabraser's class
settlements in TCPA cases have collectively resulted in the recovery by
consumers to date of over $380 million.

11.     ***Thompson v. WFS Financial***, No. 3-02-0570 (M.D. Tenn.);
***Pakeman v. American Honda Finance Corporation***, No. 3-02-
0490 (M.D. Tenn.); ***Herra v. Toyota Motor Credit Corporation***,
No. CGC 03-419 230 (San Francisco Supr. Ct.).  Lieff Cabraser with co-
counsel litigated against several of the largest automobile finance
companies in the country to compensate victims of—and stop future
instances of—racial discrimination in the setting of interest rates in
automobile finance contracts.  The litigation led to substantial changes in
the way Toyota Motor Credit Corporation ("TMCC"), American Honda
Finance Corporation ("American Honda") and WFS Financial, Inc. sell
automobile finance contracts, limiting the discrimination that can occur.
In approving the settlement in *Thompson v. WFS Financial*, the Court
recognized the "innovative" and "remarkable settlement" achieved on
behalf of the nationwide class.  In 2006 in *Herra v. Toyota Motor Credit
Corporation*, the Court granted final approval to a nationwide class action
settlement on behalf of all African-American and Hispanic customers of
TMCC who entered into retail installment contracts that were assigned to
TMCC from 1999 to 2006.  The monetary benefit to the class was
estimated to be between $159-$174 million.

12.     ***In re John Muir Uninsured Healthcare Cases***, JCCP No. 4494
(Cal. Supr. Ct.).  Lieff Cabraser represented nearly 53,000 uninsured
patients who received care at John Muir hospitals and outpatient centers
and were charged inflated prices and then subject to overly aggressive
collection practices when they failed to pay.  In November 2008, the
Court approved a final settlement of the *John Muir* litigation.  John Muir
agreed to provide refunds or bill adjustments of 40-50% to uninsured
patients who received medical care at John Muir over a six year period,
bringing their charges to the level of patients with private insurance, at a
value of $115 million.  No claims were required.  Every class member
received a refund or bill adjustment.  Furthermore, John Muir was
required to (1) maintain charity care policies to give substantial
discounts—up to 100%—to low income, uninsured patients who meet
certain income requirements; (2) maintain an Uninsured Patient
Discount Policy to give discounts to all uninsured patients, regardless of
income, so that they pay rates no greater than those paid by patients with
private insurance; (3) enhance communications to uninsured patients so
they are better advised about John Muir's pricing discounts, financial
assistance, and financial counseling services; and (4) limit the practices
for collecting payments from uninsured patients.

13.     ***Providian Credit Card Cases***, JCCP No. 4085 (San Francisco Supr.
Ct.).  Lieff Cabraser served as Co-Lead Counsel for a certified national
Settlement Class of Providian credit cardholders who alleged that
Providian had engaged in widespread misconduct by charging
cardholders unlawful, excessive interest and late charges, and by
promoting and selling to cardholders "add-on products" promising
illusory benefits and services.  In November 2001, the Court granted final
approval to a $105 million settlement of the case, which also required
Providian to implement substantial changes in its business practices.  The
$105 million settlement, combined with an earlier settlement by
Providian with Federal and state agencies, represents the largest
settlement ever by a U.S. credit card company in a consumer protection
case.

14.     ***In re Chase Bank USA, N.A. "Check Loan" Contract Litigation***,
MDL No. 2032 (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Liaison
Counsel and on the Plaintiffs' Executive Committee in Multi-District
Litigation ("MDL") charging that Chase Bank violated the implied
covenant of good faith and fair dealing by unilaterally modifying the
terms of fixed rate loans.  The MDL was established in 2009 to coordinate
more than two dozen cases that were filed in the wake of the conduct at
issue.  The nationwide, certified class consisted of more than 1 million
Chase cardholders who, in 2008 and 2009, had their monthly minimum
payment requirements unilaterally increased by Chase by more than
150%.  Plaintiffs alleged that Chase made this change, in part, to induce

cardholders to give up their promised fixed APRs in order to avoid the unprecedented minimum payment hike.  In November 2012, the Court approved a $100 million settlement of the case.

15. ***In re Synthroid Marketing Litigation***, MDL No. 1182 (N.D. Ill.). Lieff Cabraser served as Co-Lead Counsel for the purchasers of the thyroid medication Synthroid in litigation against Knoll Pharmaceutical, the manufacturer of Synthroid.  The lawsuits charged that Knoll misled physicians and patients into keeping patients on Synthroid despite knowing that less costly, but equally effective drugs, were available.  In 2000, the District Court gave final approval to a $87.4 million settlement with Knoll and its parent company, BASF Corporation, on behalf of a class of all consumers who purchased Synthroid at any time from 1990 to 1999. In 2001, the Court of Appeals upheld the order approving the settlement and remanded the case for further proceedings.  264 F.3d 712 (7th Cir. 2001).  The settlement proceeds were distributed in 2003.

16. ***R.M. Galicia v. Franklin; Franklin v. Scripps Health***, No. IC 859468 (San Diego Supr. Ct., Cal.).  Lieff Cabraser served as Lead Class Counsel in a certified class action lawsuit on behalf of 60,750 uninsured patients who alleged that the Scripps Health hospital system imposed excessive fees and charges for medical treatment.  The class action originated in July 2006, when uninsured patient Phillip Franklin filed a class action cross-complaint against Scripps Health after Scripps sued Mr. Franklin through a collection agency.  Mr. Franklin alleged that he, like all other uninsured patients of Scripps Health, was charged unreasonable and unconscionable rates for his medical treatment.  In June 2008, the Court granted final approval to a settlement of the action which includes refunds or discounts of 35% off of medical bills, collectively worth $73 million.  The settlement also required Scripps Health to modify its pricing and collections practices by (1) following an Uninsured Patient Discount Policy, which includes automatic discounts from billed charges for Hospital Services; (2) following a Charity Care Policy, which provides uninsured patients who meet certain income tests with discounts on Health Services up to 100% free care, and provides for charity discounts under other special circumstances; (3) informing uninsured patients about the availability and terms of the above financial assistance policies; and (4) restricting certain collections practices and actively monitoring outside collection agents.

17. ***In re Lawn Mower Engine Horsepower Marketing and Sales Practices Litigation***, MDL No. 1999 (E.D. Wis.).  Lieff Cabraser served as co-counsel for consumers who alleged manufacturers of certain gasoline-powered lawn mowers misrepresented, and significantly overstated, the horsepower of the product. As the price for lawn mowers is linked to the horsepower of the engine -- the higher the horsepower, the

more expensive the lawn mower -- defendants' alleged misconduct caused consumers to purchase expensive lawn mowers that provided lower horsepower than advertised. In August 2010, the Court approved a $65 million settlement of the action.

18. ***Strugano v. Nextel Communications***, No. BC 288359 (Los Angeles Supr. Ct).  In May 2006, the Los Angeles Superior Court granted final approval to a class action settlement on behalf of all California customers of Nextel from January 1, 1999 through December 31, 2002, for compensation for the harm caused by Nextel's alleged unilateral (1) addition of a $1.15 monthly service fee and/or (2) change from second-by-second billing to minute-by-minute billing, which caused "overage" charges (i.e., for exceeding their allotted cellular plan minutes).  The total benefit conferred by the Settlement directly to Class Members was between approximately $13.5 million and $55.5 million, depending on which benefit Class Members selected.

19. ***Curry v. Fairbanks Capital Corporation***, No. 03-10895-DPW (D. Mass.).  In 2004, the Court approved a $55 million settlement of a class action lawsuit against Fairbanks Capital Corporation arising out of charges against Fairbanks of misconduct in servicing its customers' mortgage loans.  The settlement also required substantial changes in Fairbanks' business practices and established a default resolution program to limit the imposition of fees and foreclosure proceedings against Fairbanks' customers.  Lieff Cabraser served as nationwide Co-Lead Counsel for the homeowners.

20. ***Payment Protection Credit Card Litigation***.  Lieff Cabraser represented consumers in litigation in federal court against some of the nation's largest credit card issuers, challenging the imposition of charges for so-called "payment protection" or "credit protection" programs.  The complaints charged that the credit card companies imposed payment protection without the consent of the consumer and/or deceptively marketed the service, and further that the credit card companies unfairly administered their payment protection programs to the detriment of consumers.  In 2012 and 2013, the Courts approved monetary settlements with HSBC ($23.5 million), Bank of America ($20 million), and Discover ($10 million) that also required changes in the marketing and sale of payment protection to consumers.

21. ***California Title Insurance Industry Litigation***.  Lieff Cabraser, in coordination with parallel litigation brought by the Attorney General, reached settlements in 2003 and 2004 with the leading title insurance companies in California, resulting in historic industry-wide changes to the practice of providing escrow services in real estate closings.  The settlements brought a total of $50 million in restitution to California

consumers, including cash payments.  In the lawsuits, plaintiffs alleged, among other things, that the title companies received interest payments on customer escrow funds that were never reimbursed to their customers. The defendant companies include Lawyers' Title, Commonwealth Land Title, Stewart Title of California, First American Title, Fidelity National Title, and Chicago Title.

22.  ***Vytorin/Zetia Marketing, Sales Practices & Products Liability Litigation***, MDL No. 1938 (D. N.J.).  Lieff Cabraser served on the Executive Committee of the Plaintiffs' Steering Committee representing plaintiffs alleging that Merck/Schering-Plough Pharmaceuticals falsely marketed anti-cholesterol drugs Vytorin and Zetia as being more effective than other anti-cholesterol drugs. Plaintiffs further alleged that Merck/Schering-Plough Pharmaceuticals sold Vytorin and Zetia at higher prices than other anti-cholesterol medication when they were no more effective than other drugs. In 2010, the Court approved a $41.5 million settlement for consumers who bought Vytorin or Zetia between November 2002 and February 2010.

23.  ***Morris v. AT&T Wireless Services***, No. C-04-1997-MJP (W.D. Wash.).  Lieff Cabraser served as class counsel for a nationwide settlement class of cell phone customers subjected to an end-of-billing cycle cancellation policy implemented by AT&T Wireless in 2003 and alleged to have breached customers' service agreements.  In May 2006, the New Jersey Superior Court granted final approval to a class settlement that guarantees delivery to the class of $40 million in benefits.  Class members received cash-equivalent calling cards automatically, and had the option of redeeming them for cash.  Lieff Cabraser had been prosecuting the class claims in the Western District of Washington when a settlement in New Jersey state court was announced.  Lieff Cabraser objected to that settlement as inadequate because it would have only provided $1.5 million in benefits without a cash option, and the Court agreed, declining to approve it.  Thereafter, Lieff Cabraser negotiated the new settlement providing $40 million to the class, and the settlement was approved.

24.  ***Berger v. Property I.D. Corporation***, No.  CV 05-5373-GHK (C.D. Cal.).  In January 2009, the Court granted final approval to a $39.4 million settlement with several of the nation's largest real estate brokerages, including companies doing business as Coldwell Banker, Century 21, and ERA Real Estate, and California franchisors for RE/MAX and Prudential California Realty, in an action under the Real Estate Settlement Procedures Act on behalf of California home sellers. Plaintiffs charged that the brokers and Property I.D. Corporation set up straw companies as a way to disguise kickbacks for referring their California clients' natural hazard disclosure report business to Property I.D. (the report is required to sell a home in California).

Under the settlement, hundreds of thousands of California home sellers were eligible to receive a full refund of the cost of their report, typically about $100.

25.     ***In re Tri-State Crematory Litigation***, MDL No. 1467 (N.D. Ga.).  In March 2004, Lieff Cabraser delivered opening statements and began testimony in a class action by families whose loved ones were improperly cremated and desecrated by Tri-State Crematory in Noble, Georgia.  The families also asserted claims against the funeral homes that delivered the decedents to Tri-State Crematory for failing to ensure that the crematory performed cremations in the manner required under the law and by human decency.  One week into trial, settlements with the remaining funeral home defendants were reached and brought the settlement total to approximately $37 million.  Trial on the class members' claims against the operators of crematory began in August 2004.  Soon thereafter, these defendants entered into a $80 million settlement with plaintiffs.  As part of the settlement, all buildings on the Tri-State property were razed.  The property will remain in a trust so that it will be preserved in peace and dignity as a secluded memorial to those whose remains were mistreated, and to prevent crematory operations or other inappropriate activities from ever taking place there.  Earlier in the litigation, the Court granted plaintiffs' motion for class certification in a published order.  215 F.R.D. 660 (2003).

26.     ***In re American Family Enterprises***, MDL No. 1235 (D. N.J.).  Lieff Cabraser served as Co-Lead Counsel for a nationwide class of persons who received any sweepstakes materials sent under the name "American Family Publishers."  The class action lawsuit alleged that defendants deceived consumers into purchasing magazine subscriptions and merchandise in the belief that such purchases were necessary to win an American Family Publishers' sweepstakes prize or enhanced their chances of winning a sweepstakes prize.  In September 2000, the Court granted final approval of a $33 million settlement of the class action.  In April 2001, over 63,000 class members received refunds averaging over $500 each, representing 92% of their eligible purchases.  In addition, American Family Publishers agreed to make significant changes to the way it conducts the sweepstakes.

27.     ***Walsh v. Kindred Healthcare Inc.***, No. 3:11-cv-00050 (N.D. Cal.).  Lieff Cabraser and co-counsel represented a class of 54,000 current and former residents, and families of residents, of skilled nursing care facilities in a class action against Kindred Healthcare for failing to adequately staff its nursing facilities in California.  Since January 1, 2000, skilled nursing facilities in California have been required to provide at least 3.2 hours of direct nursing hours per patient day (NHPPD), which

represented the minimum staffing required for patients at skilled nursing facilities.

The complaint alleged a pervasive and intentional failure by Kindred Healthcare to comply with California's required minimum standard for qualified nurse staffing at its facilities. Understaffing is uniformly viewed as one of the primary causes of the inadequate care and often unsafe conditions in skilled nursing facilities. Studies have repeatedly shown a direct correlation between inadequate skilled nursing care and serious health problems, including a greater likelihood of falls, pressure sores, significant weight loss, incontinence, and premature death. The complaint further charged that Kindred Healthcare collected millions of dollars in payments from residents and their family members, under the false pretense that it was in compliance with California staffing laws and would continue to do so.

In December 2013, the Court approved a $8.25 million settlement which included cash payments to class members and an injunction requiring Kindred Healthcare to consistently utilize staffing practices which would ensure they complied with applicable California law. The injunction, subject to a third party monitor, was valued at between $6 to $20 million.

28. ***Cincotta v. California Emergency Physicians Medical Group***, No. 07359096 (Cal. Supr. Ct.). Lieff Cabraser served as class counsel for nearly 100,000 uninsured patients that alleged they were charged excessive and unfair rates for emergency room service across 55 hospitals throughout California. The settlement, approved on October 31, 2008, provided complete debt elimination, 100% cancellation of the bill, to uninsured patients treated by California Emergency Physicians Medical Group during the 4-year class period. These benefits were valued at $27 million. No claims were required, so all of these bills were cancelled. In addition, the settlement required California Emergency Physicians Medical Group prospectively to (1) maintain certain discount policies for all charity care patients; (2) inform patients of the available discounts by enhanced communications; and (3) limit significantly the type of collections practices available for collecting from charity care patients.

29. ***In re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation***, MDL No. 1715. Lieff Cabraser served as Co-Lead Counsel for borrowers who alleged that Ameriquest engaged in a predatory lending scheme based on the sale of loans with illegal and undisclosed fees and terms. In August 2010, the Court approved a $22 million settlement.

30. ***ING Bank Rate Renew Cases***, Case No. 11-154-LPS (D. Del.). Lieff Cabraser represented borrowers in class action lawsuits charging that ING Direct breached its promise to allow them to refinance their mortgages for a flat fee. From October 2005 through April 2009, ING

promoted a $500 or $750 flat-rate refinancing fee called "Rate Renew" as a benefit of choosing ING for mortgages over competitors.  Beginning in May 2009, however, ING began charging a higher fee of a full monthly mortgage payment for refinancing using "Rate Renew," despite ING's earlier and lower advertised price.  As a result, the complaint alleged that many borrowers paid more to refinance their loans using "Rate Renew" than they should have, or were denied the opportunity to refinance their loan even though the borrowers met the terms and conditions of ING's original "Rate Renew" offer.  In August 2012, the Court certified a class of consumers in ten states who purchased or retained an ING mortgage from October 2005 through April 2009.  A second case on behalf of California consumers was filed in December 2012.  In October 2014, the Court approved a $20.35 million nationwide settlement of the litigation.  The settlement provided an average payment of $175 to the nearly 100,000 class members, transmitted to their accounts automatically and without any need to file a claim form.

31.   **Yarrington v. Solvay Pharmaceuticals**, No. 09-CV-2261 (D. Minn.).  In March 2010, the Court granted final approval to a $16.5 million settlement with Solvay Pharmaceuticals, one of the country's leading pharmaceutical companies.  Lieff Cabraser served as Co-Lead Counsel, representing a class of persons who purchased Estratest—a hormone replacement drug.  The class action lawsuit alleged that Solvay deceptively marketed and advertised Estratest as an FDA-approved drug when in fact Estratest was not FDA-approved for any use.  Under the settlement, consumers obtained partial refunds for up to 30% of the purchase price paid of Estratest.  In addition, $8.9 million of the settlement was allocated to fund programs and activities devoted to promoting women's health and well-being at health organizations, medical schools, and charities throughout the nation.

32.   **Reverse Mortgage Cases**, JCCP No. 4061 (San Mateo County Supr. Ct., Cal.).  Transamerica Corporation, through its subsidiary Transamerica Homefirst, Inc., sold "reverse mortgages" marketed under the trade name "Lifetime."  The Lifetime reverse mortgages were sold exclusively to seniors, *i.e.*, persons 65 years or older.  Lieff Cabraser, with co-counsel, filed suit on behalf of seniors alleging that the terms of the reverse mortgages were unfair, and that borrowers were misled as to the loan terms, including the existence and amount of certain charges and fees.  In 2003, the Court granted final approval to an $8 million settlement of the action.

33.   **Brazil v. Dell**, No. C-07-01700 RMW (N.D. Cal.).  Lieff Cabraser served as Class Counsel representing a certified class of online consumers in California who purchased certain Dell computers based on the advertisement of an instant-off (or "slash-through") discount.  The

complaint challenged Dell's pervasive use of "slash-through" reference prices in its online marketing. Plaintiffs alleged that these "slash-through" reference prices were interpreted by consumers as representing Dell's former or regular sales prices, and that such reference prices (and corresponding representations of "savings") were false because Dell rarely, if ever, sold its products at such prices. In October 2011, the Court approved a settlement that provided a $50 payment to each class member who submitted a timely and valid claim. In addition, in response to the lawsuit, Dell changed its methodology for consumer online advertising, eliminating the use of "slash-through" references prices.

34.     ***Hepting v. AT&T Corp.***, Case No. C-06-0672-VRW (N.D. Cal.). Plaintiffs alleged that AT&T collaborated with the National Security Agency in a massive warrantless surveillance program that illegally tracked the domestic and foreign communications and communications records of millions of Americans in violation of the U.S. Constitution, Electronic Communications Privacy Act, and other statutes. The case was filed on January 2006. The U.S. government quickly intervened and sought dismissal of the case. By the Spring of 2006, over 50 other lawsuits were filed against various telecommunications companies, in response to a *USA Today* article confirming the surveillance of communications and communications records. The cases were combined into a multi-district litigation proceeding entitled *In re National Security Agency Telecommunications Record Litigation*, MDL No. 06-1791. In June of 2006, the District Court rejected both the government's attempt to dismiss the case on the grounds of the state secret privilege and AT&T's arguments in favor of dismissal. The government and AT&T appealed the decision and the U.S. Court of Appeals for the Ninth Circuit heard argument one year later. No decision was issued. In July 2008, Congress granted the government and AT&T "retroactive immunity" for liability for their wiretapping program under amendments to the Foreign Intelligence Surveillance Act that were drafted in response to this litigation. Signed into law by President Bush in 2008, the amendments effectively terminated the litigation. Lieff Cabraser played a leading role in the litigation working closely with co-counsel from the Electronic Frontier Foundation.

35.     ***In Re Apple and AT&T iPad Unlimited Data Plan Litigation***, No. 5:10-cv-02553 RMW (N.D. Cal.). Lieff Cabraser served as class counsel in an action against Apple and AT&T charging that Apple and AT&T misrepresented that consumers purchasing an iPad with 3G capability could choose an unlimited data plan for a fixed monthly rate and switch in and out of the unlimited plan on a monthly basis as they wished. Less than six weeks after its introduction to the U.S. market, AT&T and Apple discontinued their unlimited data plan for any iPad 3G customers not currently enrolled and prohibited current unlimited data plan customers

from switching back and forth from a less expensive, limited data plan.  In March 2014, Apple agreed to compensate all class members $40 and approximately 60,000 claims were paid.  In addition, sub-class members who had not yet entered into an agreement with AT&T were offered a data plan.

## V.   Economic Injury Product Defects

### A.   Current Cases

1.  ***Front-Loading Washer Products Liability Litigation***.  Lieff Cabraser represents consumers in multiple states who have filed separate class action lawsuits against Whirlpool, Sears and LG Corporations.  The complaints charge that certain front-loading automatic washers manufactured by these companies are defectively designed and that the design defects create foul odors from mold and mildew that permeate washing machines and customers' homes.  Many class members have spent money for repairs and on other purported remedies.  As the complaints allege, none of these remedies eliminates the problem.

2.  ***In Re General Motors LLC Ignition Switch Litigation***, MDL No. 2543 (S.D.N.Y.).  Lieff Cabraser represents proposed nationwide classes of GM vehicle  owners and lessees whose cars include defective ignition switches in litigation focusing on economic loss claims. On August 15, 2014, U.S. District Court Judge Jesse M. Furman appointed Elizabeth J. Cabraser as Co-Lead Plaintiffs' Counsel in the litigation, which seeks compensation on behalf of consumers who purchased or leased GM vehicles containing a defective ignition switch, over 500,000 of which have now been recalled.  The consumer complaints allege that the ignition switches in these vehicles share a common, uniform, and defective design.  As a result, these cars are of a lesser quality than GM represented, and class members overpaid for the cars.  Further, GM's public disclosure of the ignition switch defect has caused the value of these cars to materially diminish.  The complaints seek monetary relief for the diminished value of the class members' cars.

3.  ***Honda Window Defective Window Litigation***.  Case No. 2:21-cv-01142-SVW-PLA (C.D. Cal.).  Lieff Cabraser represents consumers in a class action lawsuit filed against Honda Motor Company, Inc. for manufacturing and selling vehicles with allegedly defective window regulator mechanisms. Windows in these vehicles allegedly can, without warning, drop into the door frame and break or become permanently stuck in the fully-open position.

The experience of one Honda Element owner, as set forth in the complaint, exemplifies the problem: The driver's side window in his vehicle slid down suddenly while he was driving on a smooth road. A few

months later, the window on the passenger side of the vehicle also slid down into the door and would not move back up.  The owner incurred more than $300 in repair costs, which Honda refused to pay for.  Discovery in the action is ongoing.

4.  ***Moore, et al. v. Samsung Electronics America and Samsung Electronics Co., Ltd.***, Case No. 2:16-cv-4966 (D.N.J.). Lieff Cabraser represents consumers in federal court in New Jersey in cases focusing on complaints about Samsung top-loading washing machines that explode in the home, causing damage to walls, doors, and other equipment and presenting significant injury risks. Owners report Samsung top-load washers exploding as early as the day of installation, while others have seen their machines explode months or even more than a year after purchase. The lawsuit seeks injunctive relief as well as remedial and restitutionary actions and damages.

5.  ***In re Chinese-Manufactured Drywall Products Liability Litigation***, No. 10-30568 (E.D. La.).  Lieff Cabraser with co-counsel represents a proposed class of builders who suffered economic losses as a result of the presence of Chinese-manufactured drywall in homes and other buildings they constructed.  From 2005 to 2008, hundreds-of-millions of square feet of gypsum wallboard manufactured in China were exported to the U.S., primarily to the Gulf Coast states, and installed in newly-constructed and reconstructed properties. After installation of this drywall, owners and occupants of the properties began noticing unusual odors, blackening of silver and copper items and components, and the failure of appliances, including microwaves, refrigerators, and air-conditioning units. Some residents of the affected homes also experienced health problems, such as skin and eye irritation, respiratory issues, and headaches.

Lieff Cabraser's client, Mitchell Company, Inc., was the first to perfect service on Chinese defendant Taishan Gypsum Co. Ltd. ("TG"), and thereafter secured a default judgment against TG.  Lieff Cabraser participated in briefing that led to the District Court's denial of TG's motion to dismiss the class action complaint for lack of personal jurisdiction.  On May 21, 2014, the U.S. Court of Appeals for the Fifth Court affirmed the District Court's default judgment against TG, finding jurisdiction based on ties of the company and its agent with state distributors.  753 F.3d 521 (5th Cir. 2014).

**B.  Successes**

1.  ***In re Navistar MaxxForce Engines Marketing, Sales Practices and Products Liability Litigation***, Case No. 1:14-cv-10318 (N.D. Ill.). On January 3, 2020, Judge Joan B. Gottschall of the United States District Court for the Northern District of Illinois issued an Order

granting final approval to the proposed $135m settlement of multidistrict litigation brought by Lieff Cabraser and co-counsel on behalf of plaintiff truck owners and lessees alleging that Navistar, Inc. and Navistar International, Inc. sold or leased 2011-2014 model year vehicles equipped with certain MaxxForce 11- or 13-liter diesel engines equipped with a defective EGR emissions system. Judge Gottschall ruled that the proposed class action settlement which had been submitted to the Court on May 28, 2019, was fair, reasonable, and adequate in addressing plaintiffs' claims. Owners and lessees of the affected trucks have until May 11, 2020 to file their settlement claims at the official website.

The $135 million settlement provides class members with up to $2,500 per truck or up to $10,000 rebate off a new truck depending on months of ownership or lease, or the option to seek up to $15,000 per truck in out-of-pocket damages caused by the alleged defect.

2.   ***Allagas v. BP Solar***, No. 3:14-cv-00560-SI (N.D. Cal.). Lieff Cabraser and co-counsel represented California consumers in a class action lawsuit against BP Solar and Home Depot charging the companies sold solar panels with defective junction boxes that caused premature failures and fire risks. In January 2017, Judge Susan Illston granted final approval to a consumer settlement valued at more than $67 million that extends relief to a nationwide class as well as eliminating the serious fire risks.

3.   ***In re Mercedes-Benz Tele-Aid Contract Litigation***, MDL No. 1914 (D. N.J.).  Lieff Cabraser represented owners and lessees of Mercedes-Benz cars and SUVs equipped with the Tele-Aid system, an emergency response system which links subscribers to road-side assistance operators by using a combination of global positioning and cellular technology.  In 2002, the Federal Communications Commission issued a rule, effective 2008, eliminating the requirement that wireless phone carriers provide analog-based networks.  The Tele-Aid system offered by Mercedes-Benz relied on analog signals.  Plaintiffs charged that Mercedes-Benz committed fraud in promoting and selling the Tele-Aid system without disclosing to buyers of certain model years that the Tele-Aid system as installed would become obsolete in 2008.

In an April 2009 published order, the Court certified a nationwide class of all persons or entities in the U.S. who purchased or leased a Mercedes-Benz vehicle equipped with an analog-only Tele Aid system after August 8, 2002, and (1) subscribed to Tele Aid service until being informed that such service would be discontinued at the end of 2007, or (2) purchased an upgrade to digital equipment.  In September 2011, the Court approved a settlement that provided class members between a $650 check or a $750 to $1,300 certificate toward the purchase or lease of new Mercedes-Benz vehicle, depending upon whether or not they paid for an

upgrade of the analog Tele Aid system and whether they still owned their vehicle.  In approving the settlement, U.S. District Court Judge Dickinson R. Debevoise stated,  "I want to thank counsel for the . . . very effective and good work . . . .  It was carried out with vigor, integrity and aggressiveness with never going beyond the maxims of the Court."

4. ***McLennan v. LG Electronics USA***, No. 2:10-cv-03604 (D. N.J.).  Lieff Cabraser represented consumers who alleged several LG refrigerator models had a faulty design that caused the interior lights to remain on even when the refrigerator doors were closed (identified as the "light issue"), resulting in overheating and food spoilage. In March 2012, the Court granted final approval to a settlement of the nationwide class action lawsuit.  The settlement provides that LG reimburse class members for all out-of-pocket costs (parts and labor) to repair the light issue prior to the mailing of the class notice and extends the warranty with respect to the light issue for 10 years from the date of the original retail purchase of the refrigerator.  The extended warranty covers in-home refrigerator repair performed by LG and, in some cases, the cost of a replacement refrigerator.  In approving the settlement, U.S. District Court Judge William J. Martini stated, "The Settlement in this case provides for both the complete reimbursement of out-of-pocket expenses for repairs fixing the Light Issue, as well as a warranty for ten years from the date of refrigerator purchase. It would be hard to imagine a better recovery for the Class had the litigation gone to trial. Because Class members will essentially receive all of the relief to which they would have been entitled after a successful trial, this factor weighs heavily in favor of settlement."

5. ***Grays Harbor Adventist Christian School v. Carrier Corporation***, No. 05-05437 (W.D. Wash.).  In April 2008, the Court approved a nationwide settlement for current and past owners of high-efficiency furnaces manufactured and sold by Carrier Corporation and equipped with polypropylene-laminated condensing heat exchangers ("CHXs").  Carrier sold the furnaces under the Carrier, Bryant, Day & Night and Payne brand-names.  Plaintiffs alleged that starting in 1989 Carrier began manufacturing and selling high efficiency condensing furnaces manufactured with a secondary CHX made of inferior materials. Plaintiffs alleged that as a result, the CHXs, which Carrier warranted and consumers expected to last for 20 years, failed prematurely.  The settlement provides an enhanced 20-year warranty of free service and free parts for consumers whose furnaces have not yet failed.  The settlement also offers a cash reimbursement for consumers who already paid to repair or replace the CHX in their high-efficiency Carrier furnaces.

An estimated three million or more consumers in the U.S. and Canada purchased the furnaces covered under the settlement.  Plaintiffs valued the settlement to consumers at over $300 million based upon the

combined value of the cash reimbursement and the estimated cost of an enhanced warranty of this nature.

6. ***Carideo v. Dell***, No. C06-1772 JLR (W.D. Wash.).  Lieff Cabraser represented consumers who owned Dell Inspiron notebook computer model numbers 1150, 5100, or 5160.  The class action lawsuit complaint charged that the notebooks suffered premature failure of their cooling system, power supply system, and/or motherboards.  In December 2010, the Court approved a settlement which provided class members that paid Dell for certain repairs to their Inspiron notebook computer a reimbursement of all or a portion of the cost of the repairs.

7. ***Cartwright v. Viking Industries***, No. 2:07-cv-2159 FCD (E.D. Cal.) Lieff Cabraser represented California homeowners in a class action lawsuit which alleged that over one million Series 3000 windows produced and distributed by Viking between 1989 and 1999 were defective.  The plaintiffs charged that the windows were not watertight and allowed for water to penetrate the surrounding sheetrock, drywall, paint or wallpaper.  Under the terms of a settlement approved by the Court in August 2010, all class members who submitted valid claims were entitled to receive as much as $500 per affected property.

8. ***Pelletz v. Advanced Environmental Recycling Technologies*** (W.D. Wash.).  Lieff Cabraser served as Co-Lead Counsel in a case alleging that ChoiceDek decking materials, manufactured by AERT, developed persistent and untreatable mold spotting throughout their surface.  In a published opinion in January 2009, the Court approved a settlement that provided affected consumers with free and discounted deck treatments, mold inhibitor applications, and product replacement and reimbursement.

9. ***Create-A-Card v. Intuit***, No. C07-6452 WHA (N.D. Cal.).  Lieff Cabraser, with co-counsel, represented business users of QuickBooks Pro for accounting that lost their QuickBooks data and other files due to faulty software code sent by Intuit, the producer of QuickBooks.  In September 2009, the Court granted final approval to a settlement that provided all class members who filed a valid claim with a free software upgrade and compensation for certain data-recovery costs.  Commenting on the settlement and the work of Lieff Cabraser on September 17, 2009, U.S. District Court Judge William H. Alsup stated, "I want to come back to something that I observed in this case firsthand for a long time now.  I think you've done an excellent job in the case as class counsel and the class has been well represented having you and your firm in the case."

10. ***Weekend Warrior Trailer Cases***, JCCP No. 4455 (Cal. Supr. Ct.). Lieff Cabraser, with co-counsel, represented owners of Weekend Warrior trailers manufactured between 1998 and 2006 that were equipped with

frames manufactured, assembled, or supplied by Zieman Manufacturing Company. The trailers, commonly referred to as "toy haulers," were used to transport outdoor recreational equipment such as motorcycles and all-terrain vehicles. Plaintiffs charged that Weekend Warrior and Zieman knew of design and performance problems, including bent frames, detached siding, and warped forward cargo areas, with the trailers, and concealed the defects from consumers. In February 2008, the Court approved a $5.5 million settlement of the action that provided for the repair and/or reimbursement of the trailers. In approving the settlement, California Superior Court Judge Thierry P. Colaw stated that class counsel were "some of the best" and "there was an overwhelming positive reaction to the settlement" among class members.

11.   ***Lundell v. Dell***, No. C05-03970 (N.D. Cal.). Lieff Cabraser served as Lead Class Counsel for consumers who experienced power problems with the Dell Inspiron 5150 notebook. In December 2006, the Court granted final approval to a settlement of the class action which extended the one-year limited warranty on the notebook for a set of repairs related to the power system. In addition, class members that paid Dell or a third party for repair of the power system of their notebook were entitled to a 100% cash refund from Dell.

12.   ***Kan v. Toshiba American Information Systems***, No. BC327273 (Los Angeles Super. Ct.). Lieff Cabraser served as Co-Lead Counsel for a class of all end-user persons or entities who purchased or otherwise acquired in the United States, for their own use and not for resale, a new Toshiba Satellite Pro 6100 Series notebook. Consumers alleged a series of defects were present in the notebook. In 2006, the Court approved a settlement that extended the warranty for all Satellite Pro 6100 notebooks, provided cash compensation for certain repairs, and reimbursed class members for certain out-of-warranty repair expenses.

13.   ***Foothill/DeAnza Community College District v. Northwest Pipe Company***, No. C-00-20749 (N.D. Cal.). In June 2004, the Court approved the creation of a settlement fund of up to $14.5 million for property owners nationwide with Poz-Lok fire sprinkler piping that fails. Since 1990, Poz-Lok pipes and pipe fittings were sold in the U.S. as part of fire suppression systems for use in residential and commercial buildings. After leaks in Poz-Lok pipes caused damage to its DeAnza Campus Center building, Foothill/DeAnza Community College District in California retained Lieff Cabraser to file a class action lawsuit against the manufacturers of Poz-Lok. The college district charged that Poz-Lok pipe had manufacturing and design defects that resulted in the premature corrosion and failure of the product. Under the settlement, owners whose Poz-Lok pipes are leaking today, or over the next 15 years, may file a claim for compensation.

14.     **Toshiba Laptop Screen Flicker Settlement**.  Lieff Cabraser negotiated a settlement with Toshiba America Information Systems, Inc. ("TAIS") to provide relief for owners of certain Toshiba Satellite 1800 Series, Satellite Pro 4600 and Tecra 8100 personal notebook computers whose screens flickered, dimmed or went blank due to an issue with the FL Inverter Board component.  In 2004 under the terms of the Settlement, owners of affected computers who paid to have the FL Inverter issue repaired by either TAIS or an authorized TAIS service provider recovered the cost of that repair, up to $300 for the Satellite 1800 Series and the Satellite Pro 4600 personal computers, or $400 for the Tecra 8100 personal computers.  TAIS also agreed to extend the affected computers' warranties for the FL Inverter issue by 18 months.

15.     **McManus v. Fleetwood Enterprises, Inc.**, No. SA-99-CA-464-FB (W.D. Tex.).  Lieff Cabraser served as Class Counsel on behalf of original owners of 1994-2000 model year Fleetwood Class A and Class C motor homes.  In 2003, the Court approved a settlement that resolved lawsuits pending in Texas and California about braking while towing with 1994 Fleetwood Class A and Class C motor homes.  The lawsuits alleged that Fleetwood misrepresented the towing capabilities of new motor homes it sold, and claimed that Fleetwood should have told buyers that a supplemental braking system is needed to stop safely while towing heavy items, such as a vehicle or trailer.  The settlement paid $250 to people who bought a supplemental braking system for Fleetwood motor homes that they bought new.   Earlier, the appellate court found that common questions predominated under purchasers' breach of implied warranty of merchantability claim.  320 F.3d 545 (5th Cir. 2003).

16.     **Richison v. American Cemwood Corp.**, No. 005532 (San Joaquin Supr. Ct., Cal.).  Lieff Cabraser served as Co-Lead Class Counsel for an estimated nationwide class of 30,000 owners of homes and other structures on which defective Cemwood Shakes were installed.  In November 2003, the Court granted final approval to a $75 million Phase 2 settlement in the American Cemwood roofing shakes national class action litigation.  This amount was in addition to a $65 million partial settlement approved by the Court in May 2000, and brought the litigation to a conclusion.

17.     **ABS Pipe Litigation**, JCCP No. 3126 (Contra Costa County Supr. Ct., Cal.).  Lieff Cabraser served as Lead Class Counsel on behalf of property owners whose ABS plumbing pipe was allegedly defective and caused property damage by leaking.  Six separate class actions were filed in California against five different ABS pipe manufacturers, numerous developers of homes containing the ABS pipe, as well as the resin supplier and the entity charged with ensuring the integrity of the product.  Between 1998 and 2001, Lieff Cabraser achieved 12 separate settlements

in the class actions and related individual lawsuits for approximately $78 million.

Commenting on the work of Lieff Cabraser and co-counsel in the case, California Superior Court (now appellate) Judge Mark B. Simons stated on May 14, 1998: "The attorneys who were involved in the resolution of the case certainly entered the case with impressive reputations and did nothing in the course of their work on this case to diminish these reputations, but underlined, in my opinion, how well deserved those reputations are."

18.    ***Williams v. Weyerhaeuser***, No. 995787 (San Francisco Supr. Ct.). Lieff Cabraser served as Class Counsel on behalf of a nationwide class of hundreds of thousands or millions of owners of homes and other structures with defective Weyerhaeuser hardboard siding.  A California-wide class was certified for all purposes in February 1999, and withstood writ review by both the California Court of Appeals and Supreme Court of California.  In 2000, the Court granted final approval to a nationwide settlement of the case which provides class members with compensation for their damaged siding, based on the cost of replacing or, in some instances, repairing, damaged siding.  The settlement has no cap, and requires Weyerhaeuser to pay all timely, qualified claims over a nine year period.

19.    ***Naef v. Masonite***, No. CV-94-4033 (Mobile County Circuit Ct., Ala.). Lieff Cabraser served as Co-Lead Class Counsel on behalf of a nationwide Class of an estimated 4 million homeowners with allegedly defective hardboard siding manufactured and sold by Masonite Corporation, a subsidiary of International Paper, installed on their homes. The Court certified the class in November 1995, and the Alabama Supreme Court twice denied extraordinary writs seeking to decertify the Class, including in *Ex Parte Masonite*, 681 So. 2d 1068 (Ala. 1996).  A month-long jury trial in 1996 established the factual predicate that Masonite hardboard siding was defective under the laws of most states.  The case settled on the eve of a second class-wide trial, and in 1998, the Court approved a settlement.  Under a claims program established by the settlement that ran through 2008, class members with failing Masonite hardboard siding installed and incorporated in their property between January 1, 1980 and January 15, 1998 were entitled to make claims, have their homes evaluated by independent inspectors, and receive cash payments for damaged siding.  Combined with settlements involving other alleged defective home building products sold by Masonite, the total cash paid to homeowners exceeded $1 billion.

20.    ***In re General Motors Corp. Pick-Up Fuel Tank Products Liability Litigation***, MDL No. 961 (E.D. Pa.).  Lieff Cabraser served as

Court-appointed Co-Lead Counsel representing a class of 4.7 million plaintiffs who owned 1973-1987 GM C/K pickup trucks with allegedly defective gas tanks. The Consolidated Complaint asserted claims under the Lanham Act, the Magnuson-Moss Act, state consumer protection statutes, and common law. In 1995, the Third Circuit vacated the District Court settlement approval order and remanded the matter to the District Court for further proceedings. In July 1996, a new nationwide class action was certified for purposes of an enhanced settlement program valued at a minimum of $600 million, plus funding for independent fuel system safety research projects. The Court granted final approval of the settlement in November 1996.

21.  ***In re Louisiana-Pacific Inner-Seal Siding Litigation***, No. C-95-879-JO (D. Or.). Lieff Cabraser served as Co-Lead Class Counsel on behalf of a nationwide class of homeowners with defective exterior siding on their homes. Plaintiffs asserted claims for breach of warranty, fraud, negligence, and violation of consumer protection statutes. In 1996, U.S. District Judge Robert E. Jones entered an Order, Final Judgment and Decree granting final approval to a nationwide settlement requiring Louisiana-Pacific to provide funding up to $475 million to pay for inspection of homes and repair and replacement of failing siding over the next seven years.

22.  ***In re Intel Pentium Processor Litigation***, No. CV 745729 (Santa Clara Supr. Ct., Cal.). Lieff Cabraser served as one of two Court-appointed Co-Lead Class Counsel, and negotiated a settlement, approved by the Court in June 1995, involving both injunctive relief and damages having an economic value of approximately $1 billion.

23.  ***Cox v. Shell***, No. 18,844 (Obion County Chancery Ct., Tenn.). Lieff Cabraser served as Class Counsel on behalf of a nationwide class of approximately 6 million owners of property equipped with defective polybutylene plumbing systems and yard service lines. In November 1995, the Court approved a settlement involving an initial commitment by Defendants of $950 million in compensation for past and future expenses incurred as a result of pipe leaks, and to provide replacement pipes to eligible claimants. The deadline for filing claims expired in 2009.

24.  ***Hanlon v. Chrysler Corp.***, No. C-95-2010-CAL (N.D. Cal.). In 1995, the District Court approved a $200+ million settlement enforcing Chrysler's comprehensive minivan rear latch replacement program, and to correct alleged safety problems with Chrysler's pre-1995 designs. As part of the settlement, Chrysler agreed to replace the rear latches with redesigned latches. The settlement was affirmed on appeal by the Ninth Circuit in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (1998).

25. ***Gross v. Mobil***, No. C 95-1237-SI (N.D. Cal.). Lieff Cabraser served as Plaintiffs' Class Counsel in this nationwide action involving an estimated 2,500 aircraft engine owners whose engines were affected by Mobil AV-1, an aircraft engine oil. Plaintiffs alleged claims for strict liability, negligence, misrepresentation, violation of consumer protection statutes, and for injunctive relief. Plaintiffs obtained a preliminary injunction requiring Defendant Mobil Corporation to provide notice to all potential class members of the risks associated with past use of Defendants' aircraft engine oil. In addition, Plaintiffs negotiated a proposed Settlement, granted final approval by the Court in November 1995, valued at over $12.5 million, under which all Class Members were eligible to participate in an engine inspection and repair program, and receive compensation for past repairs and for the loss of use of their aircraft associated with damage caused by Mobil AV-1.

## VI.   **Antitrust/Trade Regulation/Intellectual Property**

### A.   **Current Cases**

1. ***In Re: Railway Industry Employee No-Poach Antitrust Litigation,*** MDL No. 2850 (W.D. Pa.). In late 2018, Lieff Cabraser was selected as interim Co-Lead Counsel for plaintiffs in the consolidated "no-poach" employee antitrust litigation against rail equipment companies Knorr-Bremse and Wabtec, the world's dominant rail equipment suppliers. The complaint charged that the companies entered into unlawful agreements with one another not to compete for each other's employees. Plaintiffs alleged that these agreements spanned several years, were monitored and enforced by Defendants' senior executives, and achieved their desired goal of suppressing employee compensation and mobility below competitive levels. Plaintiffs' vigorous prosecution of the case led to settlements with both defendants of $48.95 million, which is pending approval.

2. ***In re California Bail Bond Antitrust Litig.,*** 3:19-cv-00717-JST (N.D. Cal.). Lieff Cabraser serves as Interim lead Class Counsel for a proposed class of purchasers of bail bonds in California. This first-of-its-kind case alleges a conspiracy among sureties and bail agents to inflate bail bond prices.

3. ***Schwab Short-Term Bond Market Fund, et al. v. Bank of America Corp., et al.***, No. 11 CV 6409 (S.D.N.Y.); ***Charles Schwab Bank, N.A., et al. v. Bank of America Corp., et al.***, No. 11 CV 6411 (S.D.N.Y.); ***Schwab Money Market Fund, et al. v. Bank of America Corp., et al.***, No. 11 CV 6412 (S.D.N.Y.); ***The Charles Schwab Corp., et al. v. Bank of America Corp., et al.***, No. 13 CV 7005 (S.D.N.Y.); and ***Bay Area Toll Authority v. Bank of America Corp., et al.***, No. 14 CV 3094 (S.D.N.Y.) (collectively, "LIBOR"). Lieff

Cabraser serves as counsel for The Bay Area Toll Authority ("BATA"), as well as The Charles Schwab Corporation ("Charles Schwab"), its affiliates Charles Schwab Bank, N.A., and Charles Schwab & Co., Inc., which manages the investments of the Charles Schwab Bank, N.A. (collectively "Schwab"), several series of The Charles Schwab Family of Funds, Schwab Investments, and Charles Schwab Worldwide Funds plc ("Schwab Fund Series"), in individual lawsuits against Bank of America Corporation, Credit Suisse Group AG, JPMorgan Chase & Co., Citibank, Inc., and additional banks for allegedly manipulating the London Interbank Offered Rate ("LIBOR"). The complaints allege that beginning in 2007, the defendants conspired to understate their true costs of borrowing, causing the calculation of LIBOR to be set artificially low. As a result, Schwab, the Schwab Fund Series, and BATA received less than their rightful rates of return on their LIBOR-based investments. The complaints assert claims under federal antitrust laws, the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the statutory and common law of California. The actions were transferred to the Southern District of New York for consolidated or coordinated proceedings with the LIBOR multidistrict litigation pending there.

4.   ***In Re: Generic Pharmaceuticals Pricing Antitrust Litigation***, MDL No. 2724 (E.D. Pa.). Beginning in February 2015, Lieff Cabraser conducted an extensive investigation into dramatic price increases of certain generic prescription drugs. Lieff Cabraser worked alongside economists and industry experts and interviewed industry participants to evaluate possible misconduct. In December of 2016, Lieff Cabraser, with co-counsel, filed the first case alleging price-fixing of Levothyroxine, the primary treatment for hypothyroidism, among the most widely prescribed drugs in the world. Lieff Cabraser also played a significant role in similar litigation over the drug Propranolol, and the drug Clomipramine. These cases, and other similar cases, were consolidated and transferred to the Eastern District of Pennsylvania as *In Re: Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724. Lieff Cabraser is a member of the End-Payer Plaintiffs' Steering Committee.

5.   ***In re Lithium-Ion Batteries Antitrust Litigation***, MDL No. 2420 (N.D. Cal.). Lieff Cabraser serves as Interim Co-Lead Counsel representing indirect purchasers in a class action filed against LG, GS Yuasa, NEC, Sony, Sanyo, Panasonic, Hitachi, LG Chem, Samsung, Toshiba, and Sanyo for allegedly conspiring from 2002 to 2011 to fix and raise the prices of lithium-ion rechargeable batteries. The defendants are the world's leading manufacturers of lithium-ion rechargeable batteries, which provide power for a wide variety of consumer electronic products. As a result of the defendants' alleged anticompetitive and unlawful conduct, consumers across the U.S. paid artificially inflated prices for lithium-ion rechargeable batteries. Lieff Cabraser and co-counsel have

reached settlements totaling $113.45 million with all defendants. Approval is pending.

6. ***In Re: Restasis Antitrust Litigation***, MDL No. 2819 (E.D.N.Y.). Lieff Cabraser serves as interim co-lead counsel for indirect purchasers (i.e., third-party payors and consumers) of Restasis, a blockbuster drug used to treat dry-eye disease, in multidistrict litigation alleging a broad-based and ongoing anticompetitive scheme by pharmaceutical giant Allergan, Inc. ("Allergan"). The goal of the alleged scheme was and is to maintain Allergan's monopoly.

Lieff Cabraser, together with co-counsel, filed the first two class actions on behalf of indirect purchasers.  The complaints allege that Allergan (1) fraudulently procured patents it knew were invalid, (2) caused those invalid patents to be listed in the FDA's "Orange Book" as being applicable to Restasis, (3) used the improper Orange Book listings as grounds for filing baseless patent-infringement litigation, (4) abused the FDA's "citizen petition" process, and (5) used a "sham" transfer of the invalid patents to the Saint Regis Mohawk Tribe to obtain tribal sovereign immunity and protect the patents from challenge. This alleged scheme of government petitioning delayed competition from generic equivalents to Restasis that would have been just as safe and cheaper for consumers. The complaints assert claims under federal and state law, including the Sherman Act and the statutory and common law of numerous states.

In late 2018, plaintiffs successfully defeated defendant's motion to dismiss the case. In May of 2020, the Court granted plaintiffs' class certification motion and plaintiffs' motion to exclude two of the defendant's experts. The Second Circuit Court of Appeals denied defendant's appeal, and the litigation is ongoing.

7. ***International Antitrust Cases.*** Lieff Cabraser has significant experience and expertise in antitrust litigation in Europe. Lieff Cabraser partner, Dr. Katharina Kolb, head of the firm's Munich office, has experience in all aspects of German and European competition law, particularly antitrust litigation matters following anti-competitive behavior established by European competition authorities including German Federal Cartel Office and the European Commission.

Currently, one of the firm's major international antitrust cases involves the European truck cartel, which the European Commission fined more than €3.8 billion for colluding on prices and emission technologies for more than 14 years. Lieff Cabraser is working with a range of funders to prosecute the claims of persons damaged by the European truck cartel, including many municipalities in Europe which purchased trucks for street cleaning, fire brigades, waste disposal, and other purposes.

Lieff Cabraser is also prosecuting other cartel damages cases in the EU, including the German quarto steel cartel, the German plant pesticides cartel and the French meal voucher cartel, each of which have likely caused significant damages to customers.

8.   ***In re Capacitors Antitrust Litigation,*** No. 3:14-cv-03264 (N.D. Cal.). Lieff Cabraser is a member of the Plaintiffs' Steering Committee representing indirect purchasers in an electrolytic and film price-fixing class action lawsuit filed against the world's largest manufacturers of capacitors, used to store and regulate current in electronic circuits and computers, phones, appliances, and cameras worldwide. The defendants include Panasonic Corp., Elna Co. Ltd., Hitachi Chemical Co., Ltd., Nitsuko Electronics Corp., NEC Tokin Corp., SANYO Electric Co., Ltd., Matsuo Electric Co., Okaya Electric Industries Co., Nippon Chemi-con Corp., Nichicon Corp., Rubycon Corp., Taitsu Corp., and Toshin Kogyo Co., Ltd. Lieff Cabraser has played a central role in discovery efforts, and assisted in opposing Defendants' motions to dismiss and in opposing Defendants' motions for summary judgment.

Settlements with defendants NEC Tokin Corp., Nitsuko Electronics Corp., and Okaya Electric Industries Co., Ltd. have received final approval, and a settlement with Hitachi Chemical and Soshin Electric Co., Ltd. has received preliminary approval. Discovery continues with respect to the remaining defendants.

9.   ***In re Disposable Contact Lens Antitrust Litigation,*** MDL No. 2626 (M.D. Fla.). Lieff Cabraser represents consumers who purchased disposable contact lenses manufactured by Alcon Laboratories, Inc., Johnson & Johnson Vision Care, Inc., Bausch + Lomb, and Cooper Vision, Inc.  The complaint challenges the use by contact lens manufacturers of minimum resale price maintenance agreements with independent eye care professionals (including optometrists and ophthalmologists) and wholesalers.  These agreements, the complaint alleges, operate to raise retail prices and eliminate price competition and discounts on contact lenses, including from "big box" retail stores, discount buying clubs, and online retailers.  As a result, the consumers across the United States have paid artificially inflated prices.

10.   ***In re Domestic Airline Travel Antitrust Litigation***, 1:15-mc-01404 (District of Columbia). Lieff Cabraser represents consumers in a class action lawsuit against the four largest U.S. airline carriers: American Airlines, Delta Air, Southwest, and United. These airlines collectively account for over 80 percent of all domestic airline travel. The complaint alleges that for years the airlines colluded to restrain capacity, eliminate competition in the market, and increase the price of domestic airline airfares in violation of U.S. antitrust law.  The proposed class

consists of all persons and entities who purchased domestic airline tickets directly from one or more defendants from July 2, 2011 to the present. In February 2016, Judge Kollar-Kotelly appointed Lieff Cabraser to the three-member Plaintiffs' Executive Committee overseeing this multidistrict airline price-fixing litigation. Defendants filed a motion to dismiss, which was denied in October 2016. Subsequently, a settlement with Southwest Airlines was granted preliminary approval. Discovery as to the remaining defendants is underway.

## B.    Successes

1.    ***Nashville General v. Momenta Pharmaceuticals, et al.***, No. 3:15-cv-01100 (M.D. Tenn.). Lieff Cabraser represents AFCSME DC 37 and the Nashville General Hospital (the Hospital Authority of Metropolitan Government of Nashville) in a class-action antitrust case against defendants Momenta Pharmaceuticals and Sandoz, Inc., for their alleged monopolization of enoxaparin, the generic version of the anti-coagulant blood clotting drug Lovenox. Lovenox, developed by Sanofi-Aventis, is a highly profitable drug with annual sales of more than $1 billion. The drug entered the market in 1995 and its patent was invalidated by the federal government in 2008, making generic production possible. The complaint alleged that defendants colluded to secretly bring the official batch-release testing standard for generics within the ambit of their patent, delaying the entry of the second generic competitor—a never-before-tried theory of liability. In 2019, the court certified a class of hospitals, third-party payors, and uninsured persons in 29 states and DC, appointing Lieff Cabraser sole lead counsel. In 2019, the parties agreed to a proposed settlement totaling $120 million, the second largest indirect-purchaser antitrust pharmaceutical settlement fund in history, after Cipro. On May 29, 2020, the Court granted final approval to the settlement.

2.    ***Seaman v. Duke University***, No. 1:15-cv-00462 (M.D. N.C.).  Lieff Cabraser represented Dr. Danielle M. Seaman and a certified class of over 5,000 academic doctors at Duke and UNC in a class action lawsuit against Duke University and Duke University Health System.  The complaint charged that Duke and UNC entered into an express, secret agreement not to compete for each other's faculty.  The lawsuit sought to recover damages and obtain injunctive relief, including treble damages, for defendants' alleged violations of federal and North Carolina antitrust law.

On February 1, 2018, U.S. District Court Judge Catherine C. Eagles issued an order certifying a faculty class.

On September 24, 2019, Judge Eagles granted final approval to the proposed settlement of the case, valued at $54.5 million.

The settlement includes an unprecedented role for the United States Department of Justice to monitor and enforce extensive injunctive relief, which will ensure that neither Duke nor UNC will enter into or enforce any unlawful no-hire agreements or similar restraints on competition. Assistant Attorney General Delrahim remarked: "Permitting the United States to become part of this settlement agreement in this private antitrust case, and thereby to obtain all of the relief and protections it likely would have sought after a lengthy investigation, demonstrates the benefits that can be obtained efficiently for the American worker when public and private enforcement work in tandem."

3. ***In re High-Tech Employee Antitrust Litigation***, No. 11 CV 2509 (N.D. Cal.). Lieff Cabraser served as Co-Lead Class Counsel in a consolidated class action charging that Adobe Systems Inc., Apple Inc., Google Inc., Intel Corporation, Intuit Inc., Lucasfilm Ltd., and Pixar violated antitrust laws by conspiring to suppress the pay of technical, creative, and other salaried employees. The complaint alleged that the conspiracy among defendants restricted recruiting of each other's employees. On October 24, 2013, U.S. District Court Judge Lucy H. Koh certified a class of approximately 64,000 persons who worked in Defendants' technical, creative, and/or research and development jobs from 2005-2009. On September 2, 2015, the Court approved a $415 million settlement with Apple, Google, Intel, and Adobe. Earlier, on May 15, 2014, the Court approved partial settlements totaling $20 million resolving claims against Intuit, Lucasfilm, and Pixar. The Daily Journal described the case as the "most significant antitrust employment case in recent history," adding that it "has been widely recognized as a legal and public policy breakthrough."

4. ***Cipro Cases I and II***, JCCP Nos. 4154 and 4220 (Cal. Supr. Ct.). Lieff Cabraser represented California consumers and third party payors in a class action lawsuit filed in California state court charging that Bayer Corporation, Barr Laboratories, and other generic prescription drug manufacturers conspired to restrain competition in the sale of Bayer's blockbuster antibiotic drug Ciprofloxacin, sold as Cipro. Between 1997 and 2003, Bayer paid its would-be generic drug competitors nearly $400 million to refrain from selling more affordable versions of Cipro. As a result, consumers were forced to pay inflated prices for the drug -- frequently prescribed to treat urinary tract, prostate, abdominal, and other infections.

The trial court granted defendants' motion for summary judgment, which the California Court of Appeal affirmed in October 2011. Plaintiffs sought review before the California Supreme Court. Following briefing, the case was stayed pending the U.S. Supreme Court's decision in FTC v. Actavis. After the U.S. Supreme Court in Actavis overturned lower federal court

precedent that pay-for-delay deals in the pharmaceutical industry are generally legal, plaintiffs and Bayer entered into settlement negotiations. In November 2013, the Trial Court approved a $74 million settlement with Bayer.

On May 7, 2015, the California Supreme Court reversed the grant of summary judgment to Defendants and resoundingly endorsed the rights of consumers to challenge pharmaceutical pay-for-delay settlements under California competition law. Working to the brink of trial, the plaintiffs reached additional settlements with the remaining defendants, bringing the total recovery to $399 million (exceeding plaintiffs' damages estimate by approximately $68 million), a result the trial court described as "extraordinary." The trial court granted final approval on April 21, 2017, adding that it was "not aware of any case" that "has taken roughly 17 years," where, net of fees, end-payor "claimants will get basically 100 cents on the dollar[.]"

In 2017, the American Antitrust Institute honored Lieff Cabraser's Cipro team with its Outstanding Private Practice Antitrust Achievement Award for their extraordinary work on the Cipro price-fixing and exclusionary drug-pricing agreements case. In addition, their work on the Cipro case led Lieff Cabraser partners Eric B. Fastiff, Brendan P. Glackin, and Dean M. Harvey to recognition by California Lawyer and the Daily Journal with a 2016 California Lawyer of the Year Award.

5.  ***In re Municipal Derivatives Litigation***, MDL No. 1950 (S.D.N.Y.). Lieff Cabraser represented the City of Oakland, the County of Alameda, City of Fresno, Fresno County Financing Authority, along with East Bay Delta Housing and Finance Agency, in a class action lawsuit brought on behalf of themselves and other California entities that purchased guaranteed investment contracts, swaps, and other municipal derivatives products from Bank of America, N.A., JP Morgan Chase & Co., Piper Jaffray & Co., Societe Generale SA, UBS AG, and other banks, brokers and financial institutions. The complaint charged that defendants conspired to give cities, counties, school districts, and other governmental agencies artificially low bids for guaranteed investment contracts, swaps, and other municipal derivatives products, which are used by public entities to earn interest on bond proceeds.

The complaint further charged that defendants met secretly to discuss prices, customers, and markets for municipal derivatives sold in the U.S. and elsewhere; intentionally created the false appearance of competition by engaging in sham auctions in which the results were pre-determined or agreed not to bid on contracts; and covertly shared their unjust profits with losing bidders to maintain the conspiracy.

6.    ***Natural Gas Antitrust Cases***, JCCP Nos. 4221, 4224, 4226 & 4228 (Cal. Supr. Ct.). In 2003, the Court approved a landmark of $1.1 billion settlement in class action litigation against El Paso Natural Gas Co. for manipulating the market for natural gas pipeline transmission capacity into California. Lieff Cabraser served as Plaintiffs' Co-Lead Counsel and Co-Liaison Counsel in the *Natural Gas Antitrust Cases I-IV*. In June 2007, the Court granted final approval to a $67.39 million settlement of a series of class action lawsuits brought by California business and residential consumers of natural gas against a group of natural gas suppliers, Reliant Energy Services, Inc., Duke Energy Trading and Marketing LLC, CMS Energy Resources Management Company, and Aquila Merchant Services, Inc. Plaintiffs charged defendants with manipulating the price of natural gas in California during the California energy crisis of 2000-2001 by a variety of means, including falsely reporting the prices and quantities of natural gas transactions to trade publications, which compiled daily and monthly natural gas price indices; prearranged wash trading; and, in the case of Reliant, "churning" on the Enron Online electronic trading platform, which was facilitated by a secret netting agreement between Reliant and Enron. The 2007 settlement followed a settlement reached in 2006 for $92 million partial settlement with Coral Energy Resources, L.P.; Dynegy Inc. and affiliates; EnCana Corporation; WD Energy Services, Inc.; and The Williams Companies, Inc. and affiliates.

7.    ***In the Matter of the Arbitration between CopyTele and AU Optronics***, Case No. 50 117 T 009883 13 (Internat'l Centre for Dispute Resolution).  Lieff Cabraser successfully represented CopyTele, Inc. in a commercial dispute involving intellectual property.  In 2011, CopyTele entered into an agreement with AU Optronics ("AUO") under which both companies would jointly develop two groups of products incorporating CopyTele's patented display technologies.  CopyTele charged that AUO never had any intention of jointly developing the CopyTele technologies, and instead used the agreements to fraudulently obtain and transfer licenses of CopyTele's patented technologies.  The case required the review of thousands of pages of documents in Chinese and in English culminating in a two week arbitration hearing.  In December 2014, after the hearing, the parties resolved the matter, with CopyTele receiving $9 million.

8.    ***Wholesale Electricity Antitrust Cases I & II***, JCCP Nos. 4204 & 4205 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel in the private class action litigation against Duke Energy Trading & Marketing, Reliant Energy, and The Williams Companies for claims that the companies manipulated California's wholesale electricity markets during the California energy crisis of 2000-2001.  Extending the landmark victories for California residential and business consumers of electricity,

in September 2004, plaintiffs reached a $206 million settlement with Duke Energy Trading & Marketing, and in August 2005, plaintiffs reached a $460 million settlement with Reliant Energy, settling claims that the companies manipulated California's wholesale electricity markets during the California energy crisis of 2000-01.  Lieff Cabraser earlier entered into a settlement for over $400 million with The Williams Companies.

9.      ***In re TFT-LCD (Flat Panel) Antitrust Litigation***, MDL No. 1827 (N.D. Cal.). Lieff Cabraser served as Court-appointed Co-Lead Counsel for direct purchasers in litigation against the world's leading manufacturers of Thin Film Transistor Liquid Crystal Displays. TFT-LCDs are used in flat-panel televisions as well as computer monitors, laptop computers, mobile phones, personal digital assistants, and other devices. Plaintiffs charged that defendants conspired to raise and fix the prices of TFT-LCD panels and certain products containing those panels for over a decade, resulting in overcharges to purchasers of those panels and products. In March 2010, the Court certified two nationwide classes of persons and entities that directly purchased TFT-LCDs from January 1, 1999 through December 31, 2006, one class of panel purchasers, and one class of buyers of laptop computers, computer monitors, and televisions that contained TFT-LCDs. Over the course of the litigation, the classes reached settlements with all defendants except Toshiba. The case against Toshiba proceeded to trial. In July 2012, the jury found that Toshiba participated in the price-fixing conspiracy. The case was subsequently settled, bringing the total settlements in the litigation to over $470 million. For his outstanding work in the precedent-setting litigation, California Lawyer recognized Richard Heimann with a 2013 California Lawyer of the Year award.

10.      ***Sullivan v. DB Investments***, No. 04-02819 (D. N.J.). Lieff Cabraser served as Class Counsel for consumers who purchased diamonds from 1994 through March 31, 2006, in a class action lawsuit against the De Beers group of companies. Plaintiffs charged that De Beers conspired to monopolize the sale of rough diamonds in the U.S. In May 2008, the District Court approved a $295 million settlement for purchasers of diamonds and diamond jewelry, including $130 million to consumers. The settlement also barred De Beers from continuing its illegal business practices and required De Beers to submit to the jurisdiction of the Court to enforce the settlement. In December 2011, the Third Circuit Court of Appeals affirmed the District Court's order approving the settlement. 667 F.3d 273 (3rd Cir. 2011). The hard-fought litigation spanned several years and nations. Despite the tremendous resources available to the U.S. Department of Justice and state attorney generals, it was only through the determination of plaintiffs' counsel that De Beers was finally brought to justice and the rights of consumers were vindicated. Lieff Cabraser attorneys played key roles in negotiating the settlement and defending it

on appeal. Discussing the DeBeers case, The National Law Journal noted that Lieff Cabraser was "among the plaintiffs' firms that weren't afraid to take on one of the business world's great white whales."

11. ***Haley Paint Co. v. E.I. Dupont De Nemours and Co. et al.***, No. 10-cv-00318-RDB (D. Md.). Lieff Cabraser served as Co-Lead Counsel for direct purchasers of titanium dioxide in a nationwide class action lawsuit against Defendants E.I. Dupont De Nemours and Co., Huntsman International LLC, Kronos Worldwide Inc., and Cristal Global (fka Millennium Inorganic Chemicals, Inc.), alleging these corporations participated in a global cartel to fix the price of titanium dioxide. Titanium dioxide, a dry chemical powder, is the world's most widely used pigment for providing whiteness and brightness in paints, paper, plastics, and other products. Plaintiffs charged that defendants coordinated increases in the prices for titanium dioxide despite declining demand, decreasing raw material costs, and industry overcapacity.

Unlike some antitrust class actions, Plaintiffs proceeded without the benefit of any government investigation or proceeding. Plaintiffs overcame attacks on the pleadings, discovery obstacles, a rigorous class certification process that required two full rounds of briefing and expert analysis, and multiple summary judgment motions. In August 2012, the Court certified the class. Plaintiffs prepared fully for trial and achieved a settlement with the final defendant on the last business day before trial. In December 2013, the Court approved a series of settlements with defendants totaling $163 million.

12. ***In re Lupron Marketing and Sales Practices Litigation***, MDL No. 1430 (D. Mass.). In May 2005, the Court granted final approval to a settlement of a class action lawsuit by patients, insurance companies and health and welfare benefit plans that paid for Lupron, a prescription drug used to treat prostate cancer, endometriosis and precocious puberty. The settlement requires the defendants, Abbott Laboratories, Takeda Pharmaceutical Company Limited, and TAP Pharmaceuticals, to pay $150 million, inclusive of costs and fees, to persons or entities who paid for Lupron from January 1, 1985 through March 31, 2005. Plaintiffs charged that the defendants conspired to overstate the drug's average wholesale price ("AWP"), which resulted in plaintiffs paying more for Lupron than they should have paid. Lieff Cabraser served as Co-Lead Plaintiffs' Counsel.

13. ***Marchbanks Truck Service v. Comdata Network***, No. 07-cv-01078 (E.D. Pa.). In July 2014, the Court approved a $130 million settlement of a class action brought by truck stops and other retail fueling facilities that paid percentage-based transaction fees to Comdata on proprietary card transactions using Comdata's over-the-road fleet card.

- 89 -

The complaint challenged arrangements among Comdata, its parent company Ceridian LLC, and three national truck stop chains: defendants TravelCenters of America LLC and its wholly owned subsidiaries, Pilot Travel Centers LLC and its predecessor Pilot Corporation, and Love's Travel Stops & Country Stores, Inc. The alleged anticompetitive conduct insulated Comdata from competition, enhanced its market power, and led to independent truck stops' paying artificially inflated transaction fees. In addition to the $130 million payment, the settlement required Comdata to change certain business practices that will promote competition among payment cards used by over-the-road fleets and truckers and lead to lower merchant fees for the independent truck stops. Lieff Cabraser served as Co-Lead Class Counsel in the litigation.

14. ***California Vitamins Cases***, JCCP No. 4076 (Cal. Supr. Ct.). Lieff Cabraser served as Co-Liaison Counsel and Co-Chairman of the Plaintiffs' Executive Committee on behalf of a class of California indirect vitamin purchasers in every level of the chain of distribution. In January 2002, the Court granted final approval of a $96 million settlement with certain vitamin manufacturers in a class action alleging that these and other manufacturers engaged in price fixing of particular vitamins. In December 2006, the Court granted final approval to over $8.8 million in additional settlements.

15. ***In re Buspirone Antitrust Litigation***, MDL No. 1413 (S.D.N.Y.). In November 2003, Lieff Cabraser obtained a $90 million cash settlement for individual consumers, consumer organizations, and third party payers that purchased BuSpar, a drug prescribed to alleviate symptoms of anxiety. Plaintiffs alleged that Bristol-Myers Squibb Co. (BMS), Danbury Pharmacal, Inc., Watson Pharmaceuticals, Inc. and Watson Pharma, Inc. entered into an unlawful agreement in restraint of trade under which BMS paid a potential generic manufacturer of BuSpar to drop its challenge to BMS' patent and refrain from entering the market. Lieff Cabraser served as Plaintiffs' Co-Lead Counsel.

16. ***Meijer v. Abbott Laboratories***, Case No. C 07-5985 CW (N.D. Cal.). Lieff Cabraser served as co-counsel for the group of retailers charging that Abbott Laboratories monopolized the market for AIDS medicines used in conjunction with Abbott's prescription drug Norvir. These drugs, known as Protease Inhibitors, have enabled patients with HIV to fight off the disease and live longer. In January 2011, the Court denied Abbott's motion for summary judgment on plaintiffs' monopolization claim. Trial commenced in February 2011. After opening statements and the presentation of four witnesses and evidence to the jury, plaintiffs and Abbott Laboratories entered into a $52 million settlement. The Court granted final approval to the settlement in August 2011.

17.     ***In re Carpet Antitrust Litigation***, MDL No. 1075 (N.D. Ga.).  Lieff Cabraser served as Class Counsel and a member of the trial team for a class of direct purchasers of twenty-ounce level loop polypropylene carpet.  Plaintiffs, distributors of polypropylene carpet, alleged that Defendants, seven manufacturers of polypropylene carpet, conspired to fix the prices of polypropylene carpet by agreeing to eliminate discounts and charge inflated prices on the carpet.  In 2001, the Court approved a $50 million settlement of the case.

18.     ***In re Lasik/PRK Antitrust Litigation***, No. CV 772894 (Cal. Supr. Ct.).  Lieff Cabraser served as a member of Plaintiffs' Executive Committee in class actions brought on behalf of persons who underwent Lasik/PRK eye surgery.  Plaintiffs alleged that defendants, the manufacturers of the laser system used for the laser vision correction surgery, manipulated fees charged to ophthalmologists and others who performed the surgery, and that the overcharges were passed onto consumers who paid for laser vision correction surgery.  In December 2001, the Court approved a $12.5 million settlement of the litigation.

19.     ***Methionine Cases I and II***, JCCP Nos. 4090 & 4096 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel on behalf of indirect purchasers of methionine, an amino acid used primarily as a poultry and swine feed additive to enhance growth and production.  Plaintiffs alleged that the companies illegally conspired to raise methionine prices to super-competitive levels.  The case settled.

20.     ***In re Electrical Carbon Products Antitrust Litigation***, MDL No. 1514 (D.N.J.).  Lieff Cabraser represented the City and County of San Francisco and a class of direct purchasers of carbon brushes and carbon collectors on claims that producers fixed the price of carbon brushes and carbon collectors in violation of the Sherman Act.

## VII.   Environmental and Toxic Exposures

### A.   Current Cases

1.     ***In Re Oil Spill  by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico***, MDL No. 2179 (E.D. La.).  Lieff Cabraser serves on the Court-appointed Plaintiffs' Steering Committee ("PSC") and with co-counsel represents fishermen, property owners, business owners, wage earners, and other harmed parties in class action litigation against BP, Transocean, Halliburton, and other defendants involved in the Deepwater Horizon oil rig blowout and resulting oil spill in the Gulf of Mexico on April 20, 2010.  The Master Complaints allege that the defendants were insouciant in addressing the operations of the well and the oil rig, ignored warning signs of the impending disaster, and failed to employ and/or

follow proper safety measures, worker safety laws, and environmental protection laws in favor of cost-cutting measures.

In 2012, the Court approved two class action settlements that will fully compensate hundreds of thousands of victims of the tragedy. The settlements resolve the majority of private economic loss, property damage, and medical injury claims stemming from the Deepwater Horizon Oil Spill, and hold BP fully accountable to individuals and businesses harmed by the spill.  Under the settlements, there is no dollar limit on the amount BP will pay.  In 2014, the U.S. Supreme Court denied review of BP's challenge to its own class action settlement.  Approval of that settlement is now final, and has so far delivered $11.2 billion to compensate claimants' losses.  The medical settlement is also final, and an additional $1 billion settlement has been reached with defendant Halliburton.

2.  ***Andrews, et al. v. Plains All American Pipeline, et al.***, No. 2:15-cv-04113-PSG-JEM (C.D. Cal.).  Lieff Cabraser is Court-appointed Class Counsel in this action arising from an oil spill in Santa Barbara County in May 2015.  A pipeline owned by Plains ruptured, and oil from the pipeline flowed into the Pacific Ocean, soiling beaches and impacting local fisheries.  Lieff Cabraser represents homeowners who lost the use of the beachfront amenity for which they pay a premium, local oil platform workers who were laid off as a result of the spill and subsequent closure of the pipeline, as well as fishers whose catch was impacted by the oil spill.  Plaintiffs allege that defendants did not follow basic safety protocols when they installed the pipeline, failed to properly monitor and maintain the pipeline, ignored clear signs that the pipeline was corroded and in danger of bursting, and failed to promptly respond to the oil spill when the inevitable rupture occurred.

The Federal District Court recently certified a plaintiff class composed of fishers whose catch diminished as a result of the spill and fish industry businesses that were affected as a result of the decimated fish population.  Lieff Cabraser has recently filed a motion to certify additional classes of groups harmed by the spill, including private property owners and lessees near the soiled shoreline, and oil industry workers and businesses that suffered economic injuries associated with the closure of the pipeline.

3.  ***Southern California Gas Leak Cases***, JCCP No. 4861. Lieff Cabraser has been selected by the Los Angeles County Superior Court to help lead two important class action cases on behalf of homeowners and businesses that suffered economic injuries in the wake of the massive Porter Ranch gas leak, which began in October of 2015 and lasted into February of 2016.  During this time, huge quantities of natural gas spewed out of an old well at Southern California Gas's Aliso Canyon Facility and into the air

of Porter Ranch, a neighborhood located adjacent to the Facility and 25 miles northwest of Los Angeles.

This large-scale environmental disaster forced thousands of residents to leave their homes for months on end while the leak continued and for several months thereafter.  It also caused local business to dry up during the busy holiday season, as many residents had evacuated the neighborhood and visitors avoided the area.  Evidence suggests the leak was caused by at least one old and malfunctioning well used to inject and retrieve gas.  Southern California Gas Company allegedly removed the safety valve on the well that could have prevented the leak.  As a result, the gas leak has left a carbon footprint larger than the *Deepwater Horizon* oil spill.

Together with other firms chosen to pursue class relief for these victims, Lieff Cabraser filed two class action complaints – one on behalf of Porter Ranch homeowners, and another on behalf of Porter Ranch businesses. Southern California Gas argued in response that the injuries suffered by homeowners and businesses cannot proceed as class actions. In May 2017, the Superior Court rejected these arguments. The class action cases are proceeding with discovery into Southern California Gas Company's role in this disaster.

**B.    Successes**

1.    ***In re Exxon Valdez Oil Spill Litigation***, No. 3:89-cv-0095 HRH (D. Al.).  The *Exxon Valdez* ran aground on March 24, 1989, spilling 11 million gallons of oil into Prince William Sound.  Lieff Cabraser served as one of the Court-appointed Plaintiffs' Class Counsel.  The class consisted of fisherman and others whose livelihoods were gravely affected by the disaster.  In addition, Lieff Cabraser served on the Class Trial Team that tried the case before a jury in federal court in 1994.  The jury returned an award of $5 billion in punitive damages.

In 2001, the Ninth Circuit Court of Appeals ruled that the original $5 billion punitive damages verdict was excessive.  In 2002, U.S. District Court Judge H. Russell Holland reinstated the award at $4 billion.  Judge Holland stated that, "Exxon officials knew that carrying huge volumes of crude oil through Prince William sound was a dangerous business, yet they knowingly permitted a relapsed alcoholic to direct the operation of the *Exxon Valdez* through Prince William Sound."  In 2003, the Ninth Circuit again directed Judge Holland to reconsider the punitive damages award under United States Supreme Court punitive damages guidelines. In January 2004, Judge Holland issued his order finding that Supreme Court authority did not change the Court's earlier analysis.

In December 2006, the Ninth Circuit Court of Appeals issued its ruling, setting the punitive damages award at $2.5 billion.  Subsequently, the U.S. Supreme Court further reduced the punitive damages award to $507.5 million, an amount equal to the compensatory damages.  With interest, the total award to the plaintiff class was $977 million.

2.    ***In re Imprelis Herbicide Marketing, Sales Practices and Products Liability Litigation***, MDL No. 2284 (E.D. Pa.).  Lieff Cabraser served as Co-Lead Counsel for homeowners, golf course companies and other property owners in a nationwide class action lawsuit against E.I. du Pont de Nemours & Company ("DuPont"), charging that its herbicide Imprelis caused widespread death among trees and other non-targeted vegetation across the country.  DuPont marketed Imprelis as an environmentally friendly alternative to the commonly used 2,4-D herbicide.  Just weeks after Imprelis' introduction to the market in late 2010, however, complaints of tree damage began to surface.  Property owners reported curling needles, severe browning, and dieback in trees near turf that had been treated with Imprelis.  In August 2011, the U.S. Environmental Protection Agency banned the sale of Imprelis.

The complaint charged that DuPont failed to disclose the risks Imprelis posed to trees, even when applied as directed, and failed to provide instructions for the safe application of Imprelis.  In response to the litigation, DuPont created a process for property owners to submit claims for damages.  Approximately $400 million was paid to approximately 25,000 claimants.  In October 2013, the Court approved a settlement of the class action that substantially enhanced the DuPont claims process, including by adding an extended warranty, a more limited release of claims, the right to appeal the denial of claim by DuPont to an independent arborist, and publication of DuPont's tree payment schedule.

3.    ***In re GCC Richmond Works Cases***, JCCP No. 2906 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Liaison Counsel and Lead Class Counsel in coordinated litigation arising out of the release on July 26, 1993, of a massive toxic sulfuric acid cloud which injured an estimated 50,000 residents of Richmond, California.  The Coordination Trial Court granted final approval to a $180 million class settlement for exposed residents.

4.    ***In re Unocal Refinery Litigation***, No. C 94-04141 (Cal. Supr. Ct.).  Lieff Cabraser served as one of two Co-Lead Class Counsel and on the Plaintiffs' Steering Committee in this action against Union Oil Company of California ("Unocal") arising from a series of toxic releases from Unocal's San Francisco refinery in Rodeo, California.  The action was settled in 1997 on behalf of approximately 10,000 individuals for $80 million.

5.    ***West v. G&H Seed Co., et al.***, No. 99-C-4984-A (La. State Ct.).  With co-counsel, Lieff Cabraser represented a certified class of 1,500 Louisiana crawfish farmers who charged in a lawsuit that Fipronil, an insecticide sold under the trade name ICON, damaged their pond-grown crawfish crops.  In Louisiana, rice and crawfish are often farmed together, either in the same pond or in close proximity to one another.

After its introduction to the market in 1999, ICON was used extensively in Louisiana to kill water weevils that attacked rice plants.  The lawsuit alleged that ICON also had a devastating effect on crawfish harvests with some farmers losing their entire crawfish crop.  In 2004, the Court approved a $45 million settlement with Bayer CropScience, which during the litigation purchased Aventis CropScience, the original manufacturer of ICON.  The settlement was reached after the parties had presented nearly a month's worth of evidence at trial and were on the verge of making closing arguments to the jury.

6.    ***Kingston, Tennessee TVA Coal Ash Spill Litigation***, No. 3:09-cv-09 (E.D. Tenn.).  Lieff Cabraser represented hundreds of property owners and businesses harmed by the largest coal ash spill in U.S. history.  On December 22, 2008, more than a billion gallons of coal ash slurry spilled when a dike burst on a retention pond at the Kingston Fossil Plant operated by the Tennessee Valley Authority (TVA) in Roane County, Tennessee.  A wall of coal ash slurry traveled across the Emory River, polluting the river and nearby waterways, and covering nearly 300 acres with toxic sludge, including 12 homes and damaging hundreds of properties.  In March 2010, the Court denied in large part TVA's motion to dismiss the litigation.  In the Fall of 2011, the Court conducted a four week bench trial on the question of whether TVA was liable for releasing the coal ash into the river system.  The issue of damages was reserved for later proceedings.  In August 2012, the Court found in favor of plaintiffs on their claims of negligence, trespass, and private nuisance.  In August 2014, the case came to a conclusion with TVA's payment of $27.8 million to settle the litigation.

7.    ***In re Sacramento River Spill Cases I and II***, JCCP Nos. 2617 & 2620 (Cal. Supr. Ct.).  On July 14, 1991, a Southern Pacific train tanker car derailed in northern California, spilling 19,000 gallons of a toxic pesticide, metam sodium, into the Sacramento River near the town of Dunsmir at a site along the rail lines known as the Cantara Loop.  The metam sodium mixed thoroughly with the river water and had a devastating effect on the river and surrounding ecosystem.  Within a week, every fish, 1.1 million in total, and all other aquatic life in a 45-mile stretch of the Sacramento River was killed.  In addition, many residents living along the river became ill with symptoms that included headaches,

shortness of breath, and vomiting.  The spill considered the worst inland ecological disaster in California history.

Lieff Cabraser served as Court-appointed Plaintiffs' Liaison Counsel and Lead Class Counsel, and chaired the Plaintiffs' Litigation Committee in coordinated proceedings that included all of the lawsuits arising out of this toxic spill.  Settlement proceeds of approximately $16 million were distributed pursuant to Court approval of a plan of allocation to four certified plaintiff classes: personal injury, business loss, property damage/diminution, and evacuation.

8.  ***Kentucky Coal Sludge Litigation***, No. 00-CI-00245 (Cmmw. Ky.).  On October 11, 2000, near Inez, Kentucky, a coal waste storage facility ruptured, spilling 1.25 million tons of coal sludge (a wet mixture produced by the treatment and cleaning of coal) into waterways in the region and contaminating hundreds of properties.  This was one of the worst environmental disasters in the Southeastern United States.  With co-counsel, Lieff Cabraser represented over 400 clients in property damage claims, including claims for diminution in the value of their homes and properties.  In April 2003, the parties reached a confidential settlement agreement on favorable terms to the plaintiffs.

9.  ***Toms River Childhood Cancer Incidents***, No. L-10445-01 MT (Sup. Ct. NJ).  With co-counsel, Lieff Cabraser represented 69 families in Toms River, New Jersey, each with a child having cancer, that claimed the cancers were caused by environmental contamination in the Toms River area.  Commencing in 1998, the parties—the 69 families, Ciba Specialty Chemicals, Union Carbide and United Water Resources, Inc., a water distributor in the area—participated in an unique alternative dispute resolution process, which lead to a fair and efficient consideration of the factual and scientific issues in the matter.  In December 2001, under the supervision of a mediator, a confidential settlement favorable to the families was reached.

## VIII.  <u>False Claims Act</u>

### A.  **Current Cases**

Lieff Cabraser represents whistleblowers in a wide range of False Claims Act cases, including Medicare kickback and healthcare fraud, defense contractor fraud, and securities and financial fraud.  We have more than a dozen whistleblower cases currently under seal and investigation in federal and state jurisdictions across the U.S.  For that reason, we do not list all of our current False Claims Act and qui tam cases in our resume.

1.  ***United States ex rel. Matthew Cestra v. Cephalon***, No. 14-01842 (E.D. Pa.); ***United States ex rel. Bruce Boise et al. v. Cephalon***,

No. 08-287 (E.D. Pa.)  Lieff Cabraser, with co-counsel, represents four whistleblowers bringing claims on behalf of the U.S. Government and various states under the federal and state False Claims Acts against Cephalon, Inc., a pharmaceutical company.  The complaints allege that Cephalon has engaged in unlawful off-label marketing of certain of its drugs, largely through misrepresentations, kickbacks, and other unlawful or fraudulent means, causing the submission of hundreds of thousands of false claims for reimbursement to federal and state health care programs. The Boise case involves Provigil and its successor drug Nuvigil, limited-indication wakefulness drugs that are unsafe and/or not efficacious for the wide array of off-label psychiatric and neurological conditions for which Cephalon has marketed them, according to the allegations.  The Cestra case involves an expensive oncological drug called Treanda, which is approved only for second-line treatment of indolent non-Hodgkin's Lymphoma despite what the relators allege to be the company's off-label marketing of the drug for first-line treatment. Various motions are pending.

## B.   Successes

1.   ***United States ex rel. Mary Hendow and Julie Albertson v. University of Phoenix***, No. 2:03-cv-00457-GEB-DAD (E.D. Cal.). Lieff Cabraser obtained a record whistleblower settlement against the University of Phoenix that charged the university had violated the incentive compensation ban of the Higher Education Act (HEA) by providing improper incentive pay to its recruiters.  The HEA prohibits colleges and universities whose students receive federal financial aid from paying their recruiters based on the number of students enrolled, which creates a risk of encouraging recruitment of unqualified students who, Congress has determined, are more likely to default on their loans.  High student loan default rates not only result in wasted federal funds, but the students who receive these loans and default are burdened for years with tremendous debt without the benefit of a college degree.

The complaint alleged that the University of Phoenix defrauded the U.S. Department of Education by obtaining federal student loan and Pell Grant monies from the federal government based on false statements of compliance with HEA.  In December 2009, the parties announced a $78.5 million settlement.  The settlement constitutes the second-largest settlement ever in a False Claims Act case in which the federal government declined to intervene in the action and largest settlement ever involving the Department of Education.  The University of Phoenix case led to the Obama Administration passing new regulations that took away the so-called "safe harbor" provisions that for-profit universities relied on to justify their alleged recruitment misconduct.  For his outstanding work as Lead Counsel and the significance of the case,

*California Lawyer* magazine recognized Lieff Cabraser attorney Robert J. Nelson with a California Lawyer of the Year (CLAY) Award.

2.   ***State of California ex rel. Sherwin v. Office Depot***, No. BC410135 (Cal. Supr. Ct.).   In February 2015, the Court approved a $77.5 million settlement with Office Depot to settle a whistleblower lawsuit brought under the California False Claims Act.  The whistleblower was a former Office Depot account manager.  The City of Los Angeles, County of Santa Clara, Stockton Unified School District, and 16 additional California cities, counties, and school districts intervened in the action to assert their claims (including common-law fraud and breach of contract) against Office Depot directly.  The governmental entities purchased office supplies from Office Depot under a nationwide supply contract known as the U.S. Communities contract. Office Depot promised in the U.S. Communities contract to sell office supplies at its best governmental pricing nationwide.  The complaint alleged that Office Depot repeatedly failed to give most of its California governmental customers the lowest price it was offering other governmental customers.  Other pricing misconduct was also alleged.

3.   ***State of California ex rel. Rockville Recovery Associates v. Multiplan***, No. 34-2010-00079432 (Sacramento Supr. Ct., Cal.).  In a case that received widespread media coverage, Lieff Cabraser represented whistleblower Rockville Recovery Associates in a qui tam suit for civil penalties under the California Insurance Frauds Prevention Act ("IFPA"), Cal. Insurance Code § 1871.7, against Sutter Health, one of California's largest healthcare providers, and obtained the largest penalty ever imposed under the statute.  The parties reached a $46 million settlement that was announced in November 2013, shortly before trial was scheduled to commence.

The complaint alleged that the 26 Sutter hospitals throughout California submitted false, fraudulent, or misleading charges for anesthesia services (separate from the anesthesiologist's fees) during operating room procedures that were already covered in the operating room bill.

After Lieff Cabraser defeated Sutter Health's demurrer and motion to compel arbitration, California Insurance Commissioner Dave Jones intervened in the litigation in May 2011.  Lieff Cabraser attorneys continued to serve as lead counsel, and litigated the case for over two more years.   In all, plaintiffs defeated no less than 10 dispositive motions, as well as three writ petitions to the Court of Appeals.

In addition to the monetary recovery, Sutter Health agreed to a comprehensive series of billing and transparency reforms, which California Insurance Commissioner Dave Jones called "a groundbreaking step in opening up hospital billing to public scrutiny."  On the date the

settlement was announced, the California Hospital Association recognized its significance by issuing a press release stating that the settlement "compels industry-wide review of anesthesia billing." Defendant Multiplan, Inc., a large leased network Preferred Provider Organization, separately paid a $925,000 civil penalty for its role in enabling Sutter's alleged false billing scheme.

4.   ***United States ex rel. Dye v. ATK Launch Systems***, No. 1:06-CV-39-TS (D. Utah). Lieff Cabraser served as co-counsel for a whistleblower who alleged that ATK Launch Systems knowingly sold defective and potentially dangerous illumination flares to the United States military in violation of the federal False Claims Act. The specialized flares were used in nighttime combat, covert missions, and search and rescue operations. A key design specification set by the Defense Department was that these highly flammable and dangerous items ignite only under certain conditions. The complaint alleged that the ATK flares at issue could ignite when dropped from a height of less than 10 feet – and, according to ATK's own analysis, from as little as 11.6 inches – notwithstanding contractual specifications that they be capable of withstanding such a drop. In April 2012, the parties reached a settlement valued at $37 million.

5.   ***United States ex rel. Mauro Vosilla and Steven Rossow v. Avaya, Inc.***, No. CV04-8763 PA JTLx (C.D. Cal.). Lieff Cabraser represented a whistleblower in litigation alleging that defendants Avaya, Lucent Technologies, and AT&T violated the Federal False Claims Act and state false claims statutes. The complaint alleged that defendants charged governmental agencies for the lease, rental, and post-warranty maintenance of telephone communications systems and services that the governmental agencies no longer possessed and/or were no longer maintained by defendants. In November 2010, the parties entered into a $21.75 million settlement of the litigation.

6.   ***State of California ex rel. Associates Against FX Insider State Street Corp.***, No. 34-2008-00008457 (Sacramento Supr. Ct., Cal.) ("***State Street I***"). Lieff Cabraser served as co-counsel for the whistleblowers in this action against State Street Corporation. The Complaint alleged that State Street violated the California False Claims Act with respect to certain foreign exchange transactions it executed with two California public pension fund custodial clients. The California Attorney General intervened in the case in October 2009.

## IX.   Digital Privacy and Data Security

### A.   Current Cases

1.   ***Balderas v. Tiny Lab Productions, et al.***, Case 6:18-cv-00854 (D. New Mexico). Lieff Cabraser, with co-counsel, is working with the

Attorney General of the State of New Mexico to represent parents, on behalf of their children, in a federal lawsuit seeking to protect children in the state from a foreign developer of child-directed apps and its marketing partners, including Google's ad network, Google AdMob.  The lawsuit alleges that Google, child-app developer Tiny Lab Productions, and their co-defendants surreptitiously harvested children's personal information for profiling and targeting children for commercial gain, without adequate disclosures and verified parental consent. When children played Tiny Lab's gaming apps on their mobile devices, Defendants collected and used their personal data, including geolocation, persistent identifiers, demographic characteristics, and other personal data in order to serve children with targeted advertisements or otherwise commercially exploit them.  The apps at issue, clearly and indisputably designed for children, include Fun Kid Racing, Candy Land Racing, and GummyBear and Friends Speed Racing. The action largely survived a motion to dismiss in spring 2020 and seeks redress under the federal Children's Online Privacy Protection Act and the common law.  The parties are currently in discovery.

2.   ***McDonald, et al. v. Kiloo A/S, et al.***, No. 3:17-cv-04344-JD; ***Rushing, et al. v. The Walt Disney Co., et al.***, No. 3:17-cv-04419-JD; ***Rushing v. ViacomCBS, et al.***, No. 3:17-cv-04492-JD (N.D. Cal.).  In three related actions, Lieff Cabraser, with co-counsel, represents parents whose children's right to privacy was violated when their personal data was surreptitiously transmitted while playing child-directed mobile gaming apps.  Specifically, Plaintiffs allege that app developers and their mobile advertising partners (developers of so-called "software development kits" or "SDKs") collected personally identifying data (e.g., device identifiers and location data) through six apps (Subway Surfers, Where's My Water? (Paid), Where's My Water (Free/Lite), Where's My Water? 2, Princess Palace Pets, and Llama Spit Spit), and used that data to monetize their apps through targeted behavioral advertising—without the knowledge of child users or their parents.  In May 2019, U.S. District Judge James Donato issued an order largely denying the defendants' motions to dismiss.  Plaintiffs then pursued their claims (i) for intrusion upon seclusion and a violation of the constitutional right to privacy under California law, (ii) under the California Unfair Competition Law, (iii) under the Massachusetts statutory right to privacy, and (iv) under New York General Business Law Section 349.

On September 24, 2020, the district court preliminarily approved sixteen class settlements with all defendants in these actions.  The settlements provide stringent and wide-ranging privacy protections (in many cases exceeding federal regulations) and meaningful changes to defendants' business practices, ensuring participants in the largely unpoliced mobile advertising industry proactively protect children's privacy in thousands of

apps popular with children.  A final approval hearing is scheduled for
December 17, 2020.

3.   ***In re Google LLC Street View Electronic Communications
     Litigation***, No. 3:10-md-021784-CRB (N.D. Cal.).  Lieff Cabraser
     represents individuals whose right to privacy was violated when Google
     intentionally equipped its Google Maps "Street View" vehicles with Wi-Fi
     antennas and software that collected data transmitted by those persons'
     Wi-Fi networks located in their nearby homes.  Google collected not only
     basic identifying information about individuals' Wi-Fi networks, but also
     personal, private data being transmitted over their Wi-Fi networks such
     as emails, usernames, passwords, videos, and documents.  Plaintiffs allege
     that Google's actions violated the federal Wiretap Act, as amended by the
     Electronic Communications Privacy Act.  On September 10, 2013, the
     Ninth Circuit Court of Appeals held that Google's actions are not exempt
     from the Act.

     On March 20, 2020, U.S. District Judge Charles R. Breyer granted final
     approval to a $13 million settlement over Google's illegal gathering of
     network data via its Street View vehicle fleet. Given the difficulties of
     assessing precise individual harms, the innovative settlement, which is
     intended in part to disincentivize companies like Google from future
     privacy violations, will distribute its monies to eight nonprofit
     organizations with a history of addressing online consumer privacy issues.
     Judge Breyer's order to distribute the settlement funds to nonprofit
     organizations is currently on appeal.

4.   ***In re Google LLC Location History Litigation***, No. 5:18-cv-05062-
     EJD (N.D. Cal.).  Lieff Cabraser serves as Co-Lead Interim Class Counsel
     representing individuals whose locations were tracked, and whose
     location information was stored and used by Google for its own purposes
     after the consumers disabled a feature that was supposed to prevent
     Google from storing a record of their locations.  Plaintiffs allege that, for
     years, Google deliberately misled its users that their "Location History"
     settings would prevent Google from tracking and storing a permanent
     record of their movements, when in fact despite users' privacy settings,
     Google did so anyway.  Plaintiffs allege that Google's conduct violates
     its users' reasonable expectations of privacy and is unlawful under the
     California Constitutional Right to Privacy and the common law of
     intrusion upon seclusion, as well as giving rise to claims for unjust
     enrichment and disgorgement.

5.   ***In re: Marriott Int'l Customer Data Sec. Breach Litig.***, No. 19-
     md-2879 (D. Md.).  Lieff Cabraser serves as a member of the Steering
     Committee in class action litigation against Marriott International Inc.
     and Accenture PLC for a 2018 data breach of Starwood Hotels affecting

more than 300 million U.S. citizens.   Plaintiffs allege that Marriott failed to fulfill its legal duty to protect its customers' sensitive personal and financial information, causing class members' personally identifying information, including credit cards and passport numbers, to be exfiltrated by cybercriminals.  In February 2020, U.S. District Court Judge Paul Grimm granted in part, and denied in part, Marriott's motion to dismiss.   Critically, the Court held that Plaintiffs have standing to bring their claims and that they properly alleged several tort, contract, and consumer protection claims.

6.      ***In re: American Medical Collection Agency, Inc., Customer Data Sec. Breach Litig.***, No. 19-md-2904 (D. N.J.).  Lieff Cabraser serves as Co-Lead Counsel on the Quest track in class action litigation against Quest Diagnostics Inc., Laboratory Corporation of America, and other blood testing and diagnostic companies that shared, or facilitated the sharing of, customers' personal identifying financial and health information with a third-party debt collector American Medical Collection Agency.  Plaintiffs allege that Quest (and other blood-testing labs) failed to fulfill its legal duty to protect customers' sensitive personal, financial, and health information by sharing it with a third-party that lacked adequate data security.  The complaints against each lab company allege that they were negligent, unjustly enriched, and violated numerous state consumer protection statutes.

7.      ***In re Plaid Inc. Privacy Litig.***, No. 4:20-cv-03056 (N.D. Cal.). Lieff Cabraser serves as Co-Lead Interim Class Counsel in a class action lawsuit alleging that Plaid Inc., a financial technology company, invaded consumers' privacy in their financial affairs. Plaid provides third-party bank account authentication services for several well-known payment apps, such as Venmo, Coinbase, Square's Cash App, and Stripe. Plaintiffs allege that Plaid uses login screens that misleadingly look like those of real banks to obtain consumers' banking account credentials, and subsequently uses consumers' credentials to access their bank accounts and improperly take their banking data.  Plaintiffs argue that Plaid's intrusions violate established social norms, and expose consumers to additional privacy risks. The lawsuit asserts claims under state and federal consumer protection and privacy laws and seeks monetary as well as injunctive (practice change) relief to stop the conduct and purge all improperly obtained data.

## B.      Successes

1.      ***In re Anthem, Inc. Data Breach Litig.***, No. 5:15-md-02617 (N.D. Cal.).  Lieff Cabraser served on the Plaintiffs' Steering Committee representing individuals in a class action lawsuit against Anthem for its alleged failure to safeguard and secure the medical records and other

personally identifiable information of its members. The second largest health insurer in the U.S., Anthem provides coverage for 37.5 million Americans. Anthem's customer database was allegedly attacked by international hackers on December 10, 2014. Anthem says it discovered the breach on January 27, 2015, and reported it about a week later on February 4, 2015. California customers were informed around March 18, 2015. The theft included names, birth dates, social security numbers, billing information, and highly confidential health information. The complaint charged that Anthem violated its duty to safeguard and protect consumers' personal information, and violated its duty to disclose the breach to consumers in a timely manner. In addition, the complaint charged that Anthem was on notice about the weaknesses in its computer security defenses for at least a year before the breach occurred.

In August 2018, Judge Lucy H. Koh of the U. S. District Court for the Northern District of California granted final approval to a class action settlement which required Anthem to undertake significant additional cybersecurity measures to better safeguard information going forward, and to pay $115 million into a settlement fund from which benefits to settlement class members will be paid.

2. ***Matera v. Google Inc.***, No. 5:15-cv-04062 (N.D. Cal.). Lieff Cabraser served as Co-Lead Class Counsel representing consumers in a digital privacy class action against Google Inc. over claims the popular Gmail service conducted unauthorized scanning of email messages to build marketing profiles and serve targeted ads. The complaint alleged that Google routinely scanned email messages that were sent by non-Gmail users to Gmail subscribers, analyzed the content of those messages, and then shared that data with third parties in order to target ads to Gmail users, an invasion of privacy that violated the California Invasion of Privacy Act and the federal Electronic Communications Privacy Act. In February 2018, Judge Lucy H. Koh of the U. S. District Court for the Northern District of California granted final approval to a class action settlement. Under the settlement, Google made business-related changes to its Gmail service, as part of which, Google will no longer scan the contents of emails sent to Gmail accounts for advertising purposes, whether during the transmission process or after the emails have been delivered to the Gmail user's inbox. The proposed changes, which will not apply to scanning performed to prevent the spread of spam or malware, will run for at least three years.

3. ***Campbell v. Facebook***, No. 4:13-cv-05996 (N.D. Cal.). Lieff Cabraser serves as Co-Lead Class Counsel in a nationwide class action lawsuit alleging that Facebook intercepts certain private data in users' personal and private messages on the social network and profits by sharing that information with third parties. When a user composes a private Facebook

message and includes a link (a "URL") to a third party website, Facebook allegedly scans the content of the message, follows the URL, and searches for information to profile the message-sender's web activity. This enables Facebook to data mine aspects of user data and profit from that data by sharing it with advertisers, marketers, and other data aggregators. In December 2014, the Court in large part denied Facebook's motion to dismiss. In rejecting one of Facebook's core arguments, U.S. District Court Judge Phyllis Hamilton stated: "An electronic communications service provider cannot simply adopt any revenue-generating practice and deem it 'ordinary' by its own subjective standard." In August of 2017, Judge Hamilton granted final approval to an injunctive relief settlement of the action. As part of the settlement, Facebook has ceased the offending practices and has made changes to its operative relevant user disclosures.

4.    ***Ebarle et al. v. LifeLock Inc.***, No. 3:15-cv-00258 (N.D. Cal.). Lieff Cabraser represented consumers who subscribed to LifeLock's identity theft protection services in a nationwide class action fraud lawsuit. The complaint alleged LifeLock did not protect the personal information of its subscribers from hackers and criminals, and specifically that, contrary to its advertisements and statements, LifeLock lacked a comprehensive monitoring network, failed to provide "up-to-the-minute" alerts of suspicious activity, and did an inferior job of providing the same theft protection services that banks and credit card companies provide, often for free. On September 21, 2016, U.S. District Judge Haywood Gilliam, Jr. granted final approval to a $68 million settlement of the case.

5.    ***In re Carrier IQ Privacy Litigation***, MDL No. 2330 (N.D. Cal.). Lieff Cabraser represented a plaintiff in Multi-District Litigation against Samsung, LG, Motorola, HTC, and Carrier IQ alleging that smartphone manufacturers violated privacy laws by installing tracking software, called IQ Agent, on millions of cell phones and other mobile devices that use the Android operating system. Without notifying users or obtaining consent, IQ Agent tracks users' keystrokes, passwords, apps, text messages, photos, videos, and other personal information and transmits this data to cellular carriers.  In a 96-page order issued in January 2015, U.S. District Court Judge Edward Chen granted in part, and denied in part, defendants' motion to dismiss.  Importantly, the Court permitted the core Wiretap Act claim to proceed as well as the claims for violations of the Magnuson-Moss Warranty Act and the California Unfair Competition Law and breach of the common law duty of implied warranty. In 2016, the Court granted final approval of a $9 million settlement plus injunctive relief provisions.

6.    ***Perkins v. LinkedIn Corp.***, No. 13-cv-04303-LHK (N.D. Cal.).  Lieff Cabraser represented individuals who joined LinkedIn's network and, without their consent or authorization, had their names and likenesses

used by LinkedIn to endorse LinkedIn's services and send repeated emails
to their contacts asking that they join LinkedIn.  On February 16, 2016,
the Court granted final approval to a $13 million settlement, one of the
largest per-class member settlements ever in a digital privacy class action.
In addition to the monetary relief, LinkedIn agreed to make significant
changes to Add Connections disclosures and functionality.  Specifically,
LinkedIn revised disclosures to real-time permission screens presented to
members using Add Connections, agreed to implement new functionality
allowing LinkedIn members to manage their contacts, including viewing
and deleting contacts and sending invitations, and to stop reminder
emails from being sent if users have sent connection invitations
inadvertently.

7. ***Corona v. Sony Pictures Entertainment***, No.  2:14-cv-09660-RGK
(C.D. Cal.).  Lieff Cabraser served as Plaintiffs' Co-Lead Counsel in class
action litigation against Sony for failing to take reasonable measures to
secure the data of its employees from hacking and other attacks.  As a
result, personally identifiable information of thousands of current and
former Sony employees and their families was obtained and published on
websites across the Internet.  Among the staggering array of personally
identifiable information compromised were  medical records, Social
Security Numbers, birth dates, personal emails, home addresses, salaries,
tax information, employee evaluations, disciplinary actions, criminal
background checks, severance packages, and family medical histories.
The complaint charged that Sony owed a duty to take reasonable steps to
secure the data of its employees from hacking.  Sony allegedly breached
this duty by failing to properly invest in adequate IT security, despite
having already succumbed to one of the largest data breaches in history
only three years ago. In October 2015, an $8 million settlement was
reached under which Sony agreed to reimburse employees for losses and
harm.

8. ***In re Intuit Data Litig.***, No. 5:15-cv-01778-EJD (N.D. Cal.).  Lieff
Cabraser represented identity theft victims in a nationwide class action
lawsuit against Intuit for allegedly failing to protect consumers' data from
foreseeable and preventable breaches, and by facilitating the filing of
fraudulent tax returns through its TurboTax software program.  The
complaint alleged that Intuit failed to protect data provided by consumers
who purchased TurboTax, used to file an estimated 30 million tax returns
for American taxpayers every year, from easy access by hackers and other
cybercriminals.  The complaint further alleged that Intuit was aware of
the widespread use of TurboTax exclusively for the filing of fraudulent tax
returns.  Yet, Intuit failed to adopt basic cyber security policies to prevent
this misuse of TurboTax.  As a result, fraudulent tax returns were filed in
the names of the plaintiffs and thousands of other individuals across
America, including persons who never purchased TurboTax. In May 2019,

Judge Edward J. Davila of the U. S. District Court for the Northern District of California granted final approval to a settlement that provided all class members who filed a valid claim with free credit monitoring and identity restoration services, and required Intuit to commit to security changes for preventing future misuse of the TurboTax platform.

## X.   **International and Human Rights Litigation**

### A.   **Successes**

1.   ***Holocaust Cases***.  Lieff Cabraser was one of the leading firms that prosecuted claims by Holocaust survivors and the heirs of Holocaust survivors and victims against banks and private manufacturers and other corporations who enslaved and/or looted the assets of Jews and other minority groups persecuted by the Nazi Regime during the Second World War era.  The firm served as Settlement Class Counsel in the case against the Swiss banks for which the Court approved a U.S. $1.25 billion settlement in July 2000.  Lieff Cabraser donated its attorneys' fees in the Swiss Banks case, in the amount of $1.5 million, to endow a Human Rights clinical chair at Columbia University Law School.  The firm was also active in slave labor and property litigation against German and Austrian defendants, and Nazi-era banking litigation against French banks.  In connection therewith, Lieff Cabraser participated in multi-national negotiations that led to Executive Agreements establishing an additional approximately U.S. $5 billion in funds for survivors and victims of Nazi persecution.

Commenting on the work of Lieff Cabraser and co-counsel in the litigation against private German corporations, entitled *In re Holocaust Era German Industry, Bank & Insurance Litigation* (MDL No. 1337), U.S. District Court Judge William G. Bassler stated on November 13, 2002:

> Up until this litigation, as far as I can tell, perhaps with some minor exceptions, the claims of slave and forced labor fell on deaf ears.  You can say what you want to say about class actions and about attorneys, but the fact of the matter is, there was no attention to this very, very large group of people by Germany, or by German industry until these cases were filed. . . .  What has been accomplished here with the efforts of the plaintiffs' attorneys and defense counsel is quite incredible. . . .  I want to thank counsel for the assistance in bringing us to where we are today.  Cases don't get settled just by litigants.  It can only be settled by competent, patient attorneys.

2.   ***Cruz v. U.S., Estados Unidos Mexicanos, Wells Fargo Bank, et al.***, No. 01-0892-CRB (N.D. Cal.).  Working with co-counsel, Lieff

Cabraser succeeded in correcting an injustice that dated back 60 years. The case was brought on behalf of Mexican workers and laborers, known as Braceros ("strong arms"), who came from Mexico to the United States pursuant to bilateral agreements from 1942 through 1946 to aid American farms and industries hurt by employee shortages during World War II in the agricultural, railroad, and other industries. As part of the Braceros program, employers held back 10% of the workers' wages, which were to be transferred via United States and Mexican banks to savings accounts for each Bracero. The Braceros were never reimbursed for the portion of their wages placed in the forced savings accounts.

Despite significant obstacles including the aging and passing away of many Braceros, statutes of limitation hurdles, and strong defenses to claims under contract and international law, plaintiffs prevailed in a settlement in February 2009. Under the settlement, the Mexican government provided a payment to Braceros, or their surviving spouses or children, in the amount of approximately $3,500 (USD). In approving the settlement on February 23, 2009, U.S. District Court Judge Charles Breyer stated:

> I've never seen such litigation in eleven years on the bench that was more difficult than this one. It was enormously challenging. . . . It had all sorts of issues . . . that complicated it: foreign law, constitutional law, contract law, [and] statute of limitations. . . . Notwithstanding all of these issues that kept surfacing . . . over the years, the plaintiffs persisted. I actually expected, to tell you the truth, at some point that the plaintiffs would just give up because it was so hard, but they never did. They never did. And, in fact, they achieved a settlement of the case, which I find remarkable under all of these circumstances.

Notice on the Firm's AV Rating: AV is a registered certification mark of Reed Elsevier Properties, Inc., used in accordance with the Martindale-Hubbell certification procedures, standards and policies. Martindale-Hubbell is the facilitator of a peer review process that rates lawyers. Ratings reflect the confidential opinions of members of the Bar and the Judiciary. Martindale-Hubbell Ratings fall into two categories—legal ability and general ethical standards.